UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION
- - -

UNITED STATES OF AMERICA,          : CASE NO. 1:21-CR-0085
                                   :
                    Plaintiff,     : MOTIONS HEARING
          vs.                      :
                                   : 20th of October, 2021
TRES GENCO,                        : 10:04 a.m.
                                   :
                    Defendant.     :

                    - - -
          EXCERPTED TRANSCRIPT OF PROCEEDINGS
     BEFORE THE HONORABLE SUSAN J. DLOTT, JUDGE
                    - - -

APPEARANCES:

For the Plaintiff:
                    Megan Gaffney-Painter, Esq.
                    Assistant United States Attorney
                    221 East Fourth Street, Suite 400
                    Cincinnati, Ohio 45202

For the Defendant:
                    Richard W. Monahan, Esq.
                    Federal Public Defender
                    250 East Fifth Street, Suite 350
                    Cincinnati, Ohio 45202

Also present:       ATF Special Agent Timur J. Housum
                    FBI Special Agent Patrick A. Gragan
                    Detective Erica Engle

Law Clerks:         Jennifer Johnson, Esq.
                    Michael Soder, Esq.

Courtroom Deputy:   William Miller

Stenographer:       Lisa Conley Yungblut, RDR, RMR, CRR, CRC
                    United States District Court
                    100 East Fifth Street
                    Cincinnati, Ohio 45202

<u>PROCEEDINGS</u>

(Proceedings held in open court at 10:04 a.m.)

\* \* \*

(Previous proceedings not included in this excerpted transcript.)

THE COURT:  Thank you, Counsel.

Mr. Miller, you can go ahead and swear the witness.

THE DEPUTY:  Raise your right hand.  You do solemnly swear that the testimony you're about to give in this case will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE COURT:  Ms. Painter, you may proceed.

MR. MONAHAN:  If she's comfortable, Judge, I would prefer that the witness have the mask off.

THE WITNESS:  I'm fine with whatever.

THE COURT:  Do you mind taking it off?

THE WITNESS:  No.

THE COURT:  I think we'll hear you much better.

THE WITNESS:  I prefer to take it off.

THE COURT:  Good.  Unfortunately, first, the mask muffles your voice, and then the Plexiglass muffles your voice, and it is a little difficult to hear with both of those.

MS. GAFFNEY-PAINTER:  Yes.  To that end, Detective

1    Engle, I'll instruct you, to the best you can, to speak into

2    that microphone.  It will help us all.

3             THE WITNESS:  Sure.

4                        ERICA ENGLE

5                     DIRECT EXAMINATION

6    BY MS. GAFFNEY-PAINTER:

7    **Q**    Detective Engle, where do you work?

8    **A**    In the Highland County Sheriff's Office.

9    **Q**    What is your title?

10   **A**    Detective.

11   **Q**    Generally speaking, what are your responsibilities as

12   a detective?

13   **A**    I would handle cases such as burglaries, higher

14   felonies.  A lot of times we assist the road cops with cases

15   that will take longer than their shift to complete.

16   **Q**    How long have you been a detective?

17   **A**    Four years.

18   **Q**    And prior to becoming a detective, how long were you a

19   police officer?

20   **A**    I've been there 20 years total.

21   **Q**    So I would like to talk now about events that occurred

22   on March 12, 2020.  Were you working that day?

23   **A**    I was.

24   **Q**    Before we get into the details of that day, in

25   connection with the events about which you are going to

1    testify, did you prepare a felony report for the Highland

2    County prosecutor?

3    **A**    I'm sorry, are you asking prior to my shift?

4    **Q**    No.  I apologize.  I mean prior to us today discussing

5    what happened on March 12, 2020, before I ask you those

6    questions --

7    **A**    Yes, I did.

8    **Q**    -- just asking did you prepare a report about these

9    events for the Highland County prosecutor's office?

10   **A**    Yes, I did.

11   **Q**    All right.  In front of you I believe is a Government

12   Exhibit binder.  Will you please turn to Tab 3?  That's

13   Exhibit 3.  Now, in front of you is what's been marked for

14   identification as Government Exhibit 3; do you recognize

15   this?

16   **A**    Yes, I do.

17   **Q**    What is it?

18   **A**    This would be my felony packet.

19        MS. GAFFNEY-PAINTER:  The government moves for the

20   admission of Government Exhibit 3.

21        THE COURT:  Any objection?

22        MR. MONAHAN:  No objection.

23        THE COURT:  Government Exhibit 3 will be admitted

24   into evidence.

25   **Q**    Now, while you were working on March 12, 2020, did you

1    respond to a residence on Stoney Point Road in Highland

2    County?

3    **A**    Yes, I did.

4    **Q**    Now, describe for us why you responded to that

5    residence on that day.

6    **A**    The road deputies received a call of a domestic

7    violence between a mother and her son and the son was in his

8    bedroom with a firearm threatening his mother.

9    **Q**    And when you say the son was in his bedroom

10   threatening his mother, is that based -- is that from the

11   call that was received or what are you basing that on?

12   **A**    That was what went out on the radio, essentially,

13   maybe not verbatim, but essentially.

14   **Q**    And to whom was that initial call placed?

15   **A**    The Highland County Sheriff's Office 911 dispatch.

16   **Q**    What did you see when you arrived at the residence in

17   response to that radio call?

18   **A**    Sergeant Craig Seaman, Deputy Brandon Young, and

19   Deputy Nick Myers, along with a female, and a male they

20   hadn't already placed in handcuffs.

21   **Q**    Can you describe for us the scene?

22   **A**    We pulled in the driveway.  It wasn't a really short

23   driveway.  It was maybe a 25-yard driveway.  There was three

24   vehicles plus the sheriff office's vehicles, a trailer, a

25   house trailer, light in color with a deck in the front, and

1    the deputies were speaking with the two individuals.

2    **Q**    Now, you mentioned a male individual.  Did you later

3    learn the name of that male individual that you saw when you

4    approached the residence?

5    **A**    I did.

6    **Q**    And what was his name?

7    **A**    Tres Genco.

8    **Q**    Looking in the courtroom today, do you see an

9    individual who is the same individual that you later

10   identified as Tres Genco present here in the courtroom

11   today?

12   **A**    I do, seated at the defendant's table.

13   **Q**    Can you please just describe an item of clothing he's

14   wearing?

15   **A**    A correction's facility jump suit.

16          MS. GAFFNEY-PAINTER:  Please let the record reflect

17   that the witness has identified the defendant, Tres Genco,

18   as the same Tres Genco that is the subject of her testimony

19   today.

20          THE COURT:  Any objection, Mr. Monahan?

21          MR. MONAHAN:  No, Your Honor.

22          THE COURT:  Okay.  The record will so reflect.

23          MS. GAFFNEY-PAINTER:  Thank you, Your Honor.

24   **Q**    When you responded to the residence on March 12, 2020,

25   how did you respond, in your vehicle, on foot, how did you

1   arrive there?

2   **A**    I was a passenger in the vehicle.  My sergeant was

3   driving.

4   **Q**    And who's your sergeant?

5   **A**    Sergeant Vincent Antinore.

6   **Q**    Were there any other individuals with you in the

7   vehicle when you approached the residence?

8   **A**    No.

9   **Q**    Upon arriving at the residence, did you exit the

10  vehicle?

11  **A**    I did.

12  **Q**    And where did you go when you exited the vehicle?

13  **A**    To the crowd of deputies and the two civilians.

14  **Q**    What, if anything, did you hear when you approached

15  that group?

16  **A**    Sergeant Craig Seaman was talking to Mr. Genco about

17  the location of a firearm.

18  **Q**    And what was -- can you describe for us what you

19  recall of that conversation?

20  **A**    Tres indicated at first that he didn't have a firearm,

21  and then stated that he did have a firearm, it was just in

22  the back seat of his Audi car that he was leaned up against.

23  **Q**    And what, if anything, did officers say in response to

24  Mr. Genco's comment about his firearm?

25  **A**    Do you care if we take a look at it, and he stated

1    that was fine.

2    **Q**    What happened in response to the defendant saying that

3    was fine?

4    **A**    Sergeant Seaman opened the driver's side door, looked

5    in the rear of the car, the back seat.  He was unable to

6    locate a firearm.  He, Tres Genco, then stated:  Then, it's

7    probably in the trunk.  Deputy Brandon Young opened the

8    trunk of the car, and underneath the car cover was -- do you

9    want me to continue?

10   **Q**    Certainly.

11   **A**    -- was a ceramic-plated body armor along with a rifle

12   and multiple boxes of ammo.

13   **Q**    Now, you had testified that there was another civilian

14   individual, a female, present on the scene during these

15   events.  Was that individual still present when this search

16   was being conducted?

17   **A**    She was.

18   **Q**    Now, did that individual have any reaction to the

19   discovery of the firearm in the vehicle?

20   **A**    She did.

21   **Q**    What was that reaction?

22   **A**    She was completely shocked and questioned Tres on her

23   own as to why he had that.

24   **Q**    And what, if anything, did the defendant say in

25   response to that individual's questions?

1  **A**     I couldn't say for certain verbatim what she said,

2  but -- or what he said, but he dismissed it as if it was no

3  big deal.

4  **Q**     Did that individual who -- do you happen to know the

5  relationship of that individual to the defendant?

6  **A**     Yes.  She identified herself as his mother.

7  **Q**     All right.  Did his mother speak with you or other law

8  enforcement about the incidents that were ongoing at the

9  residence at that time?

10  **A**     She did.

11  **Q**     And what do you recall her saying to you about it?

12  **A**     She was very distraught initially based on why she had

13  called us.  She brought into question Tres' behavior in the

14  last several months.  She explained to us several different

15  reasons why she thought his behavior was out of control,

16  erratic, not like him.  She was very concerned about his

17  behavior and what he had been up to.

18  **Q**     Now, you just testified that she relayed to you

19  certain reasons that she believed that the defendant's

20  behavior had changed.  Do you recall any of those reasons?

21  **A**     I do.

22  **Q**     Could you please share them with us?

23  **A**     She stated that in the past, one of the things that he

24  had done was -- she thought he was getting back on track and

25  had joined the military, only once he got out of the

1    military, he became a very different person.  He was very

2    agitated.  He just did things that were out of character.

3    He had traveled to Greece for ten days without knowing

4    anybody or no rhyme or reason why he went, never discussed

5    why he was leaving, never discussed with her what he was

6    going to be doing while he was there.

7          I mean, there was just multiple conversation about how

8    she just thought his behavior was off.  She had recently

9    located a firearm inside of her car.  She questioned him

10   about it.  He told her it was none of her business, don't

11   worry about it.

12   **Q**    Now, what, if anything, did his mother say about any

13   documents that the defendant had prepared?

14   **A**    His mom stated that while he was gone in the military,

15   she had cleaned his room, and when she had cleaned his room,

16   she had located a document that scared her to death about

17   killing multiple people in a large group.

18   **Q**    After the discovery of the rifle and the body armor

19   inside of the vehicle, what happened next?

20   **A**    Tres was questioned about where's the gun that his

21   mother had spoke about on the phone.  Tres did not exit the

22   residence with a firearm, so we knew the firearm located in

23   the car could not have been the firearm that his mom spoke

24   about on the phone of him having.  He stated he did not have

25   another firearm.

1    **Q**    And what, if anything, did law enforcement say in

2    response to Mr. Genco claiming he did not have another

3    firearm?

4    **A**    If I remember the conversation correctly, XXXXX -- I

5    apologize.  His mother interrupted our conversation with him

6    and essentially told him that he was lying, that just like

7    the gun that she had told us that she had found a week ago

8    in the console of her car, he did have another gun.  She

9    didn't know why he would tell us that.  We asked him, you

10   know, where is the gun that she's telling us about.  He

11   still said that he did not own one.  He was asked for

12   permission to go in his bedroom and confirm his story.

13   **Q**    What happened after law enforcement asked Mr. Genco

14   for permission to search his bedroom?

15   **A**    Tres allowed us to go look in his bedroom.

16   **Q**    After Mr. Genco provided consent to search his

17   bedroom, what did you do?

18   **A**    Well, I waited.  Sergeant Antinore placed him in the

19   rear of Deputy Myers' patrol car; instructed Deputy Myers to

20   leave the window down and wait outside that window; and

21   explained to Tres that if at any time he wanted to revoke

22   his consent to searching his bedroom, he need to relay that

23   to Deputy Myers; and instructed Deputy Myers to mark us on

24   the radio to back out of the room if at any time he decided

25   to revoke that consent.

1   **Q**      What happened after that?

2   **A**      Tres said that was fine.  Myself, Sergeant Seaman,

3   Sergeant Antinore, and Deputy Brandon Young entered the

4   residence, accompanied by Tres' mother who showed us where

5   his bedroom was.

6   **Q**      Did you participate in the search of that bedroom?

7   **A**      I did.

8   **Q**      What did you specifically search?

9   **A**      Specifically, I walked in the bedroom.  Directly to

10  the right was his bed.  In between the door and the bed was

11  a tote.  I believe I did search the closet.  I'm certain

12  that I searched more, but for the purpose of today, I did

13  search those areas.

14  **Q**      All right.  Let me stop you there.  Let's just go to

15  the beginning of your search.  So after you entered the room

16  that the mother had identified as Mr. Genco's bedroom, what

17  is the first place you searched?

18  **A**      His bed.

19  **Q**      What were you looking for while you were searching his

20  bed?

21  **A**      A handgun.

22  **Q**      You testified a bit earlier about a tote.  Can you

23  describe that tote for us?

24  **A**      It was a standard storage tote big enough to hold a

25  gun.  I don't know, 18-, 20-gallon tote, moving tote.

1    **Q**    Where was that tote located?

2    **A**    Between the doorway of the bedroom and the bed.

3    **Q**    Was there a lid on that tote when you began your

4    search of it?

5    **A**    No, there was not.

6    **Q**    And if you could, just -- I believe you just testified

7    to it, but I want to make sure that I'm correct.  What were

8    approximate dimensions of that tote?

9    **A**    I'm going to assume they're about an 18- to 20-gallon

10   moving tote.

11   **Q**    What material is that tote made out of?

12   **A**    Plastic.

13   **Q**    Was that tote large enough to have held a firearm?

14   **A**    Certainly.

15   **Q**    When you searched that tote, what did you find inside?

16   **A**    A note.

17   **Q**    If you could, before we get to the specific note, just

18   generally, what was held within that tote as far as you

19   recall?

20   **A**    Paper, clothes.  Without seeing a photograph of it, I

21   don't recall everything that was in it.

22   **Q**    Now, you just mentioned a note.  If you could, I'll

23   direct your attention to that exhibit binder, Government

24   Exhibit binder, white binder right there in front of you on

25   the table.  If you could, please, turn to the Exhibit 4 tab.

1   Do you recognize this?

2   **A**    I do.

3   **Q**    What is this?

4   **A**    This was a note pointed out by Tres' mother, the note

5   that she had found while he was away at the military.

6   **Q**    And when you had just testified that you had searched

7   the tote and found a note, is Government Exhibit 4 the note

8   that you were referencing in your testimony?

9   **A**    Yes.

10          MS. GAFFNEY-PAINTER:  The government moves for the

11   admission of Government Exhibit 4.

12          THE COURT:  Any objection?

13          MR. MONAHAN:  No objection, Your Honor.

14          THE COURT:  Government Exhibit 4 will be admitted.

15          MS. GAFFNEY-PAINTER:  Thank you, Your Honor.

16   **Q**    Detective Engle, was Government Exhibit 4 loose within

17   the plastic tote?

18   **A**    Yes.

19   **Q**    What did you do with Government Exhibit 4 after you

20   saw it inside the tote?

21   **A**    I looked at it.  Tres' mom -- I almost said her name,

22   I apologize -- she pointed out that was a note.  We looked

23   at it to make sure that it didn't have any, you know,

24   directions on where he could have put a gun, things she was

25   speaking about the gun and the things that she had talked

1    about in the note.  We set it aside.

2    **Q**    And I believe you testified earlier that she had

3    mentioned something that was the note.  Could you just

4    explain that a bit more for us?

5    **A**    She had explained that she had located a note while he

6    was gone away in the military that was very alarming.  She

7    didn't understand why he would be writing things like this.

8    **Q**    And her identification of that note, did that happen

9    while you were searching the tote?

10   **A**    Yes.

11   **Q**    What did you do with Government Exhibit 4 after you

12   saw it?

13   **A**    I set it on his mattress.

14   **Q**    Did you continue to search after setting aside

15   Government Exhibit 4?

16   **A**    Yes.

17   **Q**    You had testified earlier that multiple law

18   enforcement officers were conducting this search at the same

19   time that you were searching; is that correct?

20   **A**    Yes.

21   **Q**    All right.  What, if anything, did Sergeant Seaman

22   find in Mr. Genco's desk drawer?

23   **A**    It appeared to be a room layout.

24   **Q**    And on what did that room layout appear?

25   **A**    I believe it just was a piece of paper.

1    **Q**    Was that a loose piece of paper?

2    **A**    Yes.

3    **Q**    The desk drawer in which Sergeant Seaman found that

4    room layout you just testified about, was that drawer

5    sufficiently sized such that it could hold a handgun?

6    **A**    Certainly.

7    **Q**    Now, after Sergeant Seaman located that room layout

8    document, what did you tell Sergeant Seaman to do?

9    **A**    Just leave it.

10   **Q**    If you could, please, look back to your Government

11   Exhibit binder and turn to Government Exhibit Tab 5, please.

12   Do you recognize this?

13   **A**    I do.

14   **Q**    What is it?

15   **A**    The layout Sergeant Seaman pointed out.

16         MS. GAFFNEY-PAINTER:  Your Honor, the government

17   moves for the admission of Government Exhibit 5.

18         THE COURT:  Any objection, Mr. Monahan?

19         MR. MONAHAN:  No objection, Your Honor.

20         THE COURT:  Government Exhibit 5 will be admitted.

21   **Q**    You testified that you told Sergeant Seaman to leave

22   that document.  Did Sergeant Seaman, in fact, leave that

23   document?

24   **A**    Yes.

25   **Q**    After Sergeant Seaman left that document, did you and

1    the other officers continue the search of the bedroom?

2    **A**    We did.

3    **Q**    Did you and the other law enforcement officers locate

4    a gun during your search?

5    **A**    We did.  In fact, we located two.

6    **Q**    Could you please describe those for us?

7    **A**    One was a BB gun wrapped in a blanket, if I recall,

8    and taped up.  The other was a handgun located in the floor

9    vent heater duct.

10   **Q**    Who located the handgun that was found in the vent?

11   **A**    Deputy Brandon Young.

12   **Q**    What happened immediately after Deputy Young found the

13   gun?

14   **A**    We continued to search what was left to search, and

15   then we all decided to back out of the home.

16   **Q**    Why did you decide to back out of the home?

17   **A**    One, we felt that we had located the firearm that his

18   mother had told us about.  Secondly, we thought that we were

19   dealing more -- dealing with more than just a domestic.

20   **Q**    Did you and the other officers, in fact, exit the

21   bedroom?

22   **A**    We did.

23   **Q**    Did you and the other officers exit the home?

24   **A**    We did.

25   **Q**    What did you do immediately after you and the other

1    officers exited the home?

2    **A**    Sergeant Antinore went and spoke with Tres Genco at

3    the rear of Deputy Myers' patrol car.  He informed Tres that

4    we had located a firearm in the floor, and Tres asked for an

5    attorney.

6    **Q**    After Mr. Genco asked for an attorney, what did you

7    do?

8    **A**    We decided to come together and collectively decide

9    where we go from here.  Sergeant Seaman knew some members of

10   a larger police force; Sergeant Antinore knew some as well.

11   They contacted members of the Portsmouth Federal Bureau of

12   Investigation unit, spoke with them.  After they spoke with

13   them, we decided that we may not get the response that we

14   were looking for, but we felt as to protect the community

15   and see what we were really dealing with that we should

16   likely get a search warrant and decide what we were dealing

17   with.

18   **Q**    If you could, take a look at the Government Exhibit

19   binder in front of you on the stand there and please turn to

20   Government Exhibit 1, Tab 1.  Do you recognize this?

21   **A**    I do.

22   **Q**    What is it?

23   **A**    This would be a copy of the certified copy of the

24   search warrant I pled for.

25   **Q**    And did you, in fact, swear out this search warrant

1    with a magistrate judge?

2    **A**    I did.

3            MS. GAFFNEY-PAINTER:  The government moves for the

4    admission of Government Exhibit 1.

5            THE COURT:  Any objection?

6            MR. MONAHAN:  No objection.

7            THE COURT:  All right.  Government Exhibit 1 will

8    be admitted.

9    **Q**    Now, to be clear, Detective Engle, are you the affiant

10   on this search warrant that appears as Government Exhibit 1?

11   **A**    I am.

12   **Q**    And did a judge approve this search warrant after you

13   had drafted it?

14   **A**    Yes, Hillsboro Municipal Court Judge David McKenna.

15   **Q**    What did you do after the judge approved this search

16   warrant?

17   **A**    Myself and Sergeant Antinore returned back to Tres

18   Genco's residence.

19   **Q**    Did you execute this search warrant at that time?

20   **A**    We did.

21   **Q**    When you executed this search warrant, did you leave a

22   copy of that warrant at the home?

23   **A**    We did.

24   **Q**    Where was the mother during the execution of this

25   search warrant?

1    **A**    We later learned that she was in the parking lot of

2    our sheriff's office, but she had requested to be allowed to

3    leave in the meantime until we figured out what was going

4    on.

5    **Q**    Now, that copy of the search warrant that you left at

6    the residence, did that copy include Exhibit A?

7    **A**    It did.

8    **Q**    Detective Engle, the documents that we discussed

9    earlier, Government Exhibit 4 and Government Exhibit 5, the

10   note from the tote and the floor plan, did you seize those

11   documents when you were executing the search warrant at the

12   residence?

13   **A**    We did.

14        MS. GAFFNEY-PAINTER:  No further questions, Your

15   Honor.

16        THE COURT:  Thank you, Ms. Painter.

17        Mr. Monahan, do you wish to cross-examine?

18        MR. MONAHAN:  Take just one moment?

19        THE COURT:  Sure, take your time.

20        MR. MONAHAN:  Good morning, Detective Engle.

21        THE WITNESS:  Good morning.

22        MR. MONAHAN:  As you know, I'm Richard Monahan.  I

23   represent Tres Genco.

24                        CROSS-EXAMINATION

25   BY MR. MONAHAN:

1    **Q**    Okay.  So discussing the day, March 12, 2020, correct?

2    **A**    (Nodding head.)

3    **Q**    You indicated that you were dispatched to that

4    residence because Mr. Genco you learned was the individual

5    that was basically locked in his bedroom with a firearm,

6    correct?

7    **A**    I was not.  I responded to the residence.  The road

8    guys, the road deputies, were dispatched to that residence,

9    yes.

10   **Q**    Okay.  And I was trying to get to you learned --

11   **A**    Sorry.

12   **Q**    -- either from the dispatcher or when you got there,

13   Mr. Genco's locked in his bedroom with a firearm, was the

14   basic allegation?

15   **A**    Right.

16   **Q**    Okay.  This is a trailer or mobile home, you

17   indicated?

18   **A**    Yes.

19   **Q**    So Mr. Genco has his own bedroom and the mother has

20   her own bedroom; is that your understanding?

21   **A**    Yes.

22   **Q**    Okay.  So at some point, the discussion with Mr. Genco

23   turns to a handgun, correct?

24   **A**    Yes.

25   **Q**    And the mother has indicated that he has a handgun,

1    and basically the officers went to search to try to find the

2    handgun, correct?

3    **A**    Yes.

4    **Q**    And Mr. Genco was asked for his consent to search his

5    bedroom for this handgun, correct?

6    **A**    Yes.

7    **Q**    And he gave consent to search his bedroom for a

8    handgun, correct?

9    **A**    Yes.

10   **Q**    And as a result of that consent, you and fellow

11   officers went to Mr. Genco's bedroom to search for a

12   handgun, correct?

13   **A**    Along with his mother, yes.

14   **Q**    To search for a handgun, correct?

15   **A**    Yes.

16   **Q**    Okay.  His mother was not searching for a handgun; I

17   assume that wouldn't be police procedure, to have the mother

18   search?

19   **A**    No.  She was standing in the doorway of the bedroom, I

20   would call it essentially supervising us.

21   **Q**    Okay.  So she showed you where the bedroom was, I

22   believe is what you said earlier, correct?

23   **A**    Yes.

24   **Q**    Okay.  And then she stood in the doorway to the

25   bedroom, correct?

1    **A**    Right.

2    **Q**    All right.  So you and two other officers go into Mr.

3    Genco's bedroom to search for a handgun, correct?

4    **A**    Three, I believe.

5    **Q**    I'm sorry.  So it was a total of four officers?

6    **A**    Yes.

7    **Q**    Including yourself?

8    **A**    Yes.

9    **Q**    Okay.  And the only permitted purpose at that point is

10   to look for a handgun, correct; we were clear on that?

11   **A**    Right.

12   **Q**    Okay.  Now, you've indicated you first searched the

13   bed, correct?

14   **A**    Yes.

15   **Q**    And then you searched this tote that you had referred

16   to, correct?

17   **A**    Yes.

18   **Q**    All right.  I believe you identified the tote as

19   approximately 18 to 20 gallons, correct?

20   **A**    Yes.

21   **Q**    And it contained a bunch of items?

22   **A**    Right.

23   **Q**    I think if I heard you right, what you said was

24   papers, clothes, photographs, and you did not remember for

25   sure what else, or did I hear you wrong?  I'm sorry if I

1   did.

2   **A**    No, I'm sure you heard me right.  I just am not

3   certain without seeing a photograph.  It has been quite some

4   time since I looked at this case file to be certain of

5   everything that was in it.  I do recall looseleaf paper,

6   miscellaneous items; I don't recall what those were.

7   **Q**    Okay.  Let's take a look at Defendant's Exhibit No. 6,

8   and this would be in the black book that should be up there.

9   It is the last exhibit on the last tab.  Take a quick look

10  at that.  And I believe that was a receipt for property

11  during the search warrant that was prepared, it appears, by

12  you; is that correct?

13  **A**    Yes.

14  **Q**    Okay.  So let's take a look at second page of

15  Defendant's Exhibit 6.  And I believe what is reflected on

16  this page will be the items that were seized when you came

17  back later with the search warrant; is that correct?

18  **A**    Yes.

19  **Q**    Okay.  So I see on -- kind of prominently on this page

20  a "red tote beside bed" mentioned over and over and over on

21  this return; do you see that?

22  **A**    Yes.

23  **Q**    I presume that is the tote to which we are referring

24  that you searched in the bedroom?

25  **A**    Yes.

1    **Q**    Okay.  So let's take just a quick moment.  These are

2    items I believe we know that you found in that tote, a Mead

3    notebook, correct?

4    **A**    Yes.

5    **Q**    Hotel stationery with plan, correct?

6    **A**    Yes.

7    **Q**    And I believe that references the one-page document

8    that is Government Exhibit No. 4; is that correct?

9    **A**    Yes.

10   **Q**    Okay.  We also see there was a composition notebook,

11   correct?

12   **A**    Yes.

13   **Q**    Orange slash black zip bag with miscellaneous items,

14   correct?

15   **A**    Yes.

16   **Q**    Blue slash tan all-weather tactile notebook, correct?

17   **A**    Yes.

18   **Q**    A white/blue book, correct?

19   **A**    Yes.

20   **Q**    A 2018/2019 planner?

21   **A**    Yes.

22   **Q**    And a camouflage planner?

23   **A**    Yes.

24   **Q**    So we know at least those items were also in this red

25   tote when you first opened and searched it, correct?

1    **A**    Yes.

2    **Q**    Okay.  There may have been others, but you don't

3    remember at this point?

4    **A**    I mean, no.

5    **Q**    Okay.  You mentioned clothing.  You mentioned

6    photographs.  So potentially, there were some things that

7    were not seized during the search warrant?

8    **A**    Right.

9    **Q**    Okay.  So it sounds like it was a fairly full tote

10   given the size you've explained and the number of items that

11   were in there, correct?

12   **A**    Without seeing the picture -- again, I haven't looked

13   at this case file in quite some time.  I would assume that

14   there was quite a bit of stuff in it, yes.

15   **Q**    Okay.  This note -- let's turn now to Government's

16   Exhibit No. 4, which is the note that I believe you found in

17   this tote, correct?

18   **A**    Yes.

19   **Q**    Okay.  This was not laying on top of that tote,

20   correct?

21   **A**    I wouldn't think it was laying on top.  Again, I'm

22   sure we photographed it.  It was in the tote.

23   **Q**    Okay.  But to your recollection, it was not the very

24   first thing?

25   **A**    I cannot testify to where at in the tote.

1    **Q**    Okay.  And it was loose, it was not in one of

2    notebooks, it was not in the bag that was mentioned, it was

3    just laying amongst the other items in there?

4    **A**    It was in the tote, and Tres' mother pointed it out.

5    **Q**    Okay.  So my question was:  It was not in one of the

6    notebooks, it was not in a bag, it was just loose, or do you

7    not remember?

8    **A**    I do not recall.  I know Tres' mother pointed it out.

9    **Q**    So she's standing back in the doorway, correct?

10   **A**    She's standing in the doorway right beside me, yes.

11   **Q**    Okay.  So you're digging through this tote looking for

12   a gun, correct?

13   **A**    Right.

14   **Q**    Are you also looking for this piece of paper?

15   **A**    No.

16   **Q**    All right.  So this piece of paper is one page, right?

17   **A**    Yes.

18   **Q**    Obviously, it doesn't contain a gun or hide a gun,

19   correct?

20   **A**    Right.

21   **Q**    So this piece of paper had nothing to do with finding

22   a handgun in his room, correct?

23   **A**    Essentially, no.

24   **Q**    Okay.  What do you mean by "essentially"?

25   **A**    His mother wanted us to see it.  She pointed it out.

1    She had talked about it.  She said that it talked about

2    killing people.  So we did look at the note to see if there

3    was -- it said something about where a gun was at, so I did

4    look at the note, yeah.

5    **Q**    I'm sorry, "said something about where a gun was at"?

6    **A**    No.  I looked at the note to see if it said that he

7    had a gun.  At this point, he says he doesn't and his mom

8    says he does.

9    **Q**    This was a note -- this was a note, your understanding

10   was, he wrote before he went to the military, correct?

11   **A**    Yes.

12   **Q**    And he was in the military from August to December of

13   the preceding year?

14   **A**    At that time, we didn't know when he went to the

15   military.

16   **Q**    But you knew he had been in the military?

17   **A**    Right.

18   **Q**    And you knew it was a note he wrote before he went to

19   the military?

20   **A**    Right.

21   **Q**    So a note written some months before wouldn't relate

22   to where a gun is in his room today, certainly?

23   **A**    (Shaking head.)  It could have.

24   **Q**    No connection there, right?

25   **A**    Huh?

1    **Q**    There's no logical connection there, on where a gun

2    would be in his room today on a note his mother told you was

3    written when he went to the military?

4    **A**    I have no way to know that.

5    **Q**    I'm just asking you as a matter of logic.  You're

6    searching for a gun today and you're looking at a note

7    written months ago to find a gun today?

8    **A**    I will look anywhere to find a gun today if it means

9    saving the public from being shot.

10   **Q**    Okay.  But we agree the note itself doesn't conceal a

11   gun?

12   **A**    Agreed.

13   **Q**    Pardon?

14   **A**    I agree.

15   **Q**    Okay.  All right.  So this note, you read it, correct?

16   **A**    I did not look at it in great depth, no.  I looked at

17   it, and she explained what it was.  It was set aside.

18   **Q**    You didn't read the note?

19   **A**    I looked over it.  I mean, I wouldn't say that I sat

20   here and said it was a 5-minute conversation about what was

21   on it, no.

22   **Q**    So you said you looked over it?

23   **A**    Um-hmm.

24   **Q**    When you looked over it, did you read the words?

25   **A**    I did.

1    **Q**    Okay.  So you read the note?

2    **A**    Yes.

3    **Q**    Okay.  Did you read the note top to bottom?

4    **A**    I mean, I glanced at it.  It didn't say nothing about

5    a gun, as far as where one could be.

6    **Q**    So did you read -- do you remember how much of the

7    note you read?  That's what I'm trying to get at.

8    **A**    Well, I would have looked at the entire note to see if

9    it said anything about the gun, if he had one or owned one.

10   **Q**    So you did read all of the words on the note?

11   **A**    Yes.

12   **Q**    Okay.

13        THE COURT:  Mr. Monahan, can you keep your voice up

14   a little?

15        MR. MONAHAN:  I'm sorry, Judge.

16        THE WITNESS:  I'm sorry.

17   **Q**    And then you set it on the bed, is that right, after

18   you read it?

19   **A**    Yes.

20   **Q**    Okay.  Now, you've indicated that my client's mother

21   was in the doorway telling you about this note?

22   **A**    Yes.

23   **Q**    And I guess when you reached the point in the tub

24   where you got to the note, she said that's the note?

25   **A**    Yes.

1    **Q**    Did you indicate that in the search warrant you filled

2    out, that the mother pointed you to that note?

3    **A**    If I can reflect back to my affidavit, I believe I

4    did, but if I can take a minute to read my affidavit.

5    **Q**    That's Government Exhibit 1, if you wanted to look.

6    **A**    I don't believe that -- it's not in my affidavit, no.

7    **Q**    Okay, okay.  And you did not -- when you saw this note

8    or when the mother told you, pointed you to this note, you

9    did not go back to Mr. Genco and ask for his consent to read

10   paperwork in his room, did you?

11   **A**    No.

12   **Q**    Did any officer do that?

13   **A**    No.

14   **Q**    All right.  There was also a second piece of paper

15   found that I believe you've identified as Government's

16   Exhibit No. 5?

17   **A**    Yes.

18   **Q**    That was found, you indicated, in a desk, correct?

19   **A**    Yes.

20   **Q**    Was that also a loose piece of paper?

21   **A**    Yes.

22   **Q**    Are you saying today that the mother made any

23   statements about this document?

24   **A**    No.

25   **Q**    All right.  Do you recall what other items were in the

1    desk drawer that were in there along with that piece of

2    paper?

3    **A**    If I can refer to my inventory.

4    **Q**    That was going to be the next step, so yes, please.

5    It's the third page of the inventory.

6    **A**    Okay.  Yeah.

7    **Q**    Okay.  So rather than read through all of this, I know

8    the judge can read it, it's page -- it's the third page of

9    the receipt for property, and I would just have you identify

10   it looks like Items 11 through 19 were all found in the desk

11   drawer, correct, by you?

12   **A**    Yes.

13   **Q**    Okay.  So again, this piece of paper, this

14   Government's Exhibit No. 5, it was not laying on top of that

15   desk drawer, or do you remember?

16   **A**    No, it wasn't.

17   **Q**    Okay.  Again --

18   **A**    I'm sorry, Counselor, could you ask that again?  Like

19   when you said it wasn't "laying on top of that desk drawer,"

20   it wasn't laying on the counter.  It was in the desk drawer.

21   **Q**    Yeah.  So you opened the desk drawer?

22   **A**    Yes.

23   **Q**    It's not the top of the pile there?

24   **A**    I don't recall.  Sergeant Seaman is the one that

25   located that.

1    **Q**    Okay.

2    **A**    I collected it as evidence in a search warrant.

3    **Q**    Okay.  All right.  So the two pieces of -- did you --

4    this drawing, this Government's Exhibit No. 5, you did in

5    fact look at this drawing at the house?

6    **A**    I don't -- I think we all just probably discussed it.

7    I don't know that I actually looked at it before the search

8    warrant, no.

9            MR. MONAHAN:  Okay.  All right.  Your Honor, may I

10   have a moment with my client?

11           THE COURT:  Certainly.

12       (Pause.)

13           MR. MONAHAN:  We have no further questions, Judge.

14   Thank you.

15           THE COURT:  Mr. Monahan, do you want to move for

16   admission of Defendant's Exhibit 6?

17           MR. MONAHAN:  Yes.  We would move to admit

18   Defendant's Exhibit 6.

19           MS. GAFFNEY-PAINTER:  No objection, Your Honor.

20           THE COURT:  All right.  Defendant's Exhibit 6 will

21   be admitted.

22           MR. MONAHAN:  Thank you, Your Honor.

23           THE COURT:  Any redirect, Ms. Painter?

24           MS. GAFFNEY-PAINTER:  Very briefly, Your Honor.

25   May I proceed?

1          THE COURT:  Yeah, you may proceed.

2          MS. GAFFNEY-PAINTER:  Thank you.

3                REDIRECT EXAMINATION

4    BY MS. GAFFNEY-PAINTER:

5    **Q**    Detective Engle, will you please turn to Government's

6    Exhibit 1 in your exhibit binder?  You were asked some

7    questions by Mr. Monahan about the search warrant that you

8    got for the residence.  Do you recall those questions?

9    **A**    Yes.

10   **Q**    All right.  If you could, please turn to the fourth

11   page of Government Exhibit 1.  Now, first, I'd like to

12   direct your attention to the first paragraph that appears on

13   the fourth page of Government Exhibit 1.  If you could, go

14   five lines down of the first paragraph, and will you please

15   read to us the sentence that begins with the word "while"?

16   **A**    While searching for the firearms, Affiant observed

17   several alarming articles of paper, including:  A layout of

18   what appeared to be some sort of business; hotel stationery

19   that indicated a plot to possibly facilitate a mass shooting

20   on May the 23rd, 2020 at OSU, including the killing of 3,000

21   people with an M-16 rifle; training needed to facilitate

22   this act; secondary plans to carry out an ambush in a

23   populated area.

24          THE COURT:  Could you slow down?  The court

25   reporter has got to get everything you say.

1          THE WITNESS:  I apologize.

2          THE COURT:  That's okay.  Just slow down a little

3    bit.

4    **Q**    Yes.  And if you could, I'll just have you read that

5    single sentence.  And, forgive me, I believe you omitted

6    just a couple of words when you were reading about the

7    layout.  So if you wouldn't mind just starting from the

8    beginning with the word "while," reading slowly for the

9    court reporter, and stopping when you get to the period of

10   that sentence.

11   **A**    "While searching for the firearms, Affiant observed

12   several alarming articles of paper, including:  A layout of

13   what appeared to be some sort of room or business; hotel

14   stationery that" -- that sentence is really long.  So all

15   the way to the period?

16   **Q**    Yes, please.

17   **A**    -- "that indicated a plot to possibly facilitate a

18   mass shooting on May the 23rd, 2020 at OSU, including a

19   killing of 3,000 people with an M-16 rifle; training needed

20   to facilitate this act; secondary plans to carry out an

21   ambush in a populated area.

22   **Q**    Thank you, Detective.

23          Now I'm going to direct your attention to the next

24   paragraph that appears on that same page, so we're still on

25   page 4, Government Exhibit 1.  Now we're in the second

1  paragraph.  If you go seven lines down, there is a sentence

2  that begins -- on the end of that line, it begins with a

3  woman's name.  Without reading that woman's name out loud,

4  you can say "individual," will you please read the remainder

5  of that sentence that appears there?

6  **A**    Individual spoke of a letter she had read that was

7  what she believed a plan for Tres to harm a lot of people;

8  however, she could not remember exactly when it was or where

9  it went.

10  **Q**    Now, Detective Engle, as you read that sentence, you

11  read the word "not," "however, she could not remember."

12  That's what I recall your testimony to be.  Does the word

13  "not" appear there?

14  **A**    No.

15  **Q**    Was that what you intended when you wrote this

16  document?

17  **A**    Right, yes.  I would like to correct that on the

18  record now.

19  **Q**    Do you intend the word "not"?  This is a typographical

20  error?  I just wanted to be clear about what appears in the

21  document and what we're discussing.

22  **A**    Right.  Reading it out loud, it made more sense.

23        MS. GAFFNEY-PAINTER:  Okay.  No further questions,

24  Your Honor.

25        THE COURT:  Thank you.

1          Any recross examination, Mr. Monahan?

2          MR. MONAHAN:  A little, Your Honor.  Thank you.

3          THE COURT:  All right.  You may proceed.

4                    RECROSS-EXAMINATION

5     BY MR. MONAHAN:

6     **Q**    Might have made it more confusing.  You indicated in

7     testimony earlier that Mr. Genco's mother found this note

8     while cleaning when he was in the military, correct; that's

9     what you said earlier?

10    **A**    Right.

11    **Q**    Okay.  So does reading what the prosecutor just had

12    you read change that opinion somehow, that this was a note

13    written before he went to the military?

14    **A**    Does it change my opinion?

15    **Q**    Yes.

16    **A**    I mean, I would agree that it was a note written

17    before he went to the military, yes.

18    **Q**    Okay, okay.  And then circling back to the other

19    portion of this that the prosecutor had you read, it sounds

20    like before you got this affidavit, you had learned that you

21    believed this stationery -- and I'm back on the top

22    paragraph of page 4 of Government Exhibit 1, the section she

23    had you read.  A layout of what appeared to be some sort of

24    room or business, I assume that refers to Government

25    Exhibit 5, the drawing?

1    **A**     Yes.

2    **Q**     So you did, it sounds like, look at the drawing in

3    order to prepare this affidavit, correct?

4    **A**     I believe it was discussed of what it -- when we were

5    searching for the gun, it was an open discussion.  I

6    wouldn't say verbatim exactly what was said, but I would

7    assume that it was along the lines of, look, I mean, this

8    looks like a drawing of a building.

9    **Q**     So either you or some of the officers actually looked

10   at this piece of paper in order to know this information to

11   put it in the search warrant, correct?

12   **A**     Yes.

13   **Q**     Okay.  And then the next thing Ms. Gaffney-Painter had

14   you read, hotel stationery that indicated a possible plot to

15   facilitate a mass shooting on May 23rd at a university,

16   including the killing of 3,000 people with an M-16 rifle.

17   So that reflects a good deal of reading what was in that

18   note, correct?

19   **A**     I would agree that when I read it, I thought it was

20   alarming, yes.

21   **Q**     And that --

22   **A**     I remember that.

23   **Q**     That reflects that you picked up that it was an M-16

24   rifle, the killing of 3,000 people, a specific date, all of

25   those were items that you read in that piece of paper,

1    correct?

2    **A**    Yes.

3    **Q**    And training needed to facilitate this act, that was

4    also something you read in that note?

5    **A**    Yes.

6    **Q**    And secondary plans to carry out an ambush in a

7    populated area, that was also something you read in that

8    note?

9    **A**    Yes.

10        MR. MONAHAN:  I don't have any further questions.

11        THE COURT:  Thank you, Mr. Monahan.

12        Anything else, Ms. Painter?

13        MS. GAFFNEY-PAINTER:  No.  Thank you, Your Honor.

14        THE COURT:  Okay.  Detective Engle, the Court

15    appreciates your testimony and you are excused.  Thank you.

16        (The Witness left the stand at 11:02 a.m.)

17                        *  *  *

18        (Proceedings continued but are not contained within

19    this excerpted transcript.)

20              **C E R T I F I C A T E**

21        I certify that the foregoing is a correct transcript of
     the record of proceedings in the above-entitled matter
22    prepared from my stenotype notes.

23    /s/ *Lisa Conley Yungblut*                    10/27/2021
          LISA CONLEY YUNGBLUT, RDR, RMR, CRR, CRC      DATE

24

25

1                    **I N D E X**

2 **GOVERNMENT'S WITNESS:   ERICA ENGLE                      PAGE**

   DIRECT EXAMINATION      BY MS. GAFFNEY-PAINTER:        3
3  CROSS-EXAMINATION       BY MR. MONAHAN:               20
   REDIRECT EXAMINATION    BY MS. GAFFNEY-PAINTER:       34
4  RECROSS-EXAMINATION     BY MR. MONAHAN:               37

5                  **E X H I B I T S**

6      **GOVERNMENT'S       PAGE IDENTIFIED     PAGE ADMITTED**
        Exhibit 1              18                  19
7       Exhibit 3               4                   4
        Exhibit 4              14                  14
8       Exhibit 5              16                  16

9      **DEFENDANT'S        PAGE IDENTIFIED     PAGE ADMITTED**
        Exhibit 6              24                  33

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25