**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | |
| vs. | : | Case No. 1:21CR085 |
| TRES GENCO, | : | Judge Dlott |
| Defendant. | : | |

## POST HEARING BRIEF OF DEFENDANT TRES GENCO

### Table of Contents

I. Officers not authorized to read private papers in warrantless search. (R. 25) . . . . . . . . p. 2

    A. Facts adduced at suppression hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 2

    B. Application of law to facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 4

        1. Scope of consent limited to search of bedroom for gun. . . . . . . . . . . . . p. 4

        2. Plain view doctrine inapplicable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 5

        3. Mother had no actual or apparent authority to consent. . . . . . . . . . . . . p. 6

        4. Suppression is the appropriate remedy . . . . . . . . . . . . . . . . . . . . . . . . . p. 7

II. The search warrant for the residence – no probable cause. (R. 26) . . . . . . . . . . . . . . p. 8

    A. Warrant lacking in probable cause. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 8

    B. Good faith does not save the warrant. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 10

    C. Particularity issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 13

III. The Glock handgun is not a machine gun as a matter of law. (R. 28) . . . . . . . . . . . p. 13

IV. Other remaining motions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 15

V. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 16

# BRIEF

Now comes the Defendant, TRES GENCO, by and through counsel, and hereby submits his post-hearing brief in this matter as follows.

This post hearing brief addresses three issues that were either raised at the motion hearing or argued in the pleadings. First, whether the officers were authorized to read private papers of Mr. Genco in his bedroom during a warrantless search for a firearm. (R. 25, Motion to Suppress Evidence from Warrantless search). Second, whether the search warrant for the residence was supported by probable cause. (R. 26, Motion to Suppress Evidence Seized in Search Warrant). Third, whether the handgun in this case qualifies as a machine gun as a matter of law. (R. 28, Motion to Dismiss Count 2). Each of these issues are addressed in turn below.

**I. Officers not authorized to read Mr. Genco's private papers in warrantless search. (R. 25).**

**A. Facts adduced at suppression hearing**

As relevant to this motion to suppress, Detective Engle testified at the suppression hearing that she responded to the residence of Tres Genco based on a report that he was locked in his bedroom with a gun. (Tr. p. 21). Upon arrival, Mr. Genco's mother indicated repeatedly that Mr. Genco had a gun with him in the bedroom, and told officers that she had seen it in the car the week before. (Tr. 11). The officers knew the gun still had to be in the bedroom because they observed Mr. Genco exit the house and he did not have the gun with him. (Tr. p. 10). As such, the officers requested consent from Mr. Genco to search his bedroom for the gun. (Tr. p. 22). Mr. Genco gave consent for the officers to search the bedroom for the gun. (Tr. p. 22). As a result, the officers went to Mr. Genco's bedroom to search for the gun. (Tr. p. 22).

Detective Engle testified that prior to searching the bedroom, she learned from Mr. Genco's mother that she had found a concerning note in Mr. Genco's room that he had written

months prior, before he had gone into the military. (Tr. p. 29). Although Detective Engle testified that she was only looking for the handgun and not this note (Tr. p. 27), the detective claimed at the hearing that the mother actually stood in the doorway to the bedroom and pointed out the note when the detective found it in the plastic bin. (Tr. pp. 13-14). This alleged fact was not contained in the sworn affidavit filed by the officer in the case. (Tr. p. 31; Gov Ex. 1). Nor was this claim contained in the official police report prepared by the detective and admitted into evidence by the government. (Gov. Ex. 3). Likewise, this alleged fact was not in the government's statement of facts in the filed response. (R. 32).

At any rate, it is not disputed that Detective Engle did in fact search the tub and locate the one page note that is Government Exhibit 4. The tote contained a large number of items including papers, clothes, notebooks, photographs, and other miscellaneous items. (Tr. pp. 23-27). Regarding the location of the note within the tote, Detective Engle testified that she "wouldn't think it was laying on top" (Tr. p. 26), but she had no idea otherwise where the note was located in the tote. (Tr. p. 26-27). In fact, she could not even remember if the note was loose in the tote, inside a notebook, within a bag, or otherwise. (Tr. p. 27). Nonetheless, she apparently found it somewhere in the tub.

Detective Engle was then asked whether she read the note. (Tr. p. 29). She first responded that she "did not look at it in great depth, no." (Tr. p. 29, Line 16). When asked again if she read the note, she said she "looked it over." (Tr. p. 29, Line 19). When asked a third time if she actually read the note, she admitted "I did." (Tr. p. 29, Line 25). But then when counsel attempted to confirm if she read the whole note top to bottom, she claimed that she just "glanced at it." (Tr. p. 30, Line 4). During recross examination, however, it became very clear that the officer read the full note, top to bottom in great detail. In fact, not only did Detective Engle read the whole note,

she recited significant portions of it back in the search warrant affidavit. (Tr. pp. 38-39; Gov. Ex. 1).

Detective Engle also separately claimed that she read the note in order to determine the location of the firearm in the room. (Tr. p. 14; 28). This statement strained credibility. Detective Engle already knew that Mr. Genco had a gun in his room because (1) his mother said he had it in his room, (2) the mother had seen the gun the week before, and (3) the officers observed Mr. Genco come out of his room and did not have the gun with him. More importantly, Detective Engle admitted repeatedly that she knew the note was written **before** Mr. Genco had entered the military. (Tr. p. 28). So the detective's claim that she read the note (written months before) to determine the location of the gun (on March 12, 2020) was obviously an after the fact justification as to why she improperly read the note while ostensibly searching for a gun.

After Detective Engle located and read the note in the tub, a second police officer found a drawing in the desk drawer (Gov.Exhibit 5) among a large number of other items in the drawer. (Tr. pp. 31-32). At no point did the officers seek consent from Mr. Genco to search for or read papers in his room. (Tr. p. 31).

**B. Application of law to facts**

**1. Scope of consent limited to search of bedroom for gun**

As noted in Mr. Genco's motion to suppress (R. 25), "'When law enforcement officers rely upon consent as the basis for a warrantless search, the scope of the consent given determines the permissible scope of the search.'" United States v. Henry, 429 F.3d 603, 616 (6th Cir. 2005) (quoting United States v. Garrido-Santana, 360 F.3d 565, 575 (6th Cir.), cert. denied, 542 U.S. 945 (2004)). "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness-what would the typical reasonable person have

understood by the exchange between the officer and the suspect?" Florida v. Jimeno, 500 U.S. 248, 251 (1991). "The scope of a search is generally defined by its expressed object." Id. When officers act beyond the scope of permissible consent in conducting a search, the seized evidence must be suppressed. United States v. Henry, 429 F.3d 603, 616-17 (6th Cir. 2005).

The government in its response did not dispute this law at all, nor did it argue that Mr. Genco somehow consented for officers to read his private papers. Rather, the government essentially argued that the officers saw the private papers "incidentally" while searching for the gun and accordingly the papers should not be suppressed. The government cited no law for this proposition.

### 2. Plain view doctrine inapplicable

It appears that the government may have been arguing the doctrine of "plain view." Under the plain view standard, officers may, while lawfully searching a location, seize other evidence that is in "plain view" during the search. Horton v. California, 496 U.S. 128, 136 (1990). In order for an item to be considered in "plain view," however, the object's incriminating nature must be "immediately apparent." Id. at 136-37; United States v. McLevain, 310 F.3d 434, 438 (6th Cir. 2002).

In this context, the Sixth Circuit has directly held that a document may not be read by an officer in a search for other evidence. More precisely, in United States v. Garcia, 496 F.3d 495 (6th Cir. 2007), the Sixth Circuit ruled as follows:

> The precise issue we must address here is whether a document, even though in plain view, is within the plain view exception if it must be read in order for its incriminating nature to be determined. We hold that it is not.

Id. at 510. Relying on the "immediately apparent" requirement, the court unambiguously held that officers searching for cocaine could not read papers. Id. Accordingly, the court held that seizure of the defendant's private papers was not supported by the plain view exception.

The present case is no different. Officers were indisputably given permission by Mr. Genco to search his bedroom for a handgun. The permission was limited to the handgun solely, and the officers did not seek further permission from Mr. Genco to conduct any more expansive of a search. While searching for the handgun, the officers fully read the two private papers that are at issue in this motion. Based on the above-cited law, the police were absolutely not permitted to read these private papers while conducting this search. As such, the papers must be suppressed.

### 3. Mother had no actual or apparent authority to consent

While not argued in the government's response, an additional issue was debatably presented at the motion to suppress hearing as it related to whether Mr. Genco's mother consented to the search. If the detective's testimony were believed, Mr. Genco's mother directed the officer (from the doorway of the bedroom) to locate the paper. Notably, this evidence was not contained in the government's response filed with the Court (R. 32), the sworn and detailed affidavit prepared by this officer on the subject (Gov. Ex. 1), nor the extensive police report prepared related to this incident (Gov. Ex. 3). Nonetheless, the officer made this claim at the hearing.

The credibility of the statement aside, it requires little pause. The government did not even attempt to establish that the mother had either actual or apparent authority to consent to a search of Mr. Genco's private papers. United States v. Waller, 426 F.3d 838, 847-48 (6th Cir. 2005)(finding no actual or apparent authority for search of cohabitant property). In fact, it was patently clear that Mr. Genco had his own separate bedroom and that he had, that very day, locked his mother out of it. Further, Mr. Genco and his mother were at odds with each other and

repeatedly arguing about a number of things in front of the police officers. Thus, no reasonable officer could possibly believe that the mother had authority to consent to a search of documents in Mr. Genco's room. Accordingly, the violation of the Fourth Amendment in the officers reading Mr. Genco's private papers is apparent.

**4. Suppression is the appropriate remedy**

As such, the government is left with its argument that even though the Fourth Amendment was clearly violated in this case, the Court should choose not to suppress the evidence based on the Supreme Court's decision in Herring v. United States, 555 U.S. 135, 141 (2009). This argument is rarely applicable where a clear Fourth Amendment violation is present. In fact, Judge Cole of this Court recently wrote a lengthy decision explaining why the Herring rule should not apply to police conduct that was, as here, not objectively reasonable. See United States v. Chivers, 1:19CR119, at R. Doc. # 73, pp. 31-38 (S.D. Ohio 2021).

Sixth Circuit law on "plain view" and reading documents is crystal clear: Officers may not do it. More than a decade ago, published Sixth Circuit case law indisputably holds that officers may not read a suspect's documents while searching for other evidence. See Garcia, 496 F.3d at 510 (discussed above). Thus, no objectively reasonable officer could believe that it was permissible to read papers in Mr. Genco's room while searching for a gun. As Judge Cole noted in Chivers, no well-trained officer could have understood this search to be legal. Admittedly, these were not federal agents, but rather local officers in the small town of Hillsboro, Ohio. But the standard is not subjective; rather, the Court must consider whether an objectively reasonable officer would have understood the law. Herring, 555 U.S. at 145; Chivers, at R. Doc. # 73, p. 33.

Where, as here, the officers' actions in conducting the search were clearly objectively unauthorized, the deterrent value of suppression "tends to outweigh the resulting costs." Davis v.

7

United States, 564 U.S. 229, 238 (2011). Thus, suppression is favored where officers have not acted objectively reasonably.

Moreover, in the present case, the societal cost of suppression is particularly low. This is prominently true because Mr. Genco has already been prosecuted and sentenced in state court for the precise conduct he is now charged with federally. At the time of his arrest, the federal authorities chose to stand by and agreed with the State of Ohio proceeding with charges. The state built the case, and prosecuted Mr. Genco for making terroristic threats. Mr. Genco was convicted and sentenced to 17 months in prison. It was not until Mr. Genco had completed his prison sentence with Ohio and reintegrated into the community, living in a halfway house for several months and working a job, that the federal authorities had him arrested and taken back into custody. Thus, given that Mr. Genco has already been fully prosecuted and punished to the full extent of the state law for the very conduct now at issue, the societal cost of suppression of wrongfully seized evidence is extraordinarily low. As such, the narrow doctrine of Herring is inapplicable.

Accordingly, Mr. Genco requests that the Court suppress the documents unlawfully read by officers at his residence and later utilized to obtain a search warrant in this case.

## II. The search warrant for the residence was not supported by probable cause. (R. 26)

### A. Warrant lacking in probable cause

The Hillsboro authorities obtained a search warrant for Mr. Genco's residence based on an alleged violation of Ohio's statute for Making Terroristic Threats. Mr. Genco argued in his motion that probable cause did not support this search warrant because law enforcement had no evidence that Mr. Genco actually made a threat under the law. The government argued in its response that the state law does not require that the threat be communicated to the victim, thus the search warrant was sufficient.

While this is true, the government's argument is clearly more smoke than fire. Admittedly, the Ohio law does not require that the terroristic threat be communicated to the intended victim of the offense. ORC § 2902.23(B). In spite of this observation, however, this does not obviate the need of a "threat" altogether. The issue hedged by the government in its filing is that the law does patently require a "threat" be made. The relevant portion of the statute provides that the defendant must "make the threat with purpose to . . . intimidate or coerce a civilian population." O.R.C. §2909.23(A)(1).

Ohio case law fleshes out that this statute requires that the defendant made a "threat," meaning that he communicated an "intent to inflict harm or loss on another." Ohio v. Klingel, 88 N.E. 3d 455, 459 (9th App. Dist. 2017). Further, the "threat" must have been "uttered . . . for the purpose of . . . intimidating or coercing a civilian population or affecting the conduct of any government." Id. at 461 (citing Ohio v. Baughman, 2012 WL 5834161, at ¶ 26 (6th App. Dist.2012)).

This is clearly not a law that targets thoughts, or even planning. It targets action. It targets individuals who communicate threats to others. As such, at a minimum, the officers needed probable cause to believe that Mr. Genco uttered a threat. Creating a single page note and a drawing that Mr. Genco kept in the quiet privacy of his own room clearly could not constitute the making of a terroristic threat under any expansive stretch of that law. Accordingly, the search warrant was markedly lacking in probable cause for the offense.

This argument applies *a fortiorari* when the references to the writings found in Mr. Genco's room are stricken from the affidavit because they were improperly seized, as outlined in the preceding section of this brief. With this evidence excised, there is not a shred of evidence that Mr. Genco made terroristic threats to harm a civilian population. Possessing two guns (which is

tremendously common in rural Ohio) and arguing with his mother do not even register on the probable cause scale to establish the making terroristic threats offense.

As a final note, the government made a rather unusual argument that because Mr. Genco was convicted in state court, there must have been probable cause for the search warrant. (See Gov. Response, p. 7-8). It is true that Mr. Genco entered an Alford plea on September 17, 2020, a full six months **after** the search warrant was executed at his home. The defense is aware of no legal authority whatsoever that a conviction in a state proceeding has any precedential effect on this Court's determination of a motion to suppress under federal law. More importantly, even if it did, the Alford plea in state court was entered after a full and complete six month investigation of Mr. Genco by the authorities. Clearly, the decision to enter an Alford plea was not based on the extremely limited information in possession of the officers at the time of the execution of the search warrant, but rather was based on the discovery produced by the State of Ohio after its thorough six month investigation. Thus, the government's argument that the Alford plea (entered at the end of the state case) establishes probable cause for a search warrant on day one of the investigation is entirely lacking in any arguable legal merit.

**B. Good faith does not save the warrant**

The government argued in its response that, even if the warrant was lacking in probable cause, it was saved by good faith under United States v. Leon, 468 U.S. 897 (1984). Pursuant to Leon, a warrant lacking in probable cause may nonetheless be found valid if the executing officers were operating in good faith. In making the inquiry, a district court must ask "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." Id. at 922 n.23. One ground for invalidation of good faith is where the affidavit is

"so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." Id. This circumstance is present in Mr. Genco's case.

As noted above, there is not a shred of evidence in the search warrant affidavit that Mr. Genco uttered a threat to anyone, which the law indisputably requires. Any reasonable police officer would know this elementary requirement of the Ohio statute. In fact, it does not take a trained legal eye to assess that O.R.C. § 2902.23, which is titled "Terroristic Threats," requires the making of a threat to someone. Even a new cadet fresh from police academy would likely pick up on this glaring nuance of the law. Thus, no officer could reasonably think that there was probable cause to believe that the crime of "Terroristic Threats" had been committed without a shred of evidence of a threat being communicated to anyone by Mr. Genco.

The government seems to make much in its response from the fact that the search warrant affidavit in the present case was long and detailed, in order to support of its argument that the warrant was not "bare bones." However, lots of quantity in an affidavit clearly does not make up for quality. If the government sought a warrant to search for cocaine in a residence, and wrote a detailed 20 page affidavit that failed to mention the word cocaine, it may nonetheless be problematic. Similarly, a detailed affidavit in this case to search for evidence of "Terroristic Threats" when the warrant provided absolutely no evidence of a threat being made should certainly have raised alerts in the reasonably well-trained officer.

Three Sixth Circuit cases illustrate this point. First, in United States v. Ward, 967 F.3d 550 (6th Cir. 2020), the court held that the warrant was so lacking in probable cause that no reasonable officer could rely on it. The search warrant in the case, however, was not lacking in detail: it provided evidence of texts relating to drug sales by the defendant, a trash pull with drugs in the defendant's garbage, and prior drug charges of the defendant. Id. at 554. The court found,

however, that although the warrant was detailed, it did not focus on the important point of whether drugs were going to be found in the residence on the day of the search warrant. Id. at 555-56.

Similarly, in United States v. Govea, 806 Fed. Appx. 423 (6th Cir. 2020), although the warrant provided extensive details about the defendant's prior drug activities with the informant and three controlled buys from the defendant, the court nonetheless found that the affidavit left out information that would link the drug activities to the defendant's residence. Id. at 423-35. Thus, the court found that no reasonable well-trained officer could have believed there was probable cause for the search. Id.

Finally, in United States v. Hython, 443 F. 3d 480 (6th Cir. 2006), the search warrant affidavit provided significant information about law enforcement's use of an informant to track drug purchases by an informant back to the ultimate source of the drugs. The affidavit even detailed an eventual controlled purchase from the source. The affidavit, however, left out the critical detail of the date for the purchase. Id. at 483. As such, although the affidavit contained significant detail about the course of the thorough investigation, it failed to provide the important detail to establish the recency of the drug sale. Thus, the Sixth Circuit held that the warrant was so lacking in probable cause that no reasonable officer could rely on it. Id. at 485.

In the present case, the affidavit did, as the government points out, contain a lot of words. Unfortunately, those words failed to focus on the crux of the offense of "Terroristic Threats," that being, making a threat to someone. As the Sixth Circuit has illustrated, it is clearly not the quantity of information in the warrant that carries the day, but rather the quality of the information conveyed. Where important – if not the most important – information is left out, the Sixth Circuit does not hesitate to find good faith lacking. Such is the problem with this case. Without actual evidence of a threat, no officer (well trained or otherwise) could have believed that the offense had

been committed and that probable cause supported the warrant. Accordingly, good faith cannot save the search, and the evidence seized must be suppressed.

### C. Particularity issue

Mr. Genco raised in his motion that the search warrant was lacking in particularity because the search warrant did not contain the address to be searched on its face. After hearing the government's evidence at the suppression hearing, Mr. Genco concedes this issue and withdraws it from consideration.

## III. The Glock handgun is not a machine gun as a matter of law. (R. 28)

The government argued in its post-hearing brief that a C.F.R. section could somehow control the meaning of the word "automatically" in 26 U.S.C. § 5845(b). This is incorrect. In fact, Gun Owners of America, Inc. v. Garland, 992 F.3d 446, 454-58 (6th Cir. 2021) recognized that the C.F.R. has never in the history of American jurisprudence dictated the meaning of federal criminal statutes. While it is true that the Gun Owners case is currently under review by the court *en banc* and thus not currently binding precedent, Gun Owners did nothing more than recognize already established Supreme Court precedent. As the Supreme Court held some seven years prior, "we have never held that the government's reading of a criminal statute is entitled to any deference." United States v. Apel, 571 U.S. 359, 369 (2014). In fact, the Sixth Circuit noted this very point:

> Considered altogether, if we take the Court at its word, it has never held that a court must necessarily grant Chevron deference to the government's interpretation of an ambiguous *criminal* statute. More to the point for present purposes, we are aware of no Supreme Court opinion that compels us to apply Chevron deference to the ATF's interpretation of § 5854(b) here.

Gun Owners of America, Inc. v. Garland, 992 F.3d 446, 458 (6th Cir. 2021). Thus, regardless of the continued validity of the Gun Owners case, a C.F.R. section does not control the meaning of a criminal statute.

Rather, the Supreme Court itself has already unambiguously defined the term "automatically" in § 5845(b): "the terms "automatic" and "fully automatic" refer to a weapon that fires repeatedly with a single pull of the trigger. That is, once its trigger is depressed, the weapon will **automatically continue to fire until its trigger is released or the ammunition is exhausted**. Such weapons are "machineguns" within the meaning of the Act." Staples v. United States, 511 U.S. 600, 602 n.1 (1994)(emphasis added). There is no ambiguity in this definition. The term automatically means that the gun must continue to fire once the trigger is pulled until and unless one of two conditions occurs: (1) the trigger is released; or (2) the ammunition is exhausted. The government has conceded in the present case that the Glock pistol in question would only fire two shots at best, regardless of how much ammunition was in the gun. Thus, it is beyond dispute that the firearm was not "automatic" and thus was not a machine gun.

The government mustered three responses to this patently clear conclusion. First, the government essentially tried to read the word "automatically" out of the statute. At page 14 of its response, the government argued: "The plain text requires only that the firearm 'shoot . . . automatically more than one shot, without manual reloading, by a single function of the trigger.' 26 U.S.C. § 5845. That is precisely what the pistol did here – pulling the trigger once fired two rounds automatically." This reading focuses only on the words **after** "automatically," namely the phrase "more than one shot." If the word "automatically" were not in the statute, the government would indisputably be correct. However, the government cannot choose to ignore this word. "[T]he Court is 'obliged to give effect, if possible, to every word Congress used.'" Nat'l Ass'n of

Mfrs. v. Dep't of Def., 138 S. Ct. 617, 632 (2018). The Supreme Court has definitively defined the word "automatically" and the government may not read it out of the statute.

Second, the government argued that the Gun Owners case held that the "Supreme Court's language [in Staples] may not necessarily foreclose the ATF's interpretation," and that at any rate the Gun Owners case had been vacated pending review. (R. 32, p. 14). This argument is misleading because Gun Owners did not deal with the same issue as Mr. Genco's case. In Gun Owners, the issue was not related to the term "automatic" as defined clearly by the Supreme Court in Staples. The issue in Gun Owners related to the meaning of the phrase "single function of the trigger," in terms of the functioning of a bump stock. Thus, the Supreme Court's definition of "automatically" in Staples did not dictate the outcome in Gun Owners. The Sixth Circuit in Gun Owners was merely reciting the already existing precedent regarding the definition of "automatically." Thus, the outcome of the Gun Owners *en banc* petition in this regard is irrelevant to the present motion.

Finally, the government argued that the definition of "automatically" in Staples was merely in a footnote and did not foreclose other meanings of the term "automatically." The government has cited no law, nor is there any, which suggests that this Court may ignore a definition of a term provided by the Supreme Court, in a footnote or otherwise. The Supreme Court's definition of "automatically" in Staples is clear and unambiguous and goes directly to the issue in this case. Moreover, it related to interpretation of the identical statute – 26 U.S.C. § 5845 – at issue in the present case. As such, its dictates must be followed. Accordingly, count 2 of the indictment should be dismissed.

**IV. Other remaining motions**

Mr. Genco has filed three additional motions in this case. First, he requested a Bill of Particulars (R. 27). Mr. Genco submits that the government's Response to his Motion to Dismiss

Based on Venue identified the conduct in the indictment that the government purported constituted an "attempt" in this case, and as such, the Motion for Bill of Particulars is moot.

Second, Mr. Genco filed a Motion to Dismiss Count 1 of the Indictment Based on Improper Venue (R. 34). Mr. Genco submits that the original motion adequately states Mr. Genco's position in this matter and no further briefing is needed at this time.

Third, Mr. Genco filed, contemporaneously with this Post-Hearing Brief, a Motion to Dismiss Count 1 of the Indictment based on the Commerce Clause. This motion will require a response from the government, and Mr. Genco will reserve any further argument on the issue for a reply to the government's response, if necessary.

## V. Conclusion

Based on the foregoing, Mr. Genco respectfully requests that the Court grants his motions and dismiss the charges in the indictment as set forth herein.

Respectfully submitted,

DEBORAH WILLIAMS
FEDERAL PUBLIC DEFENDER

*s/ Richard Monahan*
Richard Monahan (0065648)
First Assistant Federal Public Defender
250 E. 5th Street, Suite 350
Cincinnati, Ohio 45202
(513) 929-4834

Attorney for Defendant
Tres Genco

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served upon Megan Gaffney Painter, Assistant United States Attorney, via Electronic Case Filing, on this day of 3rd day of November, 2021.

*s/ Richard Monahan*