# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CASE NO. 1:21-CR-85 |
| | : | |
| | : | JUDGE SUSAN J. DLOTT |
| v. | : | |
| | : | |
| | : | **GOVERNMENT'S RESPONSE TO** |
| TRES GENCO, | : | **DEFENDANT'S POST-HEARING** |
| | : | **BRIEF** |
| Defendant. | : | |
| | : | |
| | : | |

The United States respectfully submits this response to the defendant's post-hearing brief. The hearing fortified the reasons to uphold the searches in this case, and all of the defendant's motions should be denied.

## BACKGROUND

On October 20, 2021, this Court held a hearing on the defendant's various motions. During that hearing, the Government called one witness: Detective Erica Engle. Det. Engle was present on the day the defendant was arrested and his room searched, and she was the affiant on the search warrant for the bedroom granted by a state magistrate.

Det. Engle testified that she went to a residence in Highland County on March 12, 2020, in response to a radio call of domestic violence between a mother and son. Dkt. 37, Transcript, 4:25 – 5:15. The radio call reported that "the son was in his bedroom with a firearm threatening his mother." *Id*. at 5:6 – 5:8. Det. Engle and her partner arrived at the home, and saw Highland County Sheriff's deputies along with a woman and Tres Genco. *Id*. at 5:16 – 6:7, 7:2 – 7:8. As Det. Engle approached, she heard a sergeant talking with the defendant about the location of a firearm. *Id*. at 7:12 – 7:17. The defendant initially said he did not have a firearm, before saying that he did have a firearm, which was located in the backseat of his vehicle. *Id*. at 7:20 – 22.

The deputies asked for permission to search the vehicle, which the defendant granted. *Id*. at 7:23 – 8:1. A sergeant opened the car door, looked in the backseat, but could not find a firearm. *Id*. at 8:4 – 8:6. The defendant said the firearm was probably in the trunk. *Id*. at 8:6 – 8:7. Deputies opened the trunk and found a rifle, multiple boxes of ammo, and ceramic-plated body armor underneath a car cover. *Id*. at 8:7 – 8:12. Upon that discovery, the defendant's mother, who was present for the search, was "completely shocked" and began asking the defendant why he had them. *Id*. at 8:13 – 8:23. The defendant dismissed her questions "as if it was no big deal." *Id*. at 8:24 – 9:3.

The defendant's mother told law enforcement that, in the "last several months," the defendant's "behavior was out of control, erratic, not like him." *Id*. at 9:7 – 9:16. "She was very concerned about his behavior and what he had been up to." *Id*. at 9:16 – 9:17. According to the defendant's mother, the defendant had joined the military, but once he got out, "he became a very different person," who was "agitated" and doing "things that were out of character." *Id*. at 9:24 – 10:2. Among other things, he "traveled to Greece for ten days without knowing anybody or no rhyme or reason why he went." *Id*. at 10:3 – 10:6. She had discovered a firearm in her car, and when she asked the defendant about it, he "told her it was none of her business, don't worry about it." *Id*. at 10:8 – 10:11. She also told the deputies that while the defendant was in the military, "she had cleaned his room, and when she had cleaned his room, she had located a document that scared her to death about killing multiple people in a large group." *Id*. at 10:14 – 10:17.

The deputies asked the defendant about the gun his mother had referenced in her 911 call. *Id.* at 10:20 – 10:21. The defendant denied having another gun. *Id.* at 10:24 – 10:25. His mother interrupted, and said he was lying, she had found a different gun in the console of her car a week ago. *Id.* at 11:5 – 11:8. The deputies asked the defendant for permission to search his bedroom to confirm his story, which the defendant granted. *Id*. at 11:11 – 11:15. The deputies

placed the defendant in the back of a patrol car, stationing a deputy at the car's open window in case the defendant wished to revoke consent at any time. *Id*. at 11:18 – 11:25.

Det. Engle, along with a deputy and two sergeants, went to search the defendant's bedroom, accompanied by the defendant's mother. *Id*. at 12:2 – 12:5. Law enforcement was looking for a handgun. *Id*. at 12:21. Det. Engle searched the defendant's bed, and then searched a tote between the doorway of the bedroom and the bed. *Id*. at 12:18 – 13:14. The tote was an approximately 18- to 20-gallon plastic moving bin without a lid, large enough to hold a firearm. *Id*. The tote contained clothes and paper, including the defendant's mass shooting to-do list, which was loose inside the tote. *Id*. at 13:15 – 14:18. The defendant's mother, who was standing in the doorway "supervising" during the search, alerted Det. Engle that the document was the alarming note she had previously mentioned. *Id*. at 14:21 – 15:10, 22:19 – 22:20. Det. Engle looked at the document and set it aside. *Id*. at 14:22 – 15:13.

Sergeant Seaman, who was participating in the search, found what "appeared to be a room layout" loose in the defendant's desk drawer. *Id*. at 15:21 – 16:2. The drawer was large enough to hold a handgun. *Id*. at 16:3 – 16:6. After finding the document, Sergeant Seaman set it aside at Det. Engle's direction. *Id*. at 16:7 – 16:9.

Law enforcement continued their search, and found, among other things, the Glock handgun hidden in the floor vent heater duct. *Id*. at 17:8 – 17:9. They then exited the bedroom, leaving behind the two documents. *Id*. at 17:14 – 17:24, 20:8 – 20:13. When a sergeant told the defendant that they had found a firearm in the vent, the defendant requested an attorney. *Id*. at 18:2 – 18:5.

Det. Engle decided to pursue a search warrant for the defendant's home, and swore it out before a state magistrate judge. *Id*. at 18:8 – 19:14. After the warrant was approved, Det. Engle and a sergeant returned to the defendant's home and executed it, seizing the to-do list and the floor plan. *Id*. at 19:15 – 19:20, 20:8 – 20:13.

# ARGUMENT

## I. Documents Uncovered During Consent Search Did Not Violate Fourth Amendment.

The facts adduced at the hearing establish multiple ways in which the review of the defendant's mass shooting to-do list and supposed floor plan was proper.

1. <u>The Documents Were Within Scope of Consent</u>.

As explained in the Government's Omnibus Response in Opposition to Defendant's Motions, the to-do list and the floor plan were within the scope of the defendant's consent. As Det. Engle testified, both of the documents were located in spaces that were large enough to hold a gun and found prior to the gun's recovery. Dkt. 37, Transcript, 13:13 – 13:14, 16:3 – 16:6. Law enforcement was permitted to search anywhere that a gun could be hidden. Because both documents were loose in places that could hold a gun, law enforcement's discovery and review of the documents was within the scope of the defendant's consent.

2. <u>The To-Do List Had Been Privately Searched Prior to Law Enforcement's Involvement</u>.

As Detective Engle searched the unlocked plastic tote for a gun, she came across the to-do list, loose in the tote. The defendant's mother—who had previously described the disturbing writing she had found—alerted Det. Engle that the document was the one she had referenced. Det. Engle read the document, set it aside, and continued the search.

Det. Engle's review of the document was not improper under the Fourth Amendment because the defendant's mother had already read the document on her own – at most, a private search undertaken before law enforcement's involvement. "Under the private-search doctrine, the government does not conduct a Fourth Amendment search when there is a 'virtual certainty' that its search will disclose *nothing more* than what a private party's earlier search has revealed." *United States* v. *Miller*, 982 F.3d 412, 417-18 (6th Cir. 2020) (emphasis in original). Here, the single page document that Det. Engle read was the same document that the defendant's mother

had read prior to the involvement of law enforcement. "A private party who searches a physical space and hands over paper files to the government has not violated the Fourth Amendment." *Id*. at 417; *see United States* v. *Clutter*, 914 F.2d 775, 778 (6th Cir. 1990) ("[T]he Fourth Amendment is wholly inapplicable to a search, even an unreasonable one, effected by a private individual not acting as an agent of the government."). As such, Det. Engle's review of the document, and reliance upon it for the subsequent search warrant, was proper because she did not exceed the scope of the defendant's mother's private search.

    3. <u>The Defendant's Mother Consented to a Search of the Documents and Had Actual and Apparent Authority to Do So</u>.

The defendant asserts that the defendant's mother had no actual or apparent authority to consent to law enforcement reading pieces of loose-leaf paper in the defendant's room. He is wrong.

"Typically, all family members have common authority over all of the rooms in the family residence." *Pratt* v. *United States*, 214 F. App'x 532, 535 (6th Cir. 2007) (citing *United States* v. *Clutter*, 914 F.2d 775, 777 (6th Cir. 1990)). This includes locked bedrooms. *Id*. at 534-35 (mother had actual authority to consent to search of son's locked bedroom); *see also United States* v. *Gossett*, 600 F. App'x 330, 334 (6th Cir. 2015) (mother had actual authority to consent to search of son's bedroom).

At the time that law enforcement discovered the documents, they were already appropriately inside the defendant's bedroom based on his consent, which the defendant does not contest. The only question is whether the documents were found in "an enclosed space in which the family member targeted for the search has clearly manifested an expectation of exclusivity." *Clutter*, 914 F.2d at 778. That question must be considered against the backdrop that "[g]enerally, consent to search a space includes consent to search containers within that space where a reasonable officer would construe the consent to extend to the container." *United States*

5

v. *Cork*, 18 F. App'x 376, 383 (6th Cir. 2001) (quoting *United States* v. *Melgar*, 227 F.3d 1038, 1041 (7th Cir. 2000)). As Det. Engle explained, the to-do list was found loose in an unlocked, open plastic tote, and the floor plan was found in an unlocked desk drawer. Under the actual authority that the defendant's mother had over the bedroom, she also had authority to consent to the search of those two documents, over which the defendant had not "manifested an expectation of exclusivity."

But even if she did not have actual authority, she had apparent authority. "Apparent authority exists where the factual circumstances 'available to the officer at the moment' would 'warrant a man of reasonable caution in the belief that the consenting party had authority over the premises[.]'" *United States* v. *Howard*, 806 F. App'x 383, 387 (6th Cir. 2020) (quoting *Illinois* v. *Rodriguez*, 497 U.S. 177, 188 (1990)). The defendant's mother had already made clear to law enforcement that she had read the to-do list while cleaning the defendant's room. Based on her ownership of the home and her representation that she was previously given access to the defendant's bedroom in order to clean it, it was not unreasonable for law enforcement to believe that the defendant's mother had apparent authority to consent to reading the unsecured documents in the defendant's room.

The defendant's mother had both actual and apparent authority to consent to the search of the to-do list and the floor plan. And the defendant's mother did consent, by directing Det. Engle to the document and telling her that it was the alarming document she had read earlier. *See* Dkt. 37, Transcript, 14:21 – 15:10, 27:4 – 28:4, 30:20 – 30:25. As Det. Engle testified, the defendant's mother "wanted [law enforcement] to see it." *Id*. at 27:25 – 28:1. The defendant's mother, who, unprompted, told law enforcement before the search began that she had found a written plan of the defendant to hurt a lot of people, and who was "supervising" the search from the doorway, affirmatively directed Det. Engle to the document. Det. Engle was not reading through the defendant's private papers, she was looking for a gun. *See id*. at 27:11 – 27:15. It

6

was only when the defendant's mother, again without prompting, directed her to the document that she read it. The totality of these circumstances shows the defendant's mother consented to the search of the document. *See Schneckloth* v. *Bustamonte*, 412 U.S. 218, 226 (1973) (consent evaluated through examination of the totality of the circumstances).

    4.   <u>The Documents Were Not Seized During the Consent Search.</u>

The defendant argues that the two documents cannot fall within the plain view exception to the warrant requirement because they had to be read for their probative value to be understood. Under the plain view exception, evidence may be seized without a warrant if the officers who discover it are legally present in the location where the evidence is observed, and what is observed has obvious evidentiary value. *United States* v. *McLevain*, 310 F.3d 434, 438-39 (6th Cir. 2002). The defendant cites to *United States* v. *Garcia*, in which the Sixth Circuit held that a document does not fall within the plain view exception "if it must be read in order for its incriminating nature to be determined." 496 F.3d 495, 510 (6th Cir. 2007).

But the plain view doctrine applies to the *seizure* of evidence, not the search of it. As the Supreme Court has explained:

> The right to security in person and property protected by the Fourth Amendment may be invaded in quite different ways by searches and seizures. A search compromises the individual interest in privacy; a seizure deprives the individual of dominion over his or her person or property. The 'plain-view' doctrine is often considered an exception to the general rule that warrantless searches are presumptively unreasonable, but this characterization overlooks the important difference between searches and seizures. If an article is already in plain view, neither its observation nor its seizure would involve any invasion of privacy. A seizure of the article, however, would obviously invade the owner's possessory interest. If 'plain view' justifies an exception from an otherwise applicable warrant requirement, therefore, it must be an exception that is addressed to the concerns that are implicated by seizures rather than by searches.

*Horton* v. *California*, 496 U.S. 128, 133 (1990) (citations and footnotes omitted).

The defendant was not deprived of his dominion over the documents at issue here because they were not seized during the consent search. As Det. Engle testified, law

7

enforcement left the documents behind, and only seized the weapons they found. The documents were retrieved only after they received a search warrant. Dkt. 37, Transcript, at 20:8 – 20:13. Had the Magistrate Judge denied the warrant, law enforcement would not have recovered the documents. Plain view doctrine is not implicated here.

As discussed, the defendant's privacy interest in his documents was not improperly compromised. First, with regards to the to-do list, Det. Engle's review was within the scope of the defendant's consent, covered by the private search that the defendant's mother had previously undertaken, and consented to by the defendant's mother. Second, regarding the supposed floor plan, the evidence shows that law enforcement did not actually read it. On its face, the floor plan document does appear to be a "layout of what appeared to be some sort of room or business," as it was described in the affidavit for the search warrant. Gov't Ex. 1 at 4. But had law enforcement actually read the document, they would have discovered that the drawing was not a layout of a room or business, but instead the defendant's sketch of his mind. At the top of the page is written "Mind Layout," and one of the "rooms" depicted has features labeled "insight," "knowledge," "recognition," "school," "travel," and "good grades." Gov't Ex. 5. Because law enforcement only glanced at the document during their search, as opposed to reading it, they believed it was a layout of a physical space instead of the fanciful sketch it actually is. To the extent that *Garcia* is instructive at all here, it recognizes a distinction between a mere glance and a close examination of documents. 496 F.3d at 511-12. Here the officers merely glanced at the floor plan, as evidenced by Det. Engle's description of it in the search warrant affidavit.

As the documents were not seized during the consent search, and the defendant's privacy interest in the documents was not improperly compromised, law enforcement's review of the documents did not violate the Fourth Amendment.

5. Exclusion of the Documents Is Not Justified.

As detailed in the Government's omnibus response, the exclusionary rule is a "last resort" and "applies only where it results in appreciable deterrence." *Herring* v. *United States*, 555 U.S. 135, 140-41 (2009) (internal quotation marks and brackets omitted). What deterrence could come from suppression of the documents in this case? What is law enforcement to do when, while they are conducting a search pursuant to valid consent, the co-habitant of the home alerts law enforcement to a document that she already has read as detailing a plot to hurt many people? Even if it somehow constitutes a violation of the Fourth Amendment—and it does not—reading that document and looking at a separate document that appeared on cursory inspection to be a floor plan is not "deliberate," "reckless," or "grossly negligent" disregard for Fourth Amendment rights that warrants the drastic exclusionary remedy. *See Davis* v. *United States*, 564 U.S. 229, 238 (2011). Suppressing the two documents will not "result in appreciable deterrence." *United States* v. *Leon*, 468 U.S. 897, 909 (1984). The conduct challenged here simply cannot "bear [the] heavy burden of justification" required to exclude evidence. *See Illinois* v. *Gates*, 462 U.S. 213, 257-58 (1983) (White, *J.*, concurring).

**II.    The Subsequent Search Warrant Is Valid, and Law Enforcement Relied Upon It in Good Faith.**

As the Government outlined in its omnibus response to the defendant's suppression motions, even if review of the documents was somehow improper and suppression of the documents is warranted, the subsequent search warrant contained sufficient probable cause to be upheld. Excising the reference to the documents from the warrant leaves ample evidence—including descriptions of weapons found and the knowledgeable witness's statements that she had seen "a letter she had read that was what she believed [was] a plan for Tres to harm a lot of people", Gov't Ex. 1 at 4—that supports the Magistrate's determination that there was probable cause.

The defendant makes much of the state statute in the case, Making Terroristic Threats, arguing that it was so inapposite that the officers executing the search warrant must have known that there was insufficient probable cause to search, even after the blessing of a magistrate judge. But "[p]robable cause 'requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.'" *United States* v. *Tagg*, 886 F.3d 579, 585 (6th Cir. 2018) (quoting *District of Columbia* v. *Wesby*, 583 U.S. 577, 586 (2018)). Law enforcement need only relay facts that "indicate a fair probability that evidence of a crime will be located on the premises of the proposed search." *United States* v. *Frazier*, 423 F.3d 526, 531 (6th Cir. 2005) (internal quotation marks omitted). When assessing probable cause, the inquiry is not intended to be an "excessively technical dissection" of facts, but instead a consideration of the circumstances in total. *Tagg*, 886 F.3d at 585-86. The magistrate's conclusion that there was probable cause to issue a search warrant is entitled to great deference on review and should be upheld if a "substantial basis" for probable cause exists. *Id*. at 586.

As the Government noted in its omnibus response, the state statute does not require the threats to be communicated to the target in order to violate the statute. *See* Ohio Revised Code § 2909.23(B). Given what the Magistrate Judge read in the warrant beyond even the defendant's written plot—including the discovery of an AR-15 with a bump stock in the trunk of his car, a hidden 9mm handgun in his bedroom, and a knowledgeable witness's statements that the defendant was "angry and aggressive" and she had seen a "a plan for Tres to harm a lot of people," Gov't Ex. 1 at 3-4—there was ample probable cause to believe evidence of terroristic threats could be found in the defendant's bedroom and devices.

Despite this, the defendant argues that Det. Engle and the deputies did not act in good faith in reliance on the warrant because "[e]ven a new cadet fresh from police academy" would know that the Terroristic Threats statute did not apply. Again, in making this argument, the defendant glosses over the legal realities of the statute (no threat need be conveyed) under which

10

he was convicted in the state. It is also hard to imagine even a seasoned officer knowing the statute would not apply despite consultation with the prosecutor ("Affiant spoke with Highland County Prosecuting Attorney Anneka Collins regarding what was visible in the room. Ms. Collins agreed with affiant that the writings indicated a terroristic threat and necessary steps would need to be taken to ensure the safety of the public." Gov't Ex. 1 at 4) and the sign-off of a Magistrate Judge.

The good faith exception does not apply where the officer "rel[ied] on a warrant based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *United States* v. *Carpenter*, 360 F.3d 591, 595 (6th Cir. 2004). It was far from "entirely unreasonable" for law enforcement to believe the warrant was valid and the statute cited was appropriate. Rather, it was completely reasonable for law enforcement to rely on the warrant, especially in light of law enforcement's efforts to consult with the prosecutor concerning the applicable statute.

### III. The Glock is a Machinegun.

In spite of admonishing that words have meaning, the defendant overburdens a Supreme Court footnote to argue that the Glock is not a machinegun. As explained in the Government's omnibus response, the Supreme Court wrote in a footnote that "[a]s used here, the terms 'automatic' and 'fully automatic' refer to a weapon that fires repeatedly with a single pull of the trigger. That is, once its trigger is depressed, the weapon will automatically continue to fire until its trigger is released or the ammunition is exhausted. Such weapons are 'machineguns' within the meaning of the Act." *Staples* v. *United States*, 511 U.S. 600, 602 n.1 (1994). The defendant takes this to mean this is the exclusive definition of machinegun, reading "only" into the language. The footnote, however, presents a description of weapons that are sufficient to meet the definition of machinegun, but not necessary – in other words, a machinegun is not limited only to guns that fire until the trigger is released or the ammunition is exhausted, but a gun that

11

fires that way certainly qualifies as a machinegun. Again, the plain text of the statute is that a machinegun is any weapon that "shoots . . . automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b). Because pulling the trigger of the Glock one time resulted in two shots firing without manual reloading, the Glock is a machinegun.

## CONCLUSION

The Government urges the following results:

The Defendant's Motion to Suppress Evidence from Warrantless Search of Residence on March 12, 2020, Dkt. 25, should be denied, for the reasons outlined here and in the Government's Omnibus Response in Opposition to Defendant's Motions, Dkt. 32.

The Defendant's Motion to Suppress Evidence Seized In Search Warrant for Residence on March 13, 2020, Dkt. 26, should be denied, for the reasons outlined here and in the Government's Omnibus Response in Opposition to Defendant's Motions, Dkt. 32. The

challenge to the particularity of the warrant has been withdrawn by the defendant in his post-hearing brief. *See* Def. Br. at 13.

The Defendant's Motion for Bill of Particulars and Request to Extend Motion Deadline, Dkt. 27, should be denied, as the defendant submitted in his post-hearing brief that the issue was moot. *See* Def. Br. at 16.

The Defendant's Motion to Dismiss Count Two of the Indictment, Dkt. 28, should be denied for the reasons outlined here and in the Government's Omnibus Response in Opposition to Defendant's Motions, Dkt. 32.

The Defendant's Motion to Dismiss Count One Based on Improper Venue, Dkt. 34, should be denied for the reasons detailed in the Government's Response in Opposition to Defendant's Motion to Dismiss, Dkt. 35.

The Defendant's Motion to Dismiss Count One Based on Commerce Clause, Dkt. 38, should be denied for the reasons outlined in the Government's Response in Opposition to Defendant's Motion to Dismiss Count One Based on Commerce Clause, Dkt. 40.

Respectfully submitted,

VIPAL J. PATEL
Acting United States Attorney

*s/Megan Gaffney Painter*
Megan Gaffney Painter (NY 4849220)
Timothy S. Mangan (069287)
Assistant United States Attorneys
221 East Fourth Street
Suite 400
Cincinnati, OH 45202
(513) 684-3711

# CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing *Government's Response to Defendant's Post-Hearing Brief* has been electronically served via the Court's CM/ECF system this 17th day of November, 2021, upon counsel of record.

*s/Megan Gaffney Painter*
Megan Gaffney Painter (NY 4849220)
Assistant United States Attorney