IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | Case No. 1:21-cr-85 |
| Plaintiff, | : | |
| | : | Judge Susan J. Dlott |
| v. | : | |
| | : | **ORDER** |
| TRES GENCO, | : | |
| | : | |
| Defendant. | : | |

This matter is before the Court on five motions[1] filed by Defendant Tres Genco:

(1) Motion to Suppress Evidence from Warrantless Search of Residence on March 12, 2020

("Motion to Suppress Evidence from Warrantless Search") (Doc. 25); (2) Motion to Suppress

Evidence Seized in Search Warrant for Residence on March 13, 2020 ("Motion to Suppress

Evidence Seized in Search Warrant") (Doc. 26); (3) Motion to Dismiss Count 1 of the Indictment

Based on Improper Venue (Doc. 34); (4) Motion to Dismiss Count 1 of the Indictment Based on

Commerce Clause (Doc. 38); and (5) Motion to Dismiss Count 2 of the Indictment (Doc. 28). At

the request of the Court, the parties also filed Supplemental Memoranda. (Docs. 45, 46.) The

Government opposes all motions.

For the reasons set forth herein, Defendant's Motion to Suppress Evidence from

Warrantless Search (Doc. 25) will be **GRANTED IN PART**. Defendant's Motion to Suppress

Evidence Seized in Search Warrant (Doc. 26) will be **DENIED**. Defendant's three Motions to

Dismiss (Docs. 28, 34, 38) will be **DENIED**.

---

[1] In his Post-Hearing Brief, Defendant conceded a sixth motion, his Motion for a Bill of Particulars and to Request
to Extend Motion Deadline (Doc. 27), is **MOOT**. (Doc. 39 at PageID 208–09.)

I.   **FACTS**

A.  **Indictment Facts**[2]

On July 20, 2021, Defendant Tres Genco was indicted on the following charges: (1)
attempted hate crime in violation of 18 U.S.C. § 249(a)(2); and (2) unlawful possession of a
machinegun in violation of 18 U.S.C. §§ 922(o) and 924(a)(2).  (Doc. 7.)   From at least July
2019 through March 12, 2020, Genco identified as an Incel and maintained profiles on a popular
Incel website where he posted frequently.  (*Id*. at PageID 25.)  "Incel" stands for "involuntary
celibate."  (*Id*. at PageID 24.)  The Incel movement is an online community predominantly
comprised of men who harbor anger towards women.  (*Id*.)  Incels advocate violence to support
their belief that women unjustly deny them sexual or romantic attention to which they are
entitled.  (*Id*.)

On or about January 2019, Genco purchased tactical gloves, a bullet proof vest, a hoodie
bearing the word "Revenge," cargo pants, a Bowie knife, and a skull facemask.  (*Id*.)  In
February 2019, he purchased a rifle.  (*Id*.)  On May 20, 2019, Genco purchased two factory
Glock 17 magazines, a 9 mm Glock 17 clip, and a holster clip concealed carry for a Glock.  (*Id*.
at PageID 25–26.)

On or about August 3, 2019, Genco wrote a document entitled "A Hideous Symphony a
manifesto written by Tres Genco, the socially exiled Incel,"  (*Id*. at PageID 25.)  In that
document, Genco wrote, in part:

> I would hope these words resonate in sweet familiarity to fellow incels, either
> cognizant of their situation or not  . . . I am already set to go into the U.S. Army
> . . . this training will be for the attainment of one reality, the  death of what I have
> been deprived most, but also cherish and fantasize at the opportunity of having
> but has neglected of; Women.  I will slaughter out of hatred, jealousy, and
> revenge . . . I will take away the power of life that they withhold from me, by

---

[2] The "facts" stated in this section are derived from the allegations of the Indictment.  (Doc. 7.)

> showing there is more than just happiness and fulfillment, there is all encompassing death, the great equalizer that will bear all of us into its seductively calm velvet of silence and serenity.

(*Id*. at PageID 25.)  Between July 30, 2019 and August 15, 2019, Genco wrote a note that identified a university in the Southern District of Ohio and included the following language: "May 23, 2020  290 days!  M-16 optimal, covert or mil-spec.  Will get arms training in BCT, Georgia  KC[3] needs to be huge!  3,000?  Aim big then[.]"  (*Id*. at PageID 26.)  On August 3, 2019, the same day he drafted his manifesto, he conducted online searches for sororities and a university in Ohio.  (*Id*.)

In August 2019, Genco researched gun modifications and saved illustrated guides to constructing M-16s.  (*Id*.)  Genco conducted internet searches for topics including: "Elliot Rodger," "difference between full auto and semi auto," "homemade flash bang," and "how many days until may 23."  (*Id*.)  Genco attended Army Basic Training in Georgia from August 2019 until he was discharged in December 2019.  (*Id*.)

On January 11, 2020, after returning to the Southern District of Ohio, Genco created a document entitled "isolated."  (*Id*.)  It reads: "If you're reading this, I've done something horrible.  Somehow you've come across the writings of the deluded and homicidal, not an easy task, and for that I congratulate you for your curiosity and willingness to delve into such a dark topic."  (*Id*.)  Genco signed the document, "Your hopeful friend and murderer[.]"  (*Id*.)

On January 15, 2020, Genco conducted surveillance of a university in Ohio and conducted internet searches for topics including "planning a shooting crime" and "When does preparing for a crime become an attempt?"  (*Id*.)  On March 11, 2020, Genco conducted internet

---

[3] KC is understood to reference "kill count."  (*Id*.)

research of police scanner codes for Columbus, Ohio police and university police. (*Id.* at PageID 27.)

On March 12, 2020, police officers responded to Genco's residence in Highland County, Ohio. (*Id.*) At the residence, in the trunk of Genco's vehicle, police officers found, among other things, a Palmetto State Armory 5.5x45mm caliber firearm with a bump stock attached, several loaded magazines, body armory, and boxes of ammunition. (*Id.*) Hidden in a heating vent in Genco's bedroom, police officers found a Glock-style 9mm Luger caliber semiautomatic pistol, with no manufacturer's marks or serial number. (*Id.*)

**B. Procedural History**

Genco was indicted on July 20, 2021 and made his initial appearance the following day. (Docs. 7, 10.) On August 25, 2021, Defendant filed his Motion to Suppress Evidence from Warrantless Search (Doc. 25); Motion to Suppress Evidence Seized in Search Warrant (Doc. 26); and (3) Motion to Dismiss Count 2 of the Indictment (Doc. 28). The Government filed an omnibus Response in Opposition to Defendant's Motions on September 10, 2021. (Doc. 32.) On October 6, 2021, Defendant filed a Motion to Dismiss Count 1 of the Indictment Based on Improper Venue. (Doc. 34.) On October 13, 2021, the Government filed a Response in Opposition. (Doc. 35.)

On October 20, 2021, the Court held a motion hearing, after which the Court took the matter under advisement and permitted the parties additional time to file post-hearing briefs and motions. (Docs. 36, 37.) On November 3, 2021, Defendant filed a Motion to Dismiss Count 1 of the Indictment Based on Commerce Clause (Doc. 38), to which the Government responded in opposition (Doc. 40), and Defendant replied (Doc. 43). Both the Defendant and the Government filed post-hearing briefs and supplemental memoranda. (Docs. 39, 41, 42, 45, 46.)

II.     **MOTIONS TO SUPPRESS**

Genco challenges both the warrantless search of his bedroom as well as the warrant-based search of his home.  For the reasons that follow, Defendant's Motion to Suppress Evidence from Warrantless Search will be **GRANTED IN PART**, and the Motion to Suppress Evidence Seized in Search Warrant will be **DENIED**.

### A.  Motion to Suppress Evidence From Warrantless Search

In his Motion to Suppress Evidence from Warrantless Search, Genco argues that the warrantless search of his bedroom exceeded the scope of his consent, no exception saves the search, and exclusion of references to the documents (later obtained via search warrant) is the appropriate remedy.  The Court finds that the search violated Genco's Fourth Amendment rights and will **GRANT IN PART** the Motion.

#### 1.  Detective Engle's Testimony About the Search of Genco's Bedroom

Detective Erica Engle testified as a Government witness at the October 20, 2021 suppression hearing.  (Transcript, Doc. 37.)  Detective Engle is a detective with the Highland County Sheriff's Office and responded to Genco's residence on March 12, 2020 due to a report that he was locked in his bedroom with a gun threatening his mother.  (*Id*. at PageID 145–47.)  When Detective Engle arrived at Genco's home with her colleague Sergeant Vincent Antinore, Officer Craig Seaman, Deputy Brandon Young, and Deputy Nick Myers were in a crowd with Genco and Genco's mother.  (*Id*. at PageID 147–51.)

Detective Engle approached the group and heard Sergeant Seaman talking to Genco about the location of the firearm.  (*Id*. at PageID 149.)  Genco first stated he did not have a firearm; he then stated that he did have a firearm and it was in the back seat of his car.  (*Id*.)  Officers asked for permission to search his vehicle, which Genco granted.  (*Id*. at PageID 149–

50.)  During the search, Genco stated the firearm was probably in the trunk, so Deputy Young opened the trunk of the car and discovered ceramic-plated body armor, a rifle, and multiple boxes of ammunition.  (*Id*. at PageID 150.)  Upon the discovery, Genco's mother was "shocked" and began asking Genco why he had the firearm.  (*Id*.)  Genco dismissed her questioning and acted like having the firearm was "no big deal."  (*Id*. at PageID 150–151.)

Genco's mother told law enforcement that in the last several months, Genco's behavior was "out of control, erratic, not like him."  (*Id*. at PageID 151.)  She was very concerned about his behavior and what he had been up to.  (*Id*.)  She told law enforcement that Genco joined the military, but once he got out, he became a very different person who was agitated and doing things that were out of character.  (*Id*. at PageID 152.)  For instance, he traveled to Greece for ten days without knowing anyone or having a reason to go, and he never discussed with her what he was going to be doing while he was there.  (*Id*.)  Genco's mother discovered a firearm in her car, and when she asked Genco about it, he told her it was none of her business, and not to worry about it.  (*Id*.)  She also told law enforcement that while Genco was in the military, she cleaned his room, during which she located "a document that scared her to death about killing multiple people in a large group."  (*Id*.)

The deputies then asked Genco about the gun his mother referenced in her 911 call.  (*Id*.)  He denied having another gun.  (*Id*.)  His mother interrupted and stated that Genco was lying.  (*Id*. at PageID 153.)  She said Genco did have another gun, as she found one in the center console of her car a week ago.  (*Id*.)  Officers asked Genco where the other gun would be, and Genco stated that he did not own one.  (*Id*.)  When he was asked for permission to go into his bedroom and confirm his story, Genco gave permission to go into his bedroom to search for a gun.  (*Id*.)

Genco was placed in the back of Deputy Myers's patrol car, and Deputy Myers was instructed to leave the window down and wait outside the window.  (*Id*.)  Officers explained to Genco that if at any time he wanted to revoke consent, he needed to relay that to Deputy Myers who would then radio back to the room that consent to search was revoked.  (*Id*.)  Detective Engle, Sergeant Seaman, Sergeant Antinore, and Deputy Young entered the residence with Genco's mother, who showed them where Genco's bedroom was located.  (*Id*. at PageID 154.)

Law enforcement was looking for a handgun.  (*Id*.)  Detective Engle searched Genco's bed and then a tote between the doorway of the bedroom and the bed.  (*Id*. at PageID 154–55.) The tote was an 18–20 gallon plastic moving bin without a lid, large enough to hold a firearm. (*Id*. at PageID 155.)  The tote contained clothes and paper, including a note which was on a loose piece of paper inside the tote.[4]  (*Id*. at 155–56.)  Genco's mother pointed out the note to Detective Engle while she was searching the tote.  (*Id*. at PageID 156.)  Genco's mother, who was "supervising" during the search, alerted Detective Engle that the note was the alarming note she had previously mentioned.  (*Id*. at PageID 156, 164.)  She said she found the note while Genco was away at the military.  (*Id*. at PageID 157.)

Detective Engle testified that she "looked at" the note "to make sure that it didn't have any, you know, directions on where he could have put a gun" and set it aside.  (*Id*. at PageID 156–57.)  When asked on cross-examination if she read the note, Detective Engle initially testified that "I did not look at it in great depth, no.  I looked at it, and [Genco's mother] explained what it was.  It was set aside."  (*Id*. at PageID 171.)  When asked to confirm she didn't read the note, Detective Engle stated that she "looked it over."  (*Id.*)  When asked, "When you looked it over, did you read the words?" Detective Engle admitted she "did."  (*Id.*)

---

[4] The note was entered into evidence as Exhibit 4.

Sergeant Seaman found what appeared to be a room layout loose in Genco's desk drawer and set the room layout aside.[5] (*Id*. at PageID 158.) Officers continued to search Genco's bedroom for a gun and discovered a BB gun wrapped in a blanket and taped up as well as a handgun located in the floor vent heater duct. (*Id*. at PageID 159.) After locating the firearm, officers ended the search. (*Id.*) When officers exited the bedroom, they left the two documents behind. (*Id*.) When Sergeant Antinore told Genco a firearm was found in the vent, Genco requested an attorney. (*Id*. at PageID 160.)

Detective Engle then pursued a search warrant for Genco's home and swore to testimony in an Affidavit before a state magistrate judge. (*Id*. at PageID 160–61.) After Hillsboro Municipal Court Judge David McKenna approved the Search Warrant, Detective Engle and Sergeant Antinore returned to Genco's home and executed the search warrant. (*Id*. at PageID 161–62.)

### 2. The Search of Genco's Bedroom Exceeded Defendant's Consent and No Exception Applies

Genco argues that the warrantless search of his bedroom violated his Fourth Amendment rights when Detective Engle read his note, Exhibit 4, and Sergeant Seaman looked at this room layout document, Exhibit 5. The Court agrees that the search of Exhibit 4 exceeded the scope of his consent, and no exception applies to save the search, but does not find a Fourth Amendment violation as to Exhibit 5.

"The Fourth Amendment safeguards '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *United States v. Winters*, 782 F.3d 289, 295 (6th Cir. 2015) (citing U.S. Const. amend. IV). "(S)earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se

---

[5] The room layout was entered into evidence as Exhibit 5. Sergeant Seaman was not called as a witness.

unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *United States v. Oliver*, 686 F.2d 356, 370–71 (6th Cir. 1982), *aff'd*, 466 U.S. 170 (1984) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). The Government bears the burden to prove a warrantless search was conducted within an exception to the Fourth Amendment. *Id.* at 371.

Although a search warrant is necessary to search a residence, consent is a constitutionally permissible exception to that requirement. *Mincey v. Arizona*, 437 U.S. 385, 390 (1977); *Schneckloth v. Bustamonte*, 412 U.S. 218, 248–49 (1973). "When law enforcement officers rely upon consent as the basis for a warrantless search, the scope of the consent given determines the permissible scope of the search." *United States v. Gant*, 112 F.3d 239, 242 (6th Cir. 1997) (citing *Florida v. Jimeno,* 500 U.S. 248, 251–52 (1991)). "The standard for measuring the scope of the consent given is objective reasonableness— 'what would the typical reasonable person have understood by the exchange between the officer and the suspect?'" *Id.* (quoting *Jimeno*, 500 U.S. at 251). Consent to search a room includes closed and unlocked containers that may hold the expressed object of the search. *Id.* Further, the Sixth Circuit has held that officers may not read documents when conducting a search if it must be read in order for its incriminating nature to be determined. *United States v. Garcia*, 496 F.3d 495, 510 (6th Cir. 2007) (plain view doctrine, an exception to warrantless searches, does not apply where the incriminating nature of a document is not immediately apparent without reading it).

There is no dispute that Genco consented to a search of his bedroom for the purpose of locating a handgun. However, Detective Engel's reading Exhibit 4 exceeded the scope of that consent. There is no evidence that Sergeant Seaman read Exhibit 5. The evidence suggests the

contrary, as he seemingly mistook it for a "room layout." Closer inspection of the document

reveals it was a fanciful drawing of Genco's mind and not an actual room layout. *See* Exhibit 5.

Both Exhibits 4 and 5 were located in containers in which a gun could be found. While

noticing the documents was incidental to the search for a gun, reading Exhibit 4 was beyond the

scope of Genco's consent. The Court is not convinced by Detective Engle's testimony that

reading the note may have helped her determine the location of a gun in Genco's bedroom.

Thus, the Court finds that Genco's Fourth Amendment rights were violated when Detective

Engle read Exhibit 4. The Court does not find a violation for Sergeant Seaman's glancing at

Exhibit 5, which was observed in plain view during the search for a gun and for which there is no

evidence the document was read or closely inspected.

### a. Private Search Doctrine Does Not Apply

The Government argues that the search falls under the private search doctrine, because

Genco's mother revealed the contents of Exhibit 4 to officers and pointed out the document to

Detective Engle while Detective Engle was searching Genco's bedroom for a gun.[6] This

doctrine does not apply to the search of a residence, as in this case.

"[T]he Fourth Amendment only protects against 'governmental action; it is wholly

inapplicable 'to a search or seizure even an unreasonable one, effected by a private individual not

acting as an agent of the Government or with the participation or knowledge of any

governmental official.'" *United States v. Jacobsen*, 466 U.S. 109, 113–14 (1984) (citing *Walter*

*v. United States*, 447 U.S. 649, 662 (1980) (Blackmun, J., dissenting)). However, the private

search doctrine from *Jacobsen* did not originate in the context of a residential search, and the

Sixth Circuit has explicitly declined to extend the holding to "private searches of residences."

---

[6] The Government does not argue Genco's mother pointed out Exhibit 5 or otherwise knew the contents of that document and conveyed the contents to officers.

*See Jacobsen*, 466 U.S. at 120; *United States v. Allen*, 106 F.3d 695, 698–99 (6th Cir. 1997) (*Jacobsen* does not apply to private searches of residences).

This Circuit uses a two-factor analysis to determine whether a private party is acting as an agent of the government such that the Fourth Amendment applies: (1) the government's knowledge or acquiescence to the search; and (2) the intent of the party performing the search. *United States v. Bowers*, 594 F.3d 522, 526 (6th Cir. 2010) (citing *United States v. Hardin*, 539 F.3d 404, 416 (6th Cir. 2008)).  In *Bowers*, a housemate of the defendant shared common areas but maintained separate bedrooms.  594 F.3d 522, 524 (6th Cir. 2010).  The housemate's boyfriend discovered child pornography in the defendant's dresser while snooping in his bedroom without permission to enter the room.  *Id*.  The housemate's boyfriend showed the album to the housemate, who called the landlord, who, in turn, called the Federal Bureau of Investigation.  *Id*.  The housemate invited agents into the shared home and directed agents to a common space where the binder of child pornography was on the table.  *Id*.  Agents reviewed the album, confirmed it was likely child pornography, and then obtained a search warrant to search the house.  *Id*.  The viewing of the album in a common space of the home which was made "freely available for [agents'] inspection did not violate the Fourth Amendment."  *Id*. at 526 (citing *Jacobsen*, 446 U.S. at 119).  The Court found denial of the motion to suppress the evidence to be warranted, as there was no evidence that the private citizens were acting as Government agents, the evidence was in a common area of the house when agents arrived, and there was no evidence agents exceeded the scope of the initial private search.  *Id*. at 527.

Here, Genco's mother did not turn over the documents themselves to police officers in a shared common space of the home.  Although Genco's mother reportedly directed officers to Exhibit 4, the agents were the ones conducting the search in Genco's private bedroom.  This is

simply not a case where Genco's mother conducted a private search and then handed over the results of that search to the police. *Bowers* is distinguishable yet instructive in demonstrating the inapplicability of the private search doctrine to the search at hand.

### b. Genco's Mother Lacked Actual and Apparent Authority

Genco's mother also lacked actual and apparent authority to consent to the search of Exhibit 4. "The Fourth Amendment recognizes as valid a warrantless search of a person's house when a person possessing authority over the house gives consent to the search." *Pratt v. United States*, 214 F. App'x 532, 534 (6th Cir. 2007) (citing *Georgia v. Randolph,* 547 U.S. 103, 109 (2006)). "A warrantless search does not violate the Fourth Amendment when a person who possesses common authority over the premises with the suspect consents to the search." *Id*. "'Common authority' derives from the 'mutual use of the property by persons generally having joint access or control for most purposes.'" *Id*. at 535 (citing *United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974)). "Typically, all family members have common authority over all of the rooms in the family residence. However, family members may be deprived of common authority access to an enclosed space over which one family member has 'clearly manifested an expectation of exclusivity.'" *Id*. (internal citation removed) (quoting *United States v. Clutter,* 914 F.2d 775, 777–78 (6th Cir. 1990)). The Government has the burden of establishing common authority. *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990).

The Government has not established that Genco's mother had authority to consent to a search of Genco's documents within his bedroom. In some instances, the Sixth Circuit has found common authority over a locked bedroom, but the evidence supporting such a finding is lacking in this case. *See Pratt*, 214 F. App'x at 535 (mother had actual authority to consent to search of son's locked bedroom); *United States v. Gossett*, 600 F. App'x 330, 334 (6th Cir. 2015) (same).

12

For instance, in *Pratt*, where a mother was found to have actual authority to consent to the search of her son's locked bedroom, the court considered that the mother ordinarily retained a key to the room and had regular access to the room; the mother had title to the entire residence, including her son's bedroom; her son did not contribute rent; and the mother lived in the residence and had access to her son's room "anytime [she] wanted." *Pratt,* 214 F. App'x at 535. And in *Gossett*, the mother had actual authority to consent to the search of her son's bedroom in a shared residence where the son told officers they could "tear the place up for all I care, but you've got to check with my mom first[,]" and the mother consented to the search. 600 F. App'x at 334.

Not so here. Genco did not tell officers that they could search anywhere in his bedroom if his mother was there. There is no evidence about ownership of the home, whether Genco paid rent, or whether his door was normally locked or unlocked. Genco had his separate bedroom and had locked his mother out of it that day. Genco and his mother were at odds with each other, repeatedly arguing in front of police officers. Although there is evidence that Genco's mother was in his bedroom and read his papers while he was out of town, it is not clear that it was with Genco's permission. On this record, the Court cannot conclude Genco's mother had authority to consent to a search of documents in his bedroom.

The Government alternatively argues that Genco's mother had apparent authority to consent to a search of his documents, but the Court is similarly unpersuaded. "Apparent authority exists where the factual circumstances 'available to the officer at the moment' would 'warrant a man of reasonable caution in the belief that the consenting party had authority over the premises[.]" *United States v. Howard,* 806 F. App'x 383, 387 (6th Cir. 2020) (quoting *Rodriguez,* 497 U.S. at 188). Police were called to the scene because Genco was in his bedroom with a gun. There was no evidence his mother had a key or access to the room. Genco's mother

13

reported Genco had a handgun and he told her it was "none of her business." (Doc. 37 at PageID 152.) Officers did not ask the mother for consent to search Genco's bedroom and stated that they kept a police officer stationed with him by the cruiser so *he* (not his mother) could revoke consent at any time. Although Genco's mother stated that she had been in Genco's bedroom months prior to clean his room, there was no evidence that she was in his room with his permission. The Court finds that the facts of this case do not establish that a reasonable officer would think Genco's mother had apparent authority to consent to the search of documents in his bedroom. *See Bustamonte*, 412 U.S. at 226 (consent evaluated through totality of the circumstances). Thus, apparent authority is lacking.[7]

### 3. Remedy for Violation

"Application of the exclusionary rule is not automatic. In other words, exclusion is not 'a necessary consequence of a Fourth Amendment violation.'" *United States v. Figueredo-Diaz*, 718 F.3d 568, 574 (6th Cir. 2013) (citing *Herring v. United States*, 555 U.S. 135, 141 (2009)). To determine whether the exclusionary rule applies, the Court must determine if "deterrence benefits outweigh its substantial social costs." *United States v. Baker*, 976 F.3d 636, 646 (6th Cir. 2020), *cert. denied*, 141 S. Ct. 1750 (2021). Benefits include deterring future Fourth Amendment violations, whereas costs may include letting a guilty and possibly dangerous defendant go free. *Id*. "Balancing these interests, the Court has held that the exclusionary rule should apply only to police misconduct and only if that misconduct is 'sufficiently deliberate that the exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system.'" *Id*. (citing *Herring*, 555 U.S. at 144.) The test is met if an officer violates Fourth Amendment rights "deliberately, recklessly, or with gross negligence[,]"

---

[7] The Government concedes that the plain view exception does not apply to the facts of this case.

but not if the violation arises from "isolated, nonrecurring police conduct." *Id*. (citations removed).

The Court finds that the appropriate remedy in this case is excising the references to Exhibit 4 from the subsequent Search Warrant. As Defendant argues, an objectively reasonable officer would not believe he or she could read papers when searching for a gun. The deterrent effect—avoiding unnecessary intrusions—is more important than the social cost of allowing Genco to potentially not be prosecuted in this case.

In this instance, the police ultimately did the right thing and obtained a warrant to search Genco's home beyond the limited purpose of finding a gun. They did not seize evidence at the time of the warrantless search. Those actions are to be commended. But they also suggest that they knew, or should have known, that reading a document when searching for a gun was outside the scope of the search. Thus, the conduct was sufficiently "deliberate" as opposed to an "isolated" incident in this instance to warrant excision from the Search Warrant. Further, when testifying about whether she read Exhibit 4, Detective Engle was not forthcoming about her actions. Ultimately, she admitted she did read the document—a conclusion that was obvious given the document was heavily cited in the subsequent Search Warrant. This too, suggested to the Court a level of culpability and awareness rendering the conduct deliberate. Exclusion is appropriate to discourage this type of misconduct.

Accordingly, Genco's Motion to Suppress Evidence from Warrantless Search is **GRANTED AS TO EXHIBIT 4 AND DENIED AS TO EXHIBIT 5**.

### B. Motion to Suppress Evidence Seized in Warrant Search

In his Motion to Suppress Evidence Seized in Warrant Search, Genco argues that the Search Warrant Affidavit lacks probable cause of evidence that he was Making Terroristic

Threats under Ohio law.  He also argues officers used unlawfully seized evidence to obtain the warrant.  He contends that when that evidence is excised from the warrant, it is lacking in probable cause.[8]  For the reasons that follow, the Motion will be **DENIED**.

### 1. Search Warrant Affidavit[9]

The Search Warrant is comprised of a two-page Search Warrant signed by Hillsboro Municipal Court Judge David McKenna on March 12, 2020 incorporating a four-page "Exhibit A," described in the Search Warrant as "an Affidavit applying for a search warrant, a copy of which is attached hereto, made a part of hereof and marked 'Exhibit A[.]'" (Doc. 32-1 at PageID 117–18.)  The Affidavit is attested to by Highland County Sheriff's Office Detective Engle and is referred to by the Court as the "Search Warrant Affidavit." (Doc. 32-1 at PageID 119–22.)

According to Detective Engle's Search Warrant Affidavit, on March 12, 2020, Highland County Sheriff's Office deputies responded to a residence in response to a 911 call.  (*Id.* at PageID 119.)  Detective Engle learned that Genco's mother had called the Sheriff's Office and reported that her son was in his room and the two had just been in an argument when he started to "rage out." (*Id.*)  He went to his bedroom, where she heard him loading a gun and chambering a round, as if he was going to use the firearm.  (*Id.*)  While on the phone with law enforcement, Genco's mother explained Genco's temper had been getting worse and led to the incident that day.  (*Id.*)

At the scene, Sergeant Seaman asked Genco if he had a gun, to which Genco responded that he did have a shotgun in his car.  (*Id.*)  Sergeant Seaman asked Genco if he could look for

---

[8] Genco also argued that the Search Warrant was lacking in particularity because it did not contain the address to be searched on its face.  However, he has since conceded this issue and withdrawn it from consideration.  (Doc. 39 at PageID 206.)

[9] A sealed version of the Search Warrant and Search Warrant Affidavit is filed as Document 26-1 and an unsealed version is filed as Exhibit 32-1.

the gun, and Genco stated that was "fine" and asked his mother to get the keys to his car.  (*Id.*)

Once the car was unlocked, Sergeant Seaman was unable to locate a firearm in the backseat of

the car and asked if he could search the trunk of the car, to which Genco said that was fine.  (*Id.*)

A Palmetto State Armory AR-15 rifle equipped with a bump stock, a black bullet proof vest,

magazines for the firearm, and ammunition for the firearm were discovered in the trunk of

Genco's car.  (*Id.*)

Sergeant Seaman asked Genco if he had any other firearms.  (*Id.*)  Genco advised he did

not.  (*Id.*)  However, Genco's mother spoke up and stated that this was not true.  (*Id.*)  Just days

prior, Genco had a handgun hidden in her car, and she questioned him about it, but he would not

talk to her about where it came from or what he was doing with it.  (*Id.*)  Genco interrupted his

mother and said he had no idea what his mother was talking about and that he did not own any

other guns.  (*Id.*)  Genco was asked if the officer could search his bedroom to make sure, to

which he stated that was "fine with him."  (*Id.*)

Sergeant Seaman, Sergeant Antinore, Deputy Young, and Detective Engle went into the

residence and began searching Genco's bedroom.  (*Id.* at PageID 120.)  Genco's mother was

present in the doorway of the room when the search began.  (*Id.*)  Officers discovered

ammunition for a 9mm gun in a desk drawer and a 9 mm handgun along with loaded magazines

for the gun in the floor heating/AC register.  (*Id.*)  A bb gun was discovered in the closet

wrapped in a gray towel and taped up with clear packing tape.  (*Id.*)  While searching for the

firearms, Detective Engle observed several "alarming" items including: "several other weapons

in the room including a machete in a black case."[10]  (*Id.*)

---

[10] The Court excluded any reference to or description of Exhibit 4 from the Search Warrant Affidavit based on its
ruling that Detective Engle's warrantless search of his bedroom exceeded the scope of his consent when she read
Exhibit 4.  Although the Court does not exclude the reference to Exhibit 5, the reference to it within the Search
Warrant Affidavit, taken out of context and without a description of Exhibit 4 beside it, has little significance and is

Officers contacted the Federal Bureau of Investigations and spoke with Genco's mother. (*Id*.) She and Genco came to Ohio from California two years ago. (*Id*.) Neither of them works; Genco enlisted in the military at her request last fall to keep him out of trouble, but he was discharged after a couple of months. (*Id*.) Genco's mother described Genco as "angry and aggressive" and spoke of a letter she read that was what she believed to be a plan for Genco to harm a lot of people.[11] (*Id.*) Genco's mother also expressed that she was concerned about why Genco recently traveled to Greece for ten days. (*Id*.) She did not know who he would know in Greece, never heard from him while he was there, and refuses to talk about what he did while he was there. (*Id*.) She was reluctant to speak and stated that Genco has hit her in the past. (*Id*.)

Detective Engle described the property and things to be seized from Genco's residence as follows:

> Any weapons, such as but not limited to rifles, handguns and shotguns. Any documentation showing ownership of weapons, rifles, handguns or shotguns. Any currency derived from or used to support domestic or international terrorism. To search for and open any safes, lock boxes, or other locked containers used to store said weapons or currency. To search for, open, view, download, and/or record any cell phone data, wireless devices, computer hard drives, or other data storage devices where records of terrorism may be found[.] To search for any paperwork, documents, writings, books, or any other form of written or printed terroristic material; any paperwork showing residency, possession, use or control of the residence. Any material used to manufacture, detonate, or otherwise connected to an explosive device. Any other physical, digital, or forensic evidence connected to, used for, or associated with, any act of domestic or international terrorism.

(*Id.* at PageID 121.)

---

not helpful to the Court's probable cause analysis. Exhibit 5 is described as "[a] layout of what appeared to be some sort of room or business." (*Id.*)

[11] Genco's mother's description of Exhibit 4 conveyed information from her private search of that note. Her reading the note and conveying its contents does not constitute a Fourth Amendment violation.

The Search Warrant was signed and executed, and among the things seized were Exhibits 4 and 5. (Doc. 33 at PageID 126–30.) The Highland County Prosecutor charged Genco with Making a Terroristic Threat, in violation of Ohio Rev. Code § 2909.23(A) and a Forfeiture Specification, under Ohio Rev. Code § 2941.14.17. (Doc. 32 at PageID 102–03.) Genco entered an *Alford* plea to the charges and was sentenced to 17 months' imprisonment. (*Id.*) Subsequently, this case was brought in federal court.

### 2. Search Warrant Contains Probable Cause to Search Residence

Pursuant to the Fourth Amendment, "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "Probable cause 'is not a high bar.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (quoting *Kaley v. United States,* 134 S. Ct. 1090, 1103 (2014)). As the Sixth Circuit recently opined:

> Probable cause exists if the facts, circumstances, and "reasonably trustworthy information" would allow a person "of reasonable caution" to believe that a crime has been committed. *Brinegar v. United States*, 338 U.S. 160, 175, 69 S. Ct. 1302, 93 L.Ed. 1879 (1949). This is "a practical, nontechnical conception," *ibid.*, and it "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 243–44 n.13, 103 S. Ct. 2317, 76 L.Ed.2d 527 (1983). We give "great deference" to the issuing magistrate's probable-cause determination. *Id.* at 236, 103 S. Ct. 2317.

*United States v. Neuhard*, 770 F. App'x 251, 253 (6th Cir. 2019), *cert. denied*, 140 S. Ct. 570 (2019).

In determining whether a search warrant is supported by probable cause, a court may consider only the "four corners of the affidavit." *United States v. Ruffin*, 979 F.3d 528, 531–32 (6th Cir. 2020). Thus, "information known to the officer but not conveyed to the magistrate is irrelevant." *United States v. Abernathy*, 843 F.3d 243, 249 (6th Cir. 2016) (quoting *United States v. Brooks*, 594 F.3d 488, 492 (6th Cir. 2010)).

19

Probable cause requires a "fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238; *see also Ruffin*, 979 F.3d at 531.  Thus, "the affidavit supporting the search warrant must demonstrate a nexus between the evidence sought and the place to be searched." *United States v. Brown*, 828 F.3d 375, 382 (6th Cir. 2016) (citing *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc)).

Where law enforcement has conducted an illegal search and obtained evidence, the law generally forbids the use of that evidence in a subsequent search warrant as fruit of the poisonous tree. *See United States v. Leake*, 95 F.3d 409, 411–12 (6th Cir. 1996).  However, reliance on that evidence in a search warrant does not necessitate suppression of the evidence recovered pursuant to that warrant if the warrant details sufficient probable cause when the tainted evidence is excised. *United States v. Jenkins*, 396 F.3d 751, 758–60 (6th Cir. 2005).

Removing references to Exhibit 4, the Search Warrant still contains probable cause that evidence of Genco committing the crime of Making Terroristic Threats would be found in his residence.  Making Terroristic Threats under Ohio Rev. Code § 2909.23 is defined under Ohio law as follows:

> (A) No person shall threaten to commit or threaten to cause to be committed a specified offense when both of the following apply:
> (1) The person makes the threat with purpose to do any of the following:
> (a) Intimidate or coerce a civilian population;
> (b) Influence the policy of any government by intimidation or coercion;
> (c) Affect the conduct of any government by the threat or by the specified offense.
> (2) As a result of the threat, the person causes a reasonable expectation or fear of the imminent commission of the specified offense.
> (B) It is not a defense to a charge of a violation of this section that the defendant did not have the intent or capability to commit the threatened specified offense or that the threat was not made to a person who was a subject of the threatened specified offense.

Ohio Rev. Code § 2909.23.

Genco argues that the Search Warrant lacks evidence that he communicated any threat to harm anyone that was intended to intimidate a civilian population. He relies upon *State v. Klingel*, in which the Ohio Court of Appeals for the Ninth District acknowledged that "threat" is not defined in the statute, but generally connotes "[a] communicated intent to inflict harm or loss on another." 88 N.Ed.3d 455, 459, 2017-Ohio-1183 (2017). The court in *Klingel* also stated that whether the threat is communicated to its *subject* is not the question; rather, the inquiry is whether the defendant uttered the threat for the purpose of intimidating or coercing a civilian population or affecting the conduct of any government. *Id*. at 461. Genco takes the position that it is understandable officers had concerns, but there was no evidence the threat had been made to anyone.

"Probable cause 'requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.'" *United States v. Tagg*, 886 F.3d 579, 585 (6th Cir. 2018) (quoting *Wesby*, 583 U.S. at 586.). It is not an excessively high bar and calls for "common-sense conclusions about human behavior." *Id*. (citing *Wesby*). The Search Warrant Affidavit described discovery of concealed weapons, including an AR-15 with a bump stock in the trunk of Genco's car and a hidden 9 mm handgun in his bedroom. In addition, it describes a knowledgeable witness's statements that Genco was angry and aggressive and had hit her in the past. Further, the knowledgeable witness described seeing a document in Genco's bedroom in which he planned to harm a lot of people. Lastly, Genco's mother expressed concerns about his recent international travel and refusal to tell her what he did there and why he went. Taken together, these things provided probable cause to believe there was a substantial chance evidence of a terroristic threat could be found in Genco's residence.

### 3. Good Faith Exception Applies

Alternatively, the good faith exception would apply to save the Search Warrant. Generally, evidence obtained in violation of the Fourth Amendment cannot be used in criminally prosecuting the victim of the illegal search and seizure. *Illinois v. Krull*, 480 U.S. 340, 347 (1987). In 1984, however, the Supreme Court "established a new objective inquiry limiting suppression to circumstances in which the benefits of police deterrence outweigh the heavy costs of excluding 'inherently trustworthy tangible evidence' from the jury's consideration." *United States v. Gilbert*, 952 F.3d 759, 763 (6th Cir. 2020) (quoting *United States v. Leon*, 468 U.S. 897, 907 (1984)).

Pursuant to this good faith exception, evidence "obtained in objectively reasonable reliance" on a "subsequently invalidated search warrant" need not be suppressed where an officer acts in good faith reliance on the warrant. *Brown*, 828 F.3d at 385 (quoting *Leon*, 468 U.S. at 922). The Supreme Court in *Leon* identified four situations in which an officer's reliance cannot be considered "objectively reasonable:" (1) when the warrant is issued on the basis of an affidavit that an affiant knows—or is reckless in not knowing—contains false information; (2) when the issuing magistrate abandons his or her neutral and detached role and serves as a rubber stamp for police activities; (3) when the affidavit is so lacking in indicia of probable cause that a belief in its existence is objectively unreasonable; and (4) when the warrant is so facially deficient that it cannot reasonably be presumed to be valid. *United States v. Laughton*, 409 F.3d 744, 748 (6th Cir. 2005) (citing *Leon*, 468 U.S. at 914–23). Thus, if one of these situations applies, the evidence must be suppressed even if officers executing the warrant believed it to be valid.

Affidavits "so lacking in indicia of probable cause" are commonly called "bare bones" affidavits. *United States v. Ward,* 967 F.3d 550, 554 (6th Cir. 2020) (quoting *United States v. White*, 874 F.3d 490, 496 (6th Cir. 2017)). "To elude the 'bare bones' label, the affidavit must state more than 'suspicions, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge' and make '*some* connection' between the illegal activity and the place to be searched." *Id.* (quoting *United States v. Christian*, 925 F.3d 305, 312–13 (6th Cir. 2019) (en banc) (emphasis in original)). The Court must "read the affidavit holistically and examine the totality of the circumstances in making this inquiry." *Id.*

"We must take care not to confuse a bare bones affidavit with one that merely lacks probable cause." *Gilbert*, 952 F.3d at 763. As the Sixth Circuit recently explained:

> There must be daylight between the "bare bones" and "substantial basis" standards if *Leon*'s good-faith exception is to strike the desired balance between safeguarding Fourth Amendment rights and facilitating the criminal justice system's truth-seeking function. *See Leon*, 468 U.S. at 906–07, 913–21, 104 S. Ct. 3405; *United States v. Carpenter*, 360 F.3d 591, 595 (6th Cir. 2004) (en banc). Thus, "[a]n affidavit cannot be labeled 'bare bones' simply because it lacks the requisite facts and inferences to sustain the magistrate's probable-cause finding; rather, it must be *so* lacking in indicia of probable cause that, despite a judicial officer having issued a warrant, *no* reasonable officer would rely on it." *White*, 874 F.3d at 497.

*Id.* (emphasis in original).

The objective reasonableness determination "inquires 'whether a reasonably well trained officer would have known that the search was illegal despite the [judge's] decision'" to the contrary. *United States v. Hodson*, 543 F.3d 286, 293 (6th Cir. 2008) (quoting *United States v. Helton*, 314 F.3d 812, 824 (6th Cir. 2003)). "[R]easonable inferences that are not sufficient to sustain probable cause in the first place may suffice to save the ensuing search as objectively

reasonable." *United States v. Merriweather*, 728 F. App'x 498, 505 (6th Cir. 2018) (quoting *White*, 874 F.3d at 500).

Detective Engle's Search Warrant Affidavit is not bare bones. It is a detailed summary of evidence, including information about Genco's hidden weapons and statements of a firsthand witness about his aggressive and violent behavior. Further, the witness also described seeing a plan that Genco may hurt a lot of people. The Search Warrant Affidavit contains enough factual support that a reasonably well-trained officer "would not know to disregard a judicial determination that probable cause existed." *Gilbert*, 952 F.3d at 761. Accordingly, even if the Court found probable cause to be lacking, the good faith exception would apply, and the evidence should not be suppressed. As such, Defendant's Motion to Suppress Evidence Seized in Search Warrant is **DENIED**.

## III.     Motions to Dismiss

### A.  Motion to Dismiss Count 1 of the Indictment Based on Improper Venue

In his Motion to Dismiss Count 1 of the Indictment Based on Improper Venue, Genco argues venue is improper in the Southern District of Ohio. Count 1 charges Genco with "Attempted Hate Crime," or "attempt[ing] to willfully cause bodily injury to women, through the use of a firearm and a dangerous weapon, because of the actual and perceived gender of any person." (Doc. 7 at PageID 27.) The crime of attempt requires the Government to prove: (1) the defendant's intent to commit the criminal activity; and (2) that the defendant committed an overt act that constitutes a substantial step toward commission of the crime. *United States v. Wesley*, 417 F.3d 612, 618 (6th Cir. 2005). "A substantial step must be something more than mere preparation." *United States v. Bailey*, 228 F.3d 637, 640 (6th Cir. 2000) (internal quotation marks and citation omitted).

"Because of the problems of proving intent in attempt cases and the danger of convicting

for mere thoughts, desires, or motives, we require that the substantial step consist of objective

acts that mark the defendant's conduct as criminal in nature." *Wesley,* 417 F.3d at 618–19

(citing *United States v. Pennyman,* 889 F.2d 104, 106 (6th Cir. 1989)). "This objective conduct

must unequivocally corroborate the required subjective intent to engage in the criminal conduct."

*Id.* at 619. The substantial step analysis is objective:

> under the "substantial step" analysis, an appellate court evaluates whether any
> reasonable person could find that the acts committed would corroborate the
> firmness of a defendant's criminal intent, assuming that the defendant did, in fact,
> intend to commit the crime. The requirement does not mandate that the activity
> constituting a substantial step must be *sufficient* to prove that the defendant had
> the subjective, specific intent to commit a crime. The intent may need to be
> proven separately.

*Id.* (citing *United States v. Bilderbeck*, 163 F.3d 971, 975 (6th Cir. 1999)).

Courts in the Sixth Circuit have found that a "substantial step" may be proven through

multiple acts. *See, e.g., id.* at 619–20 (conviction for attempted bank robbery supported by

evidence of multiple acts, including recruiting a getaway driver, communicating specific plans,

and surveilling the bank, which constituted a substantial step); *United States v. Alebbini*, 979

F.3d 537, 547 (6th Cir. 2020) (rejecting argument that there was no substantial step towards

providing material to support ISIS by noting defendant said goodbye to his friends and family,

drove over an hour to the airport, obtained a boarding pass, and went toward the security

checkpoint in order to board a plane to Turkey).

Under the Sixth Amendment to the United States Constitution, individuals accused of a

crime must be prosecuted in the "district wherein the crime shall have been committed, which

district shall have previously ascertained by law[.]" U.S. Const. amend. VI. Federal Rule of

Criminal Procedure 18 states: "Unless a statute or these rules permit otherwise, the government

must prosecute an offense in a district where the offense was committed."  Fed. R. Crim. P. 18.

For offenses "begun in one district and completed in another, or committed in more than one

district," the Government may prosecute such offense "in any district in which such offense was

begun, continued, or completed."  18 U.S.C. § 3237(a).

Genco argues that discovery has shown that the alleged "substantial step" was conducting

surveillance at a university in Alliance, Ohio, which is in the Northern District of Ohio.  Thus, he

argues venue is improper in the Southern District of Ohio.  However, the analysis is not so

limited.  The Indictment describes several acts taken by Genco in the Southern District of Ohio

that taken together could constitute a "substantial step," including: acquiring and modifying a

rifle and pistol; researching gun modifications and downloading illustrated guides to constructing

M-16s; writing his manifesto which outlined his philosophy of hate; and drafting his document

"isolated" which he intended to be found after he committed his planned murders; conducting

online research of potential targets for his attack, including sororities and a university in Ohio;

researching and saving police scanner codes for Columbus, Ohio police and university police;

and purchasing body armor and ammunition and hiding them with a modified rifle in the trunk of

his car.  Because Genco acted in this district in ways that constitute a "substantial step," venue is

proper here.  *See United States v. Davis*, 531 F. App'x 601, 606 (6th Cir. 2103) (venue for

murder proper in district where the defendant "hatched his plot and executed parts of it," even

though murder was committed in different district).

Thus, Defendant's Motion to Dismiss Count 1 of the Indictment Based on Improper

Venue (Doc. 34) is **DENIED**.

**B.  Motion to Dismiss Count 1 of the Indictment Based on Commerce Clause**

Genco also argues that the 18 U.S.C. § 249(a)(2)(B), for which he is charged with

attempted hate crime, is invalid on its face and as applied in this case, because the Government

has identified no objective overt acts constituting an attempt that occurred in the course of

commerce as required by the statute.  Genco argues that the statue federally criminalizes the

common law offenses of assault and battery, which are purely non-commercial crimes, based on

insufficient connections to commerce.

**1.  Section 249 is a Valid Exercise of Congress's Authority**

Genco argues that the Hate Crimes Acts provision under which he is charged, 18 U.S.C.

§ 249(a)(2), is facially unconstitutional because it exceeds Congress's power under the

Commerce Clause.  Section 249(a)(2) states as follows:

> **(2) Offenses involving actual or perceived religion, national origin, gender, sexual orientation, gender identity, or disability.**--
> **(A) In general.**--Whoever, whether or not acting under color of law, in any circumstance described in subparagraph (B) or paragraph (3), willfully causes bodily injury to any person or, through the use of fire, a firearm, a dangerous weapon, or an explosive or incendiary device, attempts to cause bodily injury to any person, because of the actual or perceived religion, national origin, gender, sexual orientation, gender identity, or disability of any person--
>> **(i)** shall be imprisoned not more than 10 years, fined in accordance with this title, or both; and
>> **(ii)** shall be imprisoned for any term of years or for life, fined in accordance with this title, or both, if--
>> **(I)** death results from the offense; or
>> **(II)** the offense includes kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill.
> **(B) Circumstances described.**--For purposes of subparagraph (A), the circumstances described in this subparagraph are that--
>> **(i)** the conduct described in subparagraph (A) occurs during the course of, or as the result of, the travel of the defendant or the victim--
>> **(I)** across a State line or national border; or
>> **(II)** using a channel, facility, or instrumentality of interstate or foreign commerce;

> **(ii)** the defendant uses a channel, facility, or instrumentality of interstate or foreign commerce in connection with the conduct described in subparagraph (A);
> **(iii)** in connection with the conduct described in subparagraph (A), the defendant employs a firearm, dangerous weapon, explosive or incendiary device, or other weapon that has traveled in interstate or foreign commerce; or
> **(iv)** the conduct described in subparagraph (A)--
> **(I)** interferes with commercial or other economic activity in which the victim is engaged at the time of the conduct; or
> **(II)** otherwise affects interstate or foreign commerce.

18 U.S.C. § 249(a)(2)(A)–(B).

The United States Constitution delegates Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States," in the Commerce Clause.  U.S. Const., art. I, § 8, cl. 3.  The Supreme Court has identified "three broad categories of activity that Congress may regulate under its commerce power[:] "(1) the use of the channels of interstate commerce[;]" (2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities[;]" and (3) "activities having a substantial relation to interstate commerce, *i.e.*., those activities that substantially affect interstate commerce[.]"  *United States v. Lopez*, 514 U.S. 549, 558–59 (1995) (internal citations omitted).   The Hate Crimes Act falls under the third category.  *United States v. Jenkins*, 909 F. Supp. 2d 758, 767 (E.D. Ky. 2012) (finding the Hate Crimes Act generally and as applied was valid under the third category of the Commerce Clause).   The *Jenkins* court explained:

> The framework for determining whether an activity has a substantial impact on interstate commerce was set forth in [*United States v.*] *Lopez* and again applied in [*United States v.*] *Morrison*.  First, a reviewing court must determine whether the prohibited activity is economic in nature or an essential part of a larger regulation of economic activity.  Second, the statute is reviewed to determine if it contains a jurisdictional element.  Third, the court considers Congressional findings as to the effects of the prohibited activity on commerce.  Finally, a determination must be made as to whether the link between the prohibited activity and the effect on interstate commerce is attenuated.

*Id*. at 767–68 (internal citations removed) (citing *Lopez*, 514 U.S. at 561–62; *United States v. Morrison*, 529 U.S. 598, 610–12 (2000)).  In *Jenkins*, the district court found that the Hate Crimes Act contains a jurisdictional element, or "hook," codified under § 249(a)(2)(B), and that "Congress has employed the full breadth of its regulatory power to ensure that this jurisdictional hook is sufficient."  *Id*. at 770–71.  In *Jenkins*, the district court found that the use of a motor vehicle involved the instrumentality of interstate commerce, and traveling on a U.S. Highway, despite never crossing state lines, involved the use of the channels of commerce.  *Id*. at 771–72. As a result, the court concluded that the Hate Crime Act is constitutional on its face and as applied.   Similarly, in *United States v. Mullet*, the district court for the Northern District of Ohio found the Hate Crimes Act constitutional on its face and as applied, where the defendant used scissors and hair clippers, which had traveled from out of state into Ohio, to carry out an assault, and that the defendants lured a victim by using the mail and a motor vehicle to facilitate the assault.  868 F. Supp. 2d 618, 623 (N.D. Ohio 2012).

Further, in *United States v.  Hill*, the Fourth Circuit Court of Appeals confronted the issue of whether the Hate Crimes Act may be constitutionally applied to an unarmed assault of a victim engaged in commercial activity at his place of work.  927 F.3d 188, 193 (4th Cir. 2019). The Fourth Circuit held that "[w]ithout question, the Hate Crimes Act reflects Congress's carefully considered judgment that the scope of the statute complies with Congress's authority under the Commerce Clause, as that authority has been understood by the Supreme Court."  *Id*. at 197.  Like the persuasive authority of *Jenkins, Mullet,* and *Hill*, the Court similarly finds the Hate Crimes Act is constitutional on its face.

The Hate Crimes Act is constitutional as applied here.  The Indictment includes numerous examples of Genco's use of the instrumentalities and channels of interstate commerce

to commit attempted hate crime. Genco is alleged to have used his computer to use the internet to post on Incel forums and research gun modifications, university police scanner codes, and his criminal culpability. *United States v. Person*, 714 F. App'x 547, 551 (6th Cir. 2017) (internet is a channel of interstate commerce). According to the Indictment, Genco drove to the school he surveilled, loaded his modified rifle, ammunition, and body armor into his car, and planned to drive to his intended location to conduct the mass attack. The Indictment alleges that Genco used his cell phone and a motor vehicle in connection with the alleged hate crime, both of which are instrumentalities of interstate commerce. *United States v. Watson*, 852 F. App'x 164, 168 (6th Cir. 2021) (cell phones are instrumentalities of interstate commerce); *United States v. McHenry*, 97 F.3d 125, 126 (6th Cir. 1996) (cars are instrumentalities of interstate commerce).

In addition, the Indictment alleges that at least one firearm travelled in interstate commerce. *United States v. Chesney*, 86 F.3d 564, 570–72 (6th Cir. 1996) (stipulation that a gun had been transported in interstate commerce was sufficient to meet jurisdictional hook that the firearm be "in or affecting commerce"). Genco argues that his purchase of a firearm was before he posted on Incel forums and therefore cannot be the basis of Commerce Clause jurisdiction. However, as the Government argues, the Government has not been required to prove that the weapons moved in interstate commerce before the defendant formed intent to attack his or her victim in analogous hate crime prosecutions. *See Mullet*, 868 F. Supp. 2d at 623; *see also United States v. Napier*, 233 F.3d 394, 396, 400 (6th Cir. 2000) (rejecting the argument that prosecution for possessing a firearm while subject to a domestic violence order exceeded Congress's Commerce Clause authority where the defendant possessed his firearm prior to the entry of the domestic violence order against him). Consistent with this authority, it is enough that the firearm moved in interstate commerce. "Congress has made clear that it considers hate crimes . . . to

30

have a substantial [e]ffect on interstate commerce, even if that [e]ffect may appear relatively minimal in an isolated case." *United States v. Beckham*, No. 3:18-cr-00075-1, 2019 WL 2869189, at *7 (M.D. Tenn. July 3, 2019).  As Genco used the channels and instrumentalities of interstate commerce, the federal jurisdictional requirement is met as applied to his alleged conduct in this case.

Genco also argues that the Government too broadly interprets the law of attempt.  He contends that subjective intent cannot support Commerce Clause jurisdiction. According to him, the Government has not identified objective overt acts of attempt that occurred in the course of commerce as required by § 249.  Because Genco is charged with attempted hate crime, the Government must prove: (1) Genco has intent to commit a crime; and (2) Genco committed an overt act that constitutes a substantial step toward commission of the crime. *Wesley*, 417 F.3d at 618.  Genco argues that "pre-offense" conduct includes private thoughts and writings and cannot form the basis of Commerce Clause jurisdiction.  He argues that Commerce Clause jurisdiction requires the actual crime to impact commerce, not every inchoate expression of intent.  However, as the Government points out, Genco has not identified any cases in which evidence of intent may not form the basis of Commerce Clause jurisdiction.  And, further, the Government must of course establish that the protected characteristic is the but-for-cause of the attack in order to sustain a charge under the Hate Crimes Act. *See United States v. Miller*, 767 F.3d 585, 592–93 (6th Cir. 2014).

In sum, the Hate Crimes Act is a proper exercise of Congress's Commerce Clause power, and the Hate Crimes Act as applied here is constitutional.  Thus, Defendant's Motion to Dismiss Count 1 of the Indictment Based on Commerce Clause is **DENIED**.

### C. Motion to Dismiss Count 2 of the Indictment

Defendant moves to dismiss Count 2 of the Indictment, which charges him with Unlawful Possession of a Machinegun in violation of 18 U.S.C. §§ 922(o) and 924(a)(2). (Doc. 7 at PageID 28.) Defendant is charged with possession a modified Glock-type, 9 mm Luger caliber semiautomatic pistol, with no manufacturer's marks or serial number. (*Id.*) He argues that his weapon does not meet the definition of a "machinegun" under the law.

After seizing the Palmetto State Armory rifle and Glock-type semiautomatic pistol from the defendant, firearms examiners with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") examined both weapons and prepared a report. (Doc. 32-2, ATF Firearms Technology Criminal Branch Report of Technical Examination ("ATF Report").) The examiner reported that he test-fired the semiautomatic pistol and described that he was able to fire up "two rounds automatically with a single function of the trigger" and "repeated this method of test-fire twice more with the same results." (*Id.* at PageID 125.) The examiner also reported that the rear rails of the gun had been removed and so "the slide will raise up during operating causing the firing pin not to engage the trigger bar cruciform" which allows the pistol "to function like a machinegun." (*Id.*) Thus, the question before the Court is whether a modified gun which can fire two rounds "automatically with a single function of the trigger" because the rear rails of the gun have been removed constitutes a "machinegun" under the law.[12]

A "machinegun" is defined in 26 U.S.C. § 5845(b) as:

> any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a

---

[12] Although law enforcement also recovered a 5.56x45 mm caliber semi-automatic rifle with an attached bump stock, that rifle is uncharged in the Indictment. (Doc. 45 at PageID 249.)

machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. 5845(b). The Code of Federal Regulations explains that "'automatically' as it modifies 'shoots, is designed to shoot, or can be readily restored to shoot,' means functioning as the result of a self-acting or self-regulating mechanism that a*llows the firing of multiple rounds through a single function of the trigger*; and 'single function of the trigger' means a single pull of the trigger and analogous motions." 27 C.F.R. § 479.11 (emphasis added). A plain reading of the statute demonstrates that Genco's weapon fired two shots with the single pull of a trigger. Thus, it meets the statutory definition of a machinegun.

Genco argues that since test fires of the pistol could only produce two rounds with one pull of the trigger, instead of continuing to fire until the trigger was released or the ammunition exhausted, the pistol cannot be a machinegun as a matter of law.[13] In support of his position, Genco relies upon a footnote from *Staples v. United States*:

> [a]s used here, the terms "automatic" and "fully automatic" refer to a weapon that fires repeatedly with a single pull of the trigger. That is, once its trigger is depressed, the weapon will automatically continue to fire until its trigger is released or the ammunition is exhausted. Such weapons are "machineguns" within the meaning of the Act. We use the term "semiautomatic" to designate a weapon that fires only one shot with each pull of the trigger, and which requires no manual manipulation by the operator to place another round in the chamber after each round is fired.

511 U.S. 600, 602 n.1 (1994).

As has been recognized by the Seventh Circuit in a factually similar case to Genco's, the *Staples* case is distinguishable. *United States v. Olofson*, 563 F.3d 652, 657 (7th Cir. 2009). In

---

[13] Genco also argues that the Government cannot exercise Commerce Clause jurisdiction over machineguns. However, as he acknowledges, the Sixth Circuit held that the federal ban on machineguns is a valid exercise of Congress's Commerce Clause power. *United States v. Beuckelaere*, 91 F.3d 781 (6th Cir. 1996); *United States v. Faasse*, 265 F.3d 475, 490 (6th Cir. 2001).

*Olofson*, the Seventh Circuit Court of Appeals rejected the applicability of the *Staples* footnote where the defendant argued that the rifle he possessed was not a machinegun that fired automatically because it fired only three rounds per trigger pull and did not keep shooting until the trigger was released or the ammunition was exhausted. *Id*. at 658–59. The court emphasized that *Staples* addressed a different legal issue in holding that 26 U.S.C. § 5861(d) requires proof of mens rea, or that a defendant knew of the characteristic of his weapon that made it a firearm under the National Firearms Act. *Id*. at 619. Because the definition of "automatically" was not at issue in the case, "the Court's discussion of the terms 'automatic' and 'fully automatic' was immaterial to its holding." *Id*. at 657. The court concluded that the *Staples* footnote did not establish a requirement for district courts to instruct juries on the meaning of "automatically" from § 5845(b). *Id*. Thus, here, as the Government argues, the *Staples* footnote describes one circumstance that qualifies as a machinegun but does not confine a machinegun to that reading alone.

Lastly, though also factually distinguishable, the Sixth Circuit's recent en banc decision in *Gun Owners of America, Inc. v. Garland* ("*Gun Owners III*") supports the Government's position that the definition of a "machinegun" is broader than that which was described in the *Staples* footnote. 19 F.4th 890 (6th Cir. Dec. 3, 2021). The *Gun Owners III* case addressed whether the "Bump-Stock-Type Devices" Final Rule[14] published by the ATF that bump-stock-type devices fall within the definition of "machinegun" as defined in the National Firearms Act and the Gun Control Act was entitled to *Chevron*[15] deference and whether it should be enjoined from going into effect. *Id*. at 897–99. In the 8-8 divided panel opinion, the Sixth Circuit

---

[14] Department of Justice, "Bump-Stock-Type Devices" (Final Rule), 83 Fed. Reg. 66514-01, 2018 WL 6738526 (Dec. 26, 2018).

[15] *Chevron, U.S.A., Inc. v. Nat'l Resources Def. Council, Inc.*, 467 U.S. 837 (1984).

affirmed the district court's ruling that the ATF's interpretation of a bump stock as a machinegun warranted *Chevron* deference, and "in the absence of all deference, and simply as a matter of statutory interpretation, it also embodies the best reading of the statute." *Id*. at 909. Thus, though distinguishable, the opinion in support of affirming the district court's judgment that a bump stock-equipped rifle constitutes a "machinegun" supports the Government's position.

The Court agrees with the Government that the plain language of the statute requires that the firearm charged shoot "automatically more than one shot, without manual reloading, by a single function of the trigger" which is what is charged here. 26 U.S.C. § 5845(b). Defendant's Motion to Dismiss Count 2 of the Indictment is therefore **DENIED**.

## IV.   CONCLUSION

For the reasons set forth herein, Defendant's Motion to Suppress Evidence from Warrantless Search (Doc. 25) is **GRANTED IN PART**. Defendant's Motion to Suppress Evidence Seized in Search Warrant (Doc. 26); Motion to Dismiss Count 1 of the Indictment Based on Improper Venue (Doc. 34); Motion to Dismiss Count 1 of the Indictment Based on Commerce Clause (Doc. 38); and Motion to Dismiss Count 2 of the Indictment (Doc. 28) are **DENIED**. Defendant's Motion for Bill of Particulars and to Request to Extend Motion Deadline (Doc. 27) is **MOOT**.

**IT IS SO ORDERED.**


S/Susan J. Dlott_____
Judge Susan J. Dlott
United States District Court