# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CASE NO. 1:21-CR-85 |
| | : | |
| | : | JUDGE SUSAN J. DLOTT |
| v. | : | |
| | : | |
| | : | **GOVERNMENT'S OPPOSITION TO** |
| TRES GENCO, | : | **DEFENDANT'S MOTION TO** |
| | : | **RECONSIDER** |
| Defendant. | : | |
| | : | |
| | : | |

The United States respectfully submits this response to the defendant's motion to reconsider. For the reasons outlined, the defendant's motion should be denied.

## BACKGROUND

During the course of this case, the defendant filed a number of pretrial motions, including a motion to suppress evidence seen during a consent search and a motion to suppress evidence recovered pursuant to a subsequent search warrant. On October 20, 2021, this Court held a hearing on the defendant's various motions. During that hearing, the Government called one witness: Detective Erica Engle. Det. Engle was present on the day the defendant was arrested and his room searched, and she was the affiant on the search warrant for the bedroom granted by a state magistrate.

After the conclusion of the hearing and subsequent briefing, this Court issued its decision, granting the motion to suppress evidence seen during the consent search in part, and denying the motion to suppress evidence recovered pursuant to the search warrant. In this Court's view, Det. Engle reading the to-do list during the consent search was improper and warranted suppression; however, once the references to the to-do list were excised from the state warrant, what remained sufficiently provided probable cause for the search. Alternatively, this

Court found that the officers relied on the warrant in good faith. Because the warrant was upheld, the evidence recovered pursuant to that warrant, including the to-do list, is admissible in this case.

The defendant filed the instant motion to reconsider a day later, arguing that the defendant's mother's statement about "seeing a plan to hurt a lot of people" must also be stricken from the warrant, because the statement is the fruit of the poisonous tree. In the defendant's view, once that statement is removed from the warrant, what remains is insufficient to detail probable cause.

The defendant has made no effort to meet the standard for a motion for reconsideration, and could not if he tried. But even if the defendant's motion is assessed on the merits, it fails.

## ARGUMENT

**I.     The Defendant Has Not Met the Standard for a Motion for Reconsideration.**

For the Court to reconsider its decision, the defendant must show: "(1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) a need to prevent a manifest injustice." *Chapman-Sexton* v. *United States*, 2:16-cr-141, 2022 WL 203511 at *1 (S.D.O.H. Jan. 24, 2022) (quoting *Henderson* v. *Walled Lake Consol. Sch.*, 469 F.3d 479, 496 (6th Cir. 2006)). A motion for reconsideration is not the place for new arguments that were available to the defendant at the outset. *United States* v. *McIver*, 5:17-069-DCR, 2021 WL 5238773 at *1 (E.D. Ky. Nov. 9, 2021) ("Courts will not address new arguments or evidence that the moving party could have raised before the decision on the merits issued." (quoting *Banister* v. *Davis*, 140 S. Ct. 1698, 1703 (2020))).

The defendant does not identify a clear error of law committed by the Court. He does not point to evidence newly discovered or a change in the law since he filed his motions. He does not assert a manifest injustice has occurred. Instead, he raises a new argument, which was available to him during motion practice prior to the entry of the decision. The Government

2

raised in its omnibus response that if the Court found that the search of the documents was improper, excision from the warrant was the remedy. *See* Dkt. 32 at 8-11. The defendant filed multiple responses after the Government's submission, including a post-hearing brief that addressed excision but failed to argue that the mother's statements were fruit of the poisonous tree. *See* Dkt. 39 at 9-10. He cannot now raise this argument in an unwarranted motion to reconsider. *See Bank of Ann Arbor* v. *Everest Nat. Inc. Co.*, 563 F. App'x 473, 476 (6th Cir. 2014) ("It is well-settled that 'parties cannot use a motion for reconsideration to raise new legal arguments that could have been raised before a judgment was issued.'" (quoting *Roger Miller Music, Inc.* v. *Sony/ATV Publ'g*, 477 F.3d 383, 395 (6th Cir. 2007)).

The defendant cannot meet the standard for a motion to reconsider, and as such this Court should deny the motion outright.

## II. The Court Correctly Considered the Mother's Statement in Evaluating the Sufficiency of the Affidavit.

Even if this Court reaches the merits of the defendant's arguments, the Court's decision should stand. In its decision, the Court excised the references to the to-do list from the warrant[1] and found sufficient probable cause remained for the warrant to issue. The Court did not excise the statement of the mother that she had seen a writing of the defendant about hurting people. By not excising the mother's statement from the warrant, this Court ruled that the statement was

---

[1] The Government maintains its position as asserted in its motion responses, which is that the search of the to-do list was within the scope of consent, covered by private search doctrine, and also lawfully conducted pursuant to the defendant's mother's consent. The Government also maintains that even if these multiple exceptions do not apply, the to-do list need not be suppressed and excised from the warrant.

not the fruit of the poisonous tree. That correct conclusion is compelled by the evidence already before this Court.[2]

The defendant argued in his motion and at the status conference before the Court that the Court is limited to the "four corners" of the warrant to decide whether the statement is the fruit of the poisonous tree. This is wrong. The boundary of the warrant's four corners applies when determining whether a warrant contains sufficient evidence to find probable cause. *See, e.g.*, *United States* v. *Frazier*, 423 F.3d 526, 531 (6th Cir. 2005). The decision as to whether there was a Fourth Amendment violation and whether evidence was obtained as a result of that violation is a fact inquiry, and the Court is entitled to consider the facts that have been presented, including through testimony and other exhibits. *See, e.g.*, *United States* v. *Smith*, 386 F.3d 753, 763 (6th Cir. 2004) (basing conclusion that evidence was not fruit of the poisonous tree on facts gathered in part at suppression hearing). The evidence already before this Court shows the defendant's mother made her statement prior to the search of the defendant's bedroom, and thus need not be excluded and excised from the warrant. This was the Court's conclusion in the order, and that conclusion is correct.

Contemporaneously to the events, Det. Engle prepared a felony report for the state prosecutor, which was previously admitted as Exhibit 3. In that report, Det. Engle detailed that the mother's statement was made prior to the search of the defendant's bedroom:

> After checking the back seat and not locating the weapon, the male advised it may be in the trunk. Det. Antinore opened the trunk and moved a large cloth cover and located an AR-15 rifle equipped with a "Bump-Stock" along with several loaded magazines, boxes of ammunition, and body armor. We advised Sgt. Seaman that we were concerned with what we seen, and he agreed. Upon removing the rifle and body armor from the vehicle, [the defendant's mother] (who Sgt. Seaman had previously identified) had an audible emotional reaction. Det. Antinore asked her what was wrong, and she stated that in the past, before [Genco] had joined the Army, she had

---

[2] As the Government argues *infra*, the record before this Court does not need to be supplemented. However, if there are facts that the Court wishes to be explored, the Government requests the opportunity to reopen the record and provide the necessary information.

> discovered writings that she believed indicated that he was planning to hurt someone. [The defendant's mother] then advised that [Genco] also had a handgun, as she had seen it a few days prior, but was unsure where he kept it. . . . Det. Antinore then asked [Genco] about having a handgun and he stated he did not have one. . . . Det. Antinore asked Tres if he would grant permission for us to search his bedroom for a handgun. Tres stated that we could search the bedroom.

Exhibit 3 at 3. As detailed in the felony report, the defendant's mother's statement about Genco's writings was made before officers searched the defendant's bedroom, so the statement could not have been the product of the improper review of the to-do list.

> Det. Engle testimony at the hearing supports this conclusion:
>
> Q. Now, you had testified that there was another civilian individual, a female, present on the scene during these events. Was that individual still present when this search was being conducted?
>
> A. She was.
>
> Q. Now, did that individual have any reaction to the discovery of the firearm in the vehicle?
>
> A. She did.
>
> Q. What was that reaction?
>
> A. She was completely shocked and questioned Tres on her own as to why he had that.
>
> . . .
>
> Q. Did that individual who – do you happen to know the relationship of that individual to the defendant?
>
> A. Yes. She identified herself as his mother.
>
> Q. All right. Did his mother speak with you or other law enforcement about the incidents that were ongoing at the residence at that time?
>
> A. She did.
>
> Q. And what do you recall her saying to you about it?
>
> A. She was very distraught initially based on why she had called us. She brought into question Tres' behavior in the last several months. She explained to us several different reasons why she thought his behavior was out of

5

control, erratic, not like him. She was very concerned about his behavior and what he had been up to.

Q. Now, you just testified that she relayed to you certain reasons that she believed that the defendant's behavior had changed. Do you recall any of those reasons?

A. I do.

Q. Could you please share them with us?

A. She stated that, in the past, one of the things that he had done was – she thought he was getting back on track and had joined the military, only once he got out of the military, he became a very different person. He was very agitated. He just did things that were out of character. He had traveled to Greece for ten days without knowing anybody or no rhyme or reason why he went, never discussed why he was leaving, never discussed with her what he was going to be doing while he was there. I mean, there was just multiple conversation about how she just thought his behavior was off. She had recently located a firearm inside of her car. She questioned him about it. He told her it was none of her business, don't worry about it.

Q. Now, what, if anything, did his mother say about any documents that the defendant had prepared?

A. His mom stated that while he was gone in the military, she had cleaned his room, and when she had cleaned his room, she had located a document that scared her to death about killing multiple people in a large group.

Q. After the discovery of the rifle and the body armor inside of the vehicle, what happened next?

A. Tres was questioned about where's the gun that his mother had spoke about on the phone. Tres did not exit the residence with a firearm, so we knew the firearm located in the car could not have been the firearm that his mom spoke about on the phone of him having. He stated he did not have another firearm.

Q. And what, if anything, did law enforcement say in response to Mr. Genco claiming he did not have another firearm?

A. If I remember the conversation correctly, XXXXX – I apologize. His mother interrupted our conversation with him and essentially told him that he was lying, that just like the gun that she had told us that she had found a week ago in the console of her car, he did have another gun. She didn't know why he would tell us that. We asked him, you know, where is the gun that she's

telling us about. He still said that he did not own one. He was asked for permission to go in his bedroom and confirm his story.

Tr. at 8:13 - 11:12.

Det. Engle also testified that the defendant's mother stood in the doorway of the defendant's bedroom during the search and identified the to-do list as the document she "had talked about[.]" *See, e.g.*, Tr. at 27:25 – 28:2 ("His mother wanted us to see it. She pointed it out. She had talked about it. She said that it talked about killing people."). The defendant's mother alerted the officers of the to-do list's importance by referencing her statements to officers prior to the search. *See, e.g.*, Tr. at 30:23 – 30:25 ("Q. And I guess when you reached the point in the tub where you got to the note, she said that's the note? A. Yes.").

This testimony, along with the felony report, confirms the correctness of this Court's finding that the defendant's mother made her statement about the document before the search of the defendant's bedroom. *See* Dkt. 47 at 6. That statement cannot be tainted by the search that happened after.

The defendant relies solely on the text of the search warrant, which suggests that the defendant's mother's comments were made after the search:

> After what had been located all units stepped out of the residence and called Federal Bureau of Investigations. Affiant and Sgt. Seaman spoke with [the defendant's mother] briefly about her situation. [The defendant's mother] indicated that her and . . . Tres came to Ohio from California about two years ago, to get Tres out of the city. [The defendant's mother] stated that neither of them work and Tres was going to go back to school. Tres enlisted in the Military at her request last fall to keep himself out of trouble, however [the defendant's mother] stated that he was only there a couple months and they discharged him. After this she stated she doesn't feel she knows him anymore, he was so angry and aggressive. [The defendant's mother] spoke of a letter she had read that was what she believed a plan for Tres to harm a

> lot of people, however she could [not] remember exactly when it was or where it went to.

Ex. 1 at 4; *see also* Tr. 36:6 – 36:22 (Det. Engle clarifying the missing "not" in the sentence).

The defendant depends on this segment of the warrant alone to contend that the mother's statements were made after the search. Because the description of the interview appears after the section describing the search, the defendant assumes this means the conversation must have occurred after. But the warrant does not say that – there is no language in the paragraph that describes the timing of the mother's statements. The defendant's assumption that the mother's statements were made after the search is inconsistent not only with Det. Engle's testimony and felony report, but with logic. If the mother's statement were made after the document was discovered and read in her presence, why would she say, "she could [not] remember exactly when it was or where it went to"? If she spoke about the document after the search, she would know exactly where it went to – the plastic bin in the defendant's room. The statement as relayed in the warrant only makes sense if it were made prior to the search of the defendant's bedroom, as Det. Engle testified and wrote in the felony report. While the statement's placement in the affidavit invites the assumption that the conversation occurred after the search, Det. Engle's testimony at the hearing, the felony report, and common sense all support the conclusion that the statement was made before the search, and thus could not be the fruit of the poisonous tree.

Because the statement could not be the product of the improper search, this Court correctly considered it in holding that the affidavit supplied probable cause for the search.

Even if this Court were to conclude, contrary to the aforementioned evidence, that the mother's statement was made after law enforcement's search, it is not the fruit of the poisonous

8

tree because the statement is sufficiently attenuated from the reading of the to-do list to be admissible. *See United States* v. *Cooper*, --- F.4th ----, 2022 WL 321133 at *3 (6th Cir. 2022).

Whether a witness's statements are sufficiently attenuated from an improper search is determined by a number of factors, including the "degree of free will exercised by the witnesses." *United States* v. *Akridge*, 346 F.3d 618, 626 (6th Cir. 2003); *see also United States* v. *Ceccolini*, 435 U.S. 268, 276-77 (1978).[3] Here, the mother was speaking to law enforcement freely, not under arrest or even under suspicion. She was in fact speaking to them at her instigation; she had called the police to her home after fearing for her safety. Once police were there at her request, she provided a wide-ranging statement about her son, including details of his history, behavior, travels, and time in the military. *See* Ex. 1 at 4. To the extent that she had any reluctance, it was caused by fear of violence from the defendant. *Id*. ("[The defendant's mother] was very reluctant to speak with us and indicated that her son is just too much that he has hit her in the past, but he didn't today."). The mother's statements—including the statement about the note—were offered by a victim who had called police for help. She was willing to provide information to the police in order to help her son and secure her safety. It was not the officer's read of the note that compelled the mother to speak. Nor was the note used when law

---

[3] The defendant attempts to analogize this case to *United States* v. *Leake*, 95 F.3d 409 (6th Cir. 1996), but *Leake* is inapposite. First, *Leake* examined post-search witness statements under independent source and inevitable discovery doctrines, not attenuation. *See id.* at 417. The Sixth Circuit has made clear quite recently that attenuation is a distinct and different doctrine. *See Cooper*, --- F.4th ----, 2022 WL 321133 at *3-4 (detailing the differences between inevitable discovery doctrine and attenuation). Nor could the reasoning in *Leake* be grafted onto attenuation doctrine; the case was decided seven years before the Sixth Circuit outlined the factors that should be considered when evaluating attenuation of witness statements. *See Akridge*, 346 F.3d at 626. The defendant's analysis does not engage the right standard, or even cite a case that addresses attenuation in the context of witness statements (the only other two cases he cites concern suppression of physical evidence). *See United States* v. *Elmore*, 18 F.4th 193 (6th Cir. 2021) (suppression of memory-card evidence); *Murray* v. *United States*, 487 U.S. 533 (1988) (suppression of drugs and notebooks); *see also Ceccolini*, 435 U.S. at 277 ("The proffer of a living witness is not to be mechanically equated with the proffer of inanimate evidentiary objects illegally seized.").

enforcement spoke to the mother. As Det. Engle testified, officers left the note behind in the bedroom to secure a warrant. *See, e.g.*, Tr. at 20:8 – 20:13. Even if her statement were made after the search—and the record shows it was not—the officers did not use the note during that conversation because they had left it behind. Nor does the mother's statement bear any indicia that it was influenced by the note's contents; her description was broad and imprecise. *See* Ex. 1 at 4 ("[The defendant's mother] spoke of a letter she had read that was what she believed a plan for Tres to harm a lot of people, however she could [not] remember exactly when it was or where it went to.").

This Court concluded correctly that the mother's statements need not be excised from the warrant, and that decision is correct.

### III. If Statement is Excised, Warrant Sufficiently Details Probable Cause.

If the mother's statement about the note were excised from the warrant, there would still be sufficient probable cause to support its issuance.

In its excision analysis, this Court did not rely solely on the mother's statement about the note:

> The Search Warrant Affidavit described discovery of concealed weapons, including an AR-15 with a bump stock in the trunk of Genco's car and a hidden 9mm handgun in his bedroom. In addition, it describes a knowledgeable witness's statements that Genco was angry and aggressive and had hit her in the past. Further, the knowledgeable witness described seeing a document in Genco's bedroom where he planned to harm a lot of people. Lastly, Genco's mother expressed concerns about his recent international travel and refusal to tell her what he did there and why he went. Taken together, these things provided probable cause to believe there was a substantial chance evidence of a terroristic threat could be found in Genco's residence.

Dkt. 47 at 21. If reference to the mother's statement about the document is removed, ample evidence remains to support the Court's probable cause determination. In addition to the statement, the Court recounted his machineguns and the unchallenged statements of the mother about his violence, mental state, international travel, and evasive behavior. The warrant also

10

details the defendant's lies about the machinegun hidden in his room, and the discovery of ammunition, body armor, and a machete, along with his mother's distress call to police about her son loading a weapon and "rag[ing] out." Thus, even if the statement were not sufficiently attenuated and struck from the warrant, the warrant, which "is a detailed summary of evidence," outlines probable cause. Dkt. 47 at 24.

IV. **This Court Correctly Concluded that the Good-Faith Exception Applies, In Any Event.**

The good-faith exception holds that the exclusionary rule does not apply to evidence seized by officers acting in reasonable reliance on a search warrant. *United States* v. *Leon*, 468 U.S. 897, 922 (1984); *see United States* v. *Christian*, 925 F.3d 305, 312-13 (6th Cir. 2019) (*en banc*). This Court correctly concluded that the exception applies here. *See* Dkt. 47 at 24. The defendant's argument challenging this Court's good faith finding is merely "a request for the court to revisit the same issues previously rejected." *See United States* v. *Baker*, No. 09-20068, 2011 WL 13142576 at *4 (W.D. Tenn. Dec. 1, 2011).

## CONCLUSION

The defendant's motion to reconsider this Court's decision should be denied.

.

Respectfully submitted,

KENNETH L. PARKER
United States Attorney

*s/Megan Gaffney Painter*
Megan Gaffney Painter (NY 4849220)
Timothy S. Mangan (069287)
Assistant United States Attorneys
221 East Fourth Street
Suite 400
Cincinnati, OH 45202
(513) 684-3711

11

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing *Government's Opposition to the Defendant's Motion to Reconsider* has been electronically served via the Court's CM/ECF system this 15th day of February, 2022, upon counsel of record.

                                                 *s/Megan Gaffney Painter*
                                                 Megan Gaffney Painter (NY 4849220)
                                                 Assistant United States Attorney