# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | |
| vs. | : | Case No. 1:21CR085 |
| TRES GENCO, | : | Judge Dlott |
| Defendant. | : | |

## POST HEARING BRIEF OF TRES GENCO REGARDING MOTION FOR RECONSIDERATION

Now comes the Defendant, TRES GENCO, by and through counsel, and hereby submits his post hearing brief regarding his motion for reconsideration as follows.

After a second round of testimony, the government still cannot avoid the simple truth that the search warrant affidavit in this case says what it says. The affidavit on its face very clearly states as follows:

> After what had been located all units stepped out of the residence and called Federal Bureau of Investigations. Affiant and Sgt.Seaman spoke with [the mother] briefly about her situation. . . . [The mother] spoke of a letter she had read that was what she believed a plan for Tres to harm a lot of people . . .

(Exhibit 1, p. 4). The evidence adduced at the hearing clearly demonstrated that this statement occurred – as plainly stated in the affidavit – **after** the officers had unlawfully read the letter in Mr. Genco's room and while Sergeant Antinore was on the phone with other law enforcement. As such, the statement of the mother is the fruit of the poisonous tree of the unlawful search and must be stricken from the affidavit, thus rendering the search warrant lacking in probable cause. Additionally, as explained below, the warrant cannot be saved by good faith.

I. Argument

1. **The mother's statement contained in the affidavit occurred after the search**

The testimony adduced at the latest suppression hearing left no doubt that the mother's statement that was contained in the search warrant occurred after the search. Sergeant Antinore articulated this point directly and repeatedly. First, he confirmed what the affidavit actually says: The mother's comments occurred **after** the search. (Tr. p. 50, lines 9-11)("it states that she did make some statements after the search, and I agree that that is authored here") and (Tr. p. 62, lines 6-7)("I would agree that it states 'after' and it describes a conversation with the mother."). Moreover, Sergeant Antinore testified that, as a factual matter, he recalled the mother making the statements contained in the affidavit **after** the search and while he was on the phone with other law enforcement agencies. (Tr. p. 50, lines 21-23)( "I was not part of that conversation. At that time, I was on the phone with several other law enforcement contacts."). Thus, the evidence indisputably confirmed the plain wording of the affidavit. The government introduced no contradictory testimony regarding the timing of the mother's statement.

2. **The mother's earlier statement was not in the affidavit and cannot be considered**

As a separate matter, the officers testified that the mother did make an earlier, different statement that was not included in the search warrant affidavit. In this regard, Sergeant Antinore testified that the mother told him, Detective Engle, Sergeant Seaman, and Deputy Young before the search that she saw a letter of Mr. Genco that said he was planning to "hurt someone." (Tr. pp. 56-57). As important here, Sergeant Antinore testified repeatedly and unequivocally that this earlier statement of the mother was **not** contained in the search warrant affidavit. (Tr. p. 53, lines 9-12; and p. 54-55). Sergeant Antinore was also equally clear that the mother used the words "hurt someone" in this earlier statement. (Tr. p. 57, lines 20-21)( "I don't just believe it to be true. I

2

know it was true; I was there."). These same exact words were also contained in Sergeant Antinore's report. (Gov. Ex. 6, p. 1, lines 15-16).

Sergeant Seaman also confirmed this pre-search statement. He testified that, before entering the home, the mother made a statement to him, Sergeant Antinore, Detective Engle, and Deputy Young (Tr. p. 17), but he admitted that he did not remember the exact words the mother used because he had not written it in his report. (Tr. p. 28). Sergeant Seaman did not testify at all about the alleged statement of the mother contained in the search warrant affidavit.

The undisputed upshot of this testimony is the following: (1) The mother's pre-search statement indicated that Mr. Genco's letter said he may "hurt someone"; and (2) this pre-search statement was not contained in the search warrant affidavit. Because this earlier statement of the mother was not in the affidavit, the law prohibits it from being considered in the probable cause analysis. As the Supreme Court held in Whiteley v. Warden, Wyoming State Penitentiary, 401 U.S. 560 (1971), "an otherwise insufficient affidavit cannot be rehabilitated by testimony concerning information possessed by the affiant when he [or she] sought the warrant but not disclosed to the issuing magistrate. A contrary rule would, of course, render the warrant requirements of the Fourth Amendment meaningless." Id. at 565, n.8 (citing Aguilar v. Texas, 378 U.S. 108, 109 n. 1 (1964)). See also United States v. Frazier, 423 F.3d 526, 531 (6th Cir. 2005); United States v. Ruffin, 979 F.3d 528, 531–32 (6th Cir. 2020); United States v. Abernathy, 843 F.3d 243, 249 (6th Cir. 2016). Thus, the pre-search statement from the mother that Mr. Genco's letter indicated he might "hurt someone" cannot be edited into the warrant at this stage of the case and considered in the probable cause analysis.

3

**3. The mother's statement should be stricken from the search warrant affidavit**

Based on the foregoing facts, the Court should strike the statement of the mother concerning the letter that was contained in the search warrant affidavit. As noted above, such statement (if it was made at all) was made after the search of Mr. Genco's room, and after the officers had illegally read the private letter hidden in the tote.

One critical point is worth noting in this regard. Detective Engle and the other officers unlawfully read the letter directly in front of the mother, who was standing in the doorway to the bedroom. Up until that point in time, the mother had only told the officers that "in the past, before her son had joined the Army, she had discovered writings that she believed indicated that he was planning to hurt someone." (Tr. p. 57; Gov. Ex. 6, p. 1, lines 15-16). However, after Detective Engle unlawfully read the letter itself, the search warrant affidavit indicated that the mother's statement about the letter became more expansive: Mr. Genco had a "plan to harm a lot of people." (Exhibit 1, p. 4).

These facts make clear that the information in the affidavit was absolutely "the product of the primary illegality," or at least was "acquired as an indirect result of the unlawful search." Murray v. United States, 487 U.S. 533, 536–37 (1988). The government provided no other explanation at all for this change in the mother's story. Detective Engle read the letter directly in front of the mother and then, while Sergeant Antinore was on the phone, the detective allegedly obtained the more expansive statement about the letter from the mother.

As noted in prior filings, the Sixth Circuit has identified three factors to consider in determining whether to exclude evidence as the fruit of the poisonous tree: "(1) the temporal proximity between unconstitutional conduct and the discovery of the challenged evidence; (2) the

4

presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct." United States v. Elmore, 18 F.4th 193, 200 (6th Cir. 2021).

These factors easily demonstrate that suppression of the mother's statement in the search warrant affidavit is appropriate in this case. First, the interview of the mother reflected in the search warrant affidavit allegedly occurred immediately after the unlawful search. Second, the government has identified no intervening event between the unlawful conduct and the alleged statement that would break this causal link. Moreover, the alleged pre-search statement of the mother significantly expanded after Detective Engle illegally read the letter. Finally, this case frankly reeks of official misconduct. This has been previously noted in Mr. Genco's Motion for Reconsideration (R. 48, p. 4) and Reply to the Government's Response (R. 50, p. 9). There is significant question about the veracity of Detective Engle surrounding her testimony and the statements in her affidavit. This argument is more fully developed in the following section regarding good faith, and incorporated by reference. (See, Subsection 5B, False Statements, below).

As a final point, it is difficult to know for certain which theory the government may choose to rely on to justify the officers' conduct. In its most recent filing, the government argued that the inevitable discovery and independent source doctrines do not apply to the facts of the present case because they are not the "right standard" for analysis. (R. 49, Gov. Rsp., p. 9, n.3). Anticipating the government's potential continuing fluctuations on this point, Mr. Genco previously cited relevant law covering any potential legal theory the government may now raise. Such arguments are incorporated herein by reference. (See Motion for Reconsideration (R. 48, pp. 3-5) and Reply to the Government's Response (R. 50, pp. 6-9)). Accordingly, the mother's statement should be stricken from the affidavit as the fruit of the poisonous tree of the unlawful search.

### 4. Without the mother's statement, the affidavit is lacking in probable cause

With the mother's statement stricken from the affidavit as the fruit of the poisonous tree, the affidavit is clearly lacking in probable cause for the Ohio offense Making Terroristic Threats, O.R.C. § 2909.23(A)(1). This issue was fully argued in Mr. Genco's Motion for Reconsideration (R. 48, p. 5). Such argument is incorporated herein by reference.

### 5. Good faith cannot save the warrant

#### A. Bare bones affidavit

Similar to the probable cause question, the issue of good faith was thoroughly argued in Mr. Genco's Motion for Reconsideration (R. 48, p. 6-7). With the mother's statement stricken the affidavit is clearly bare bones related to any threat being made, particularly one "with purpose to . . . intimidate or coerce a civilian population," as required by O.R.C. § 2909.23(A)(1). Such argument is incorporated herein by reference.

#### B. False Statements

One additional argument bears mentioning regarding good faith. There is significant question in this case about the truthfulness of some of the statements of the officers, specifically related to Detective Engle. As explained in detail below, both her testimony before this Court and the averments in her search warrant affidavit raise troubling concerns.

Even before the latest round of litigation regarding the issues, the Court had expressed difficulty with Detective Engle's candor in this case. With regard to her intentional choice to read the private letter of Mr. Genco without any authority, the Court found that it "suggested to the Court a level of culpability and awareness rendering the conduct deliberate." (R. 47, Order, p. 15). Then, when questioned about the reading of the letter during examination before this Court, Detective Engle "was not forthcoming about her actions. Ultimately, she admitted she did read the

6

document—a conclusion that was obvious given the document was heavily cited in the subsequent Search Warrant." (Id.). Finally, the Court found her purported explanation under oath about why she read the letter questionable: "The Court is not convinced by Detective Engle's testimony that reading the note may have helped her determine the location of a gun in Genco's bedroom." (Id. at 10).

Now, after another round of testimony presented by the government, more irreconcilable inconsistencies have arisen. At the first motion to suppress hearing, Detective Engle testified that, before the search of Mr. Genco's room, the mother told the four officers that Mr. Genco's letter "scared her to death about killing multiple people in a large group." (Transcript from first suppression hearing at p. 10, lines 15-17). The government cited this language repeatedly in its filings. However, it has become quite apparent that this testimony simply was not true. As noted above, Sergeant Antinore testified unambiguously at the second suppression hearing that during this same conversation, the mother told the four of them that she saw a letter of Mr. Genco's that said he was planning to "hurt someone." (Tr. pp. 56-57). Sergeant Antinore was absolutely sure those were the words the mother spoke. (Tr. p. 57, lines 20-21)( "I don't just believe it to be true. I know it was true; I was there.").

So which officer should be believed? The clear answer is that Sergeant Antinore is the officer telling the truth. He was crystal clear on this point in his testimony. Moreover, he wrote a contemporaneous report reflecting that, prior to the search, Mr. Genco's mother said to the four officers that the letter indicated that Mr. Genco had planned "hurt someone." (Gov. Ex. 6, p. 1, lines 15-16). And even if there were any residual doubt, Detective Engle provided the nail in the coffin with her contemporaneously written report. Poignantly, her report uses the exact same

7

words as reported by Sergeant Antinore: "[The mother] had discovered writings that she believed indicated that he was planning to hurt someone." (Gov. Ex. 3, p. 3, ¶ 1).

It is (again) clear that Detective Engle was less than truthful in her testimony before this Court. Moreover, Detective Engle was the affiant and author of the search warrant. These inexplicable discrepancies raise the specter that she also made false statements in the search warrant affidavit. These concerns were amplified by the complete paucity of testimony regarding the content or timing of the mother's statements that were actually contained in the affidavit. Specifically, after two full testimonial hearings before this Court, the only information presented about the mother's statement contained in the search warrant affidavit is what is written in the document itself. Neither Sergeant Seaman at the latest hearing nor Detective Engle at the first hearing testified about the timing or content of the statement of the mother in the affidavit. Rather, these two witnesses testified exclusively about the earlier statement of the mother which occurred before the search, a statement that was not contained in the affidavit at all. (Tr. p. 53, lines 9-12; and p. 54-55). Notably, the government did not ask either Detective Engle or Sergeant Seaman a single question about the content or timing of the statement of the mother that was contained in the affidavit. This seems unusual given that the whole point of the second suppression hearing was to answer these very questions.

The one officer who did testify about the statements of the mother contained in the affidavit was Sergeant Antinore, and this was only during cross examination by the defense. While he knew that the mother made statements **after** the search when he was on the phone with other law enforcement agencies, he did not hear what the mother said, nor apparently did Detective Engle or Sergeant Seaman ever share that supposed information with him. (Tr. pp. 53, 55, 62). Thus, none of the three government witnesses ever testified about the content of the mother's statement as

reflected in the search warrant affidavit. The only evidence before the Court about what the mother may have said, after two full hearings, is what is written in the search warrant affidavit – an affidavit prepared by Detective Engle.

We can now see that the testimonial claims that Detective Engle made about what the mother said to her before the search were contradicted not only by the clear testimony of Sergeant Antinore, but were also refuted by her very own report. Instead of accurately reporting facts, it appears that Detective Engle heard the mother's pre-search statement to the four officers, which we now know said "hurt someone," and then embellished it with what Detective Engle unlawfully read in the letter shortly thereafter. What came out in the affidavit and Detective Engle's testimony was a completely improper jumbling of the information, which is now difficult to untangle. Not only does this significant problem demonstrate that the averment in the affidavit about the letter was the fruit of the poisonous tree from the unlawful search, but it significantly casts doubt on the veracity of this officer.

Under these circumstances, good faith is wholly inapplicable to save the warrant. This type of officer embellishment is actually the antithesis of good faith. The Sixth Circuit has long held that, where an officer attests to a "knowing or reckless falsity," the government is entirely precluded from relying on good faith to save the search warrant. United States v. Abernathy, 843 F.3d 243, 257 (6th Cir. 2016); United States v. Hammond, 351 F.3d 765, 773–74 (6th Cir. 2003); United States v. West, 520 F.3d 604, 612 (6th Cir. 2008). Thus, for this additional reason, the government may not rely on good faith in this case.

**II. Conclusion**

Based on the foregoing, Mr. Genco respectfully submits that the statement of the mother should be stricken from the search warrant affidavit as the fruit of the poisonous tree of the

9

unlawful search. Without such statement, the affidavit is lacking in probable cause and the search warrant is invalid. Finally, the search warrant cannot be saved by good faith because, without the statement of the mother, it is bare bones and was based on a knowing, or minimally, a reckless falsity. Accordingly, all evidence seized based on the voided search warrant should be suppressed.[1]

<div style="margin-left: 50%;">

Respectfully submitted,

DEBORAH WILLIAMS
FEDERAL PUBLIC DEFENDER

*s/ Richard Monahan*
Richard Monahan (0065648)
First Assistant Federal Public Defender
250 E. 5th Street, Suite 350
Cincinnati, Ohio 45202
(513) 929-4834

Attorney for Defendant
Tres Genco

</div>

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served upon Megan Gaffney Painter, Assistant United States Attorney, via Electronic Case Filing, on this day of 19th day of April, 2022.

*s/ Richard Monahan*

---

[1] It is worthy of note that Mr. Genco has already been convicted and sentenced in state court for the conduct at issue in count 1 of the indictment. Further, if the Court grants the motion to suppress the evidence in this matter, it would not affect the government's prosecution of count 2 of the indictment, possession of a machine gun.