IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | Case No. 1:21-cr-85 |
| Plaintiff, | : | |
| | : | Judge Susan J. Dlott |
| v. | : | |
| | : | **ORDER DENYING MOTION FOR** |
| TRES GENCO, | : | **RECONSIDERATION** |
| | : | |
| Defendant. | : | |

This matter is before the Court on Defendant Tres Genco's Motion for Reconsideration. (Doc. 48.) Genco moves the Court to reconsider its February 7, 2022 Order in which the Court granted in part Genco's Motion to Suppress Evidence from Warrantless Search of Residence on March 12, 2020 ("Motion to Suppress Evidence from Warrantless Search") (Doc. 25) and denied his Motion to Suppress Evidence Seized in Search Warrant for Residence on March 13, 2020 ("Motion to Suppress Evidence Seized in Search Warrant") (Doc. 26).[1] For the reasons that follow, Genco's Motion will be **DENIED**.

**I.  BACKGROUND**

**A.  Indictment Facts**[2]

On July 20, 2021, Genco was indicted on the following charges: (1) attempted hate crime in violation of 18 U.S.C. § 249(a)(2); and (2) unlawful possession of a machinegun in violation of 18 U.S.C. §§ 922(o) and 924(a)(2).  (Doc. 7.)   From at least July 2019 through March 12, 2020, Genco identified as an Incel and maintained profiles on a popular Incel website where he

---

[1] The Court also denied Genco's Motions to Dismiss (Docs. 28, 34, and 38) and denied as moot Genco's Motion for a Bill of Particulars (Doc. 27).

[2] The facts pled in the Indictment were fully set forth in the Court's February 7, 2022 Order.  (Doc. 47.)  The Court adopts those facts herein.  Rather than repeat them in full, the Court will highlight a few key facts.

posted frequently.  (*Id*. at PageID 25.)  "Incel" stands for "involuntary celibate."  (*Id*. at PageID 24.)  The Incel movement is an online community predominantly comprised of men who harbor anger towards women.  (*Id*.)  Incels advocate violence to support their belief that women unjustly deny them sexual or romantic attention to which they are entitled.  (*Id*.)

On March 12, 2020, police officers responded to Genco's residence in Highland County, Ohio.  (*Id.* at PageID 27.)  At the residence, in the trunk of Genco's vehicle, police officers found, among other things, a Palmetto State Armory 5.56x45mm caliber firearm with a bump stock attached, several loaded magazines, body armory, and boxes of ammunition.  (*Id*.)  Hidden in a heating vent in Genco's bedroom, police officers found a Glock-style 9mm Luger caliber semiautomatic pistol, with no manufacturer's marks or serial number.  (*Id*.)  The following day, on March 13, 2020, agents executed a Search Warrant at Genco's residence.  (Doc. 32-1 at PageID 117–18.)

### B.  Procedural History

Genco was indicted on July 20, 2021 and made his initial appearance the following day.  (Docs. 7, 10.)  On August 25, 2021, Genco filed his Motion to Suppress Evidence from Warrantless Search (Doc. 25) and Motion to Suppress Evidence Seized in Search Warrant (Doc. 26).  The Government filed an omnibus Response in Opposition to Defendant's Motions on September 10, 2021.  (Doc. 32.)

On October 20, 2021, the Court held a motion hearing, after which the Court took the matter under advisement and permitted the parties additional time to file post-hearing briefs and motions.  (Docs. 36, 37.)  Both Genco and the Government filed post-hearing briefs and supplemental memoranda.  (Docs. 39, 41, 42, 45, 46.)

On February 7, 2022, the Court issued an Order ruling on Genco's several pending motions. (Doc. 47.) With respect to Genco's Motion to Suppress Evidence from Warrantless Search, the Court found that the search of Genco's bedroom violated his Fourth Amendment rights when Detective Engle read Exhibit 4, a note on a loose piece of paper inside a plastic tote. The Court held that the appropriate remedy for that violation was to excise from the subsequent Search Warrant[3] references to Exhibit 4. The Court found Detective Erica Engel's reading of the note to be sufficiently "deliberate" as opposed to "isolated," thereby rendering exclusion the appropriate remedy. When the Court considered the subsequent Search Warrant and Search Warrant Affidavit, it did so with a lengthy description of the contents of Exhibit 4 removed. In considering Genco's Motion to Suppress Evidence Seized in Warrant Search, the Court found the Search Warrant was supported by probable cause and that good faith would save the warrant.

**C. Motion for Reconsideration**

On February 8, 2022, Genco filed a Motion for Reconsideration of the Court's February 7, 2022 Order. (Doc. 48.) Genco argues that his mother made a post-search statement that should have been excised from the Search Warrant Affidavit on the basis that it was the fruit of the poisonous tree from the unlawful search of his bedroom. (Doc. 48 at PageID 293.) Without that statement, he contends the Search Warrant lacks probable cause. He further argues that good faith cannot save the Search Warrant due the deliberate nature of the conduct involved.

The Government responded in opposition (Doc. 49), and Genco replied (Doc. 50). On March 22, 2022, the Court reopened the Suppression Hearing for additional testimony on the

---

[3] The Search Warrant is comprised of a two-page Search Warrant signed by Hillsboro Municipal Court Judge David McKenna on March 12, 2020 incorporating a four-page "Exhibit A," described in the Search Warrant as "an Affidavit applying for a search warrant, a copy of which is attached hereto, made a part of hereof and marked 'Exhibit A[.]'" (Doc. 32-1 at PageID 117–18.) The Affidavit is attested to by Highland County Sheriff's Office Detective Engle and is referred to by the Court as the "Search Warrant Affidavit." (Doc. 32-1 at PageID 119–22.)

3

issue of whether Genco's mother's statement in the Search Warrant was fruit of the poisonous tree. (Transcript, Doc. 52.) The parties filed post-hearing briefs (Docs. 53–54), and Genco replied (Doc. 55). The matter is now ripe for ruling. For the reasons that follow, Genco's Motion will be **DENIED**.

## II. STANDARD OF LAW

To prevail on a motion for reconsideration in a criminal case, a petitioner must show: (1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) a need to prevent manifest injustice. *Chapman-Sexton v. United States*, No. 2:16-cr-141, 2022 WL 203511, at *1 (S.D. Ohio Jan. 24, 2022) (citing *Henderson v. Walled Lake Consol. Sch.*, 469 F.4d 479, 496 (6th Cir. 2006)). Although not outright stated, Genco presumably argues that reconsideration of this Court's February 7, 2022 Order is necessary due to a clear error of law.

## III. ANALYSIS

### A. Search Warrant Affidavit

Genco argues that the Search Warrant contains a post-search statement made by Genco's mother that is fruit of the poisonous tree. The Search Warrant Affidavit, attached to the Search Warrant and authored by Detective Engle, states in relevant part:

> After what had been located all units stepped out of the residence and called Federal Bureau of Investigations. Affiant and Sgt.Seaman [sic] spoke with [Genco's mother] briefly about her situation. [Genco's mother] indicated that her and her son Tres came to Ohio from California about two years ago, to get Tres out of the city. [Genco's mother] stated that neither of them work and Tres was going to go back to school. Tres enlisted in the Military at her request last fall to keep himself out of trouble, however [Genco's mother] stated that he was only there a couple months and they discharged him. After this she stated she doesn't feel like she knows him anymore, he was so angry and aggressive. ***[Genco's mother] spoke of a letter she had read that was what she believed a plan for***

4

> ***Tres to harm a lot of people, however she could [not[4]] remember exactly when it was or where it went to.*** [Genco's mother] was also concerned about why Tres had recently gone to Greece for 10 days. [Genco's mother] stated she didn't know who he would even know. While Tres was in Greece, she never heard from him and he won't talk about what he did while he was there. [Genco's mother] was very reluctant to speak with us and indicated that her son is just too much that he has hit her in the past, but he didn't today. [sic]

(Doc. 32-1 at PageID 120 (sealed); Doc. 26-1 at PageID 90 (redacted) (emphasis added).) In his Motion for Reconsideration, Genco argues that the language emphasized above is a post-search statement made by his mother that is fruit of the poisonous tree. The Court found that the language about the timing of the mother's statement was ambiguous and reopened the Suppression Hearing for additional evidence as to whether the statement is fruit of the poisonous tree.

### B. Detective Engle's Testimony[5]

At the Suppression Hearing, Detective Engle testified that Genco's mother was present on the scene when police discovered a firearm in Genco's vehicle prior to the search of his bedroom. (Transcript, Doc. 37 at PageID 150.) Genco's mother spoke with law enforcement about Tres's behavior in the recent months and explained several reasons why she thought his behavior was erratic and out of control. (*Id*. at PageID 151.) Detective Engle testified that Genco's mother "stated that while he was gone in the military, she had cleaned his room, and when she had cleaned his room, she had located a document that scared her to death about killing multiple people in a large group." (*Id*. at PageID 152.) This conversation occurred *prior* to the search of Genco's bedroom. (*Id.*)

---

[4] Detective Engle testified at the Suppression Hearing that "not" should be included here. (Transcript, Doc. 37 at PageID 178.)

[5] Detective Engle testified at the Suppression Hearing, but was not recalled as a witness at the Reopened Suppression Hearing.

Detective Engle's felony report included a description clarifying that Genco's mother's made statements about the note prior to the search of his bedroom. She wrote:

> Upon removing the rifle and body armor from the vehicle, [Genco's mother] (who Sgt. Seaman had previously identified) had an audible emotional reaction. Det. Antinore asked her what was wrong, and she stated that in the past, before [Genco] had joined the Army, she had discovered writings that she believed indicated that he was planning to hurt someone. [Genco's mother] then advised that [Genco] also had a handgun, as she had seen it a few days prior, but was unsure where he kept it.
> . . .
> Det. Antinore asked Tres if he would grant permission for us to search his bedroom for a handgun. Tres stated that we could search the bedroom.

(Exhibit 3, p. 3.)

Detective Engle also testified that Genco's mother also made statements about the note *during* the search of Genco's bedroom. (Doc. 37 at PageID 172.) Detective Engle testified that Genco's mother "pointed out" the note that she had found while he was away at the military while they were searching Genco's bedroom. (*Id*. at PageID 156.) Genco's mother "explained that she had located a note while [Genco] was away in the military that was very alarming. She didn't understand why he would be writing things like this." (*Id*. at PageID 157.) Her identification of the note happened while agents were searching Genco's bedroom. (*Id*.) Detective Engle testified that while she was digging through the plastic tote, she was not looking for the piece of paper; rather, "[h]is mother wanted us to see it. She pointed it out. She had talked about it. She said that it talked about killing people. So we did look at the note to see if there was – it said something about where a gun was at, so I did look at the note, yeah." (*Id*. at PageID 169–70.) When asked: "And I guess when you reached the point in the tub where you got to the note, she said that's the note?" Detective Engle responded, "Yes." (*Id*. at PageID 172.)

6

### C. Sergeant Seaman's Testimony

Sergeant Craig Seaman of the Highland County Sheriff's Office testified at the Reopened Suppression Hearing. (Transcript, Doc. 52 at PageID 334.) Sergeant Seaman responded to Genco's home on March 12, 2020 and spoke to Genco's mother prior to the search of Genco's bedroom. (*Id*. at PageID 335–38.) Genco's mother spoke with Sergeant Seaman, Detective Engle, Deputy Brandon Young, and Sergeant Vincent Antinore before the search of Genco's bedroom. (*Id*. at PageID 339.) He testified:

> She began telling us her concerns about Tres, that he had become – over the past two months become overly agitated or aggravated. And she told us that she knew he had a handgun, that she had seen him early in the day with it. She had actually found the handgun in her car a few days earlier. She also told us that at one point she had found some notes or writings that Tres had written that caused her to believe that he may be planning or thinking about hurting people.

(*Id*.) Sergeant Seaman testified that Genco's mother took them into the home for the search of Genco's bedroom and stood in the doorway during the search. (*Id*. at PageID 340.) During the search, "I recall Tres' mother saying that's the paper that I was talking about." (*Id*.) "I turned around to see Detective Engle was holding a single sheet of paper. At that point, she read some comments off of the paper or something like that, and his mother confirmed that that was the paper she had been telling us about prior to entering the house." (*Id*.)

### D. Sergeant Antinore's Testimony

Sergeant Vincent Antinore of the Highland County Sheriff's Office also testified at the Reopened Suppression Hearing. (*Id.* at PageID 354.) Sergeant Antinore arrived at Genco's home with Detective Engle. (*Id*. at PageID 357.) Sergeant Antinore testified that he conducted a search of Genco's vehicle and observed Genco's mother have an audible emotional reaction when they discovered body armor, ammunition, and a rifle. (*Id*. at PageID 359.) At that time, which was prior to the search of Genco's bedroom, Genco's mother made statements that prior to

Tres's joining the Army, she discovered writings that he authored which described hurting people. (*Id*. at PageID 359.)

The Government also admitted a contemporaneous report written by Sergeant Antinore (*Id*. at PageID 378; Exhibit 6). Sergeant Antinore wrote in this report: "Upon removing the rifle and body armor from the vehicle, [Genco's mother] (who Sgt. Seaman had previously identified) had an audible emotional reaction. I asked her what was wrong, and she stated that in the past, before her son had joined the Army, she had discovered writings that she believed indicated that he was planning to hurt someone." (Exhibit 6, p. 1.) On cross-examination, Sergeant Antinore was asked if what he wrote was truly what Genco's mother said, and he responded that he "know[s] it was true; I was there." (Doc. 52 at PageID 379.)

Sergeant Antinore also testified that Genco's mother stood in the threshold of the doorway during the search of Genco's bedroom. (Doc. 52 at PageID 361.) When Detective Engle searched a plastic tote in Genco's bedroom, she discovered a writing. (*Id*.) "The mother had made a statement at that time that that is the writing she was referring to outside when she was telling me she had previously seen something he authored about hurting people." (*Id*. at PageID 361–62.) Sergeant Antinore did not participate in any on-scene conversation with Genco's mother than occurred after the search of Genco's bedroom. (*Id*. at PageID 372.)

E. **Independent Source Doctrine**

The Government argues that the independent source doctrine, an exception to the exclusionary rule, applies to Genco's mother's statement in the Search Warrant Affidavit about her discovery of Genco's writing. The Government argues that it has produced consistent testimony from three officers that Genco's mother disclosed discovering a writing in Genco's bedroom about his intentions to hurt people prior to the search of Genco's bedroom and then

8

directed officers' attention to that writing when it was discovered during the search. Regardless of the illegality of reading the note, the Government was aware of its general subject matter prior to the search.

As an initial matter, Genco argues that the Government waived the argument that the independent source exception saves the warrant. *See United States v. Beck*, 842 F. App'x 1010, 1013 (6th Cir. 2021) (a party waives a claim "only by knowingly and intentionally relinquishing it"). Prior to the Court's Reopened Suppression Hearing, the Government argued the attenuation doctrine applies and that Genco failed to engage the "right standard" by relying upon the independent source and inevitable discovery doctrines. (Doc. 49 at PageID 308, n.3.) After the admission of additional evidence, the Government seemingly abandoned its position and now maintains that the independent source doctrine applies to save the Search Warrant. (Doc. 53 at PageID 399.) Because the matter was reopened for additional testimony, the Court finds waiver would be an inequitable result. And although the Government previously argued that Genco failed to engage the "right standard," it did not explicitly relinquish relying upon the independent source doctrine when it argued the attenuation doctrine applies. Most importantly, the Court permitted Genco to file a reply brief to directly respond to the Government's new argument, which afforded Genco a meaningful opportunity to respond. Thus, the Court will consider the Government's position on the merits.

"The exclusionary rule prohibits introduction of evidence directly acquired by an unlawful search or seizure, as well as 'derivative evidence, both tangible and testimonial, that is the product of the primary evidence.'" *United States v. Cooper*, 24 F.4th 1086, 1092 (6th Cir. Feb. 6, 2022) (quoting *Murray v. United States*, 487 U.S. 533, 536–37 (1988)). "In assessing whether illegally seized evidence should be suppressed, but-for causation is a necessary, but not

9

sufficient condition." *Id*. (citing *Hudson v. Michigan*, 547 U.S. 586, 592 (2006); *United States v. Elmore*, 18 F.4th 193, 202 (6th Cir. 2021)).

The independent source doctrine "holds that evidence will be admitted if the government shows that it was discovered through sources 'wholly independent of any constitutional violation.'" *United States v. Chapman-Sexton*, 758 F. App'x 437, 440 (6th Cir. 2018) (citing *United States v. Jenkins*, 396 F.3d 751, 757 (6th Cir. 2005)). On this basis, "evidence obtained pursuant to a search warrant that relied, in part, on unlawfully obtained information may nevertheless be admissible under the independent-source doctrine." *Id*. at 440–41. "The doctrine ensures that the government is not penalized for wrongdoing when such wrongdoing would not bear on the outcome of the case." *United States v. Leake*, 95 F.3d 409, 412 (6th Cir. 1996). "In the classic independent source situation, information which is received through an illegal source is considered to be cleanly obtained when it arrives through an independent source unrelated to and independent of the unconstitutional search." *Id*. (quoting *Murray*, 487 U.S. at 538–39).

Detective Engle, Sergeant Seaman, and Sergeant Antinore testified that Genco's mother told them she discovered writings in Genco's bedroom about plans to hurt people *prior* to law enforcement's search of Genco's bedroom. (Doc. 37 at PageID 152; Doc. 52 at PageID 340, 359.) All three officers also testified that Genco's mother was standing in the doorway of Genco's bedroom *during* the search of Genco's bedroom, and she made statements then too. She pointed out the note as being the one that she previously told law enforcement about. (Doc. 37 at PageID 156–57, 169–70, 172; Doc. 52 at PageID. 340, 361–62.) The Court finds this to be credible and believable, as it explains why Detective Engle would have noticed and read the note in the first place. And finally, Sergeant Seaman and Sergeant Antinore testified that Detective

Engle spoke to Genco's mother *after* the search, but Sergeant Seaman was not questioned about the conversation and Sergeant Antinore was on the phone and did not hear the conversation. (Transcript, Doc. 52 at PageID 384.)

Based on this evidence, the information conveyed by Genco's mother and cited in the Search Warrant Affidavit was obtained by law enforcement *prior* to the search of Genco's bedroom. The testimony establishes a timeline of statements given by Genco's mother, which occurred prior to the search of his bedroom, during the search of his bedroom, and after the search. That timeline was initially established by Detective Engle and reinforced by testimony of two other officers. Thus, the Government has produced evidence that shows that the information conveyed was the product of a source independent of the illegal search—Genco's mother's voluntary statements prior to the search of Genco's bedroom.

Genco argues that the Government failed to meet its burden of proof on the independent source doctrine because it has not proven that Genco's mother's statement in the Search Warrant Affidavit was wholly independent of, and untainted by, the illegal search of the note. In support of his position, Genco relies upon a report prepared by Detective Engle to argue that her testimony was untruthful. Detective Engle testified at the Suppression Hearing that Genco's mother told her of a letter that "scared her to death about killing *multiple people in a large group*." (Transcript, Doc. 37 at PageID 152) (emphasis added). Yet, in a report she prepared about the incident, Detective Engle described that Genco's mother told her that "she discovered writings that she believed indicated that [Genco] was planning to hurt *someone*." (Exhibit 3, page 3 (emphasis added); Transcript, Doc. 37 at PageID 146.) Detective Engle was not questioned or cross-examined about the difference in the two statements while she was under oath. As the Government did not recall Detective Engle, there is no further testimony on this

11

topic. Genco argues that because Detective Engle was not forthcoming about reading the note in the first place, the Court should draw the conclusion that Detective Engle gave false testimony. That is, her report accurately conveyed the substance of what Genco's mother conveyed as opposed to her testimony. Genco argues this necessarily proves that the discrepancy between the two statements can only be explained by a co-mingling of information gleaned after the illegal search.

Genco also relies upon Sergeant Antinore's testimony to support its position that Detective Engle untruthfully testified. Sergeant Antinore testified that Genco's mother told him about a statement to harm people prior to the search of Genco's bedroom. (Transcript, Doc. 52 at PageID 359). However, the report Sergeant Antinore prepared after the incident uses different language and describes that Genco's mother told officers she found a writing describing Genco's intention to hurt someone. (*Compare* Exhibit 6 *to* Transcript, Doc. 52 at PageID 359, 378, 379.) Defense counsel cross-examined Sergeant Antinore but never explicitly asked about this difference. Rather, defense counsel asked Sergeant Antinore to confirm the report truthfully described what Genco's mother conveyed and Sergeant Antinore confirmed that it did: "I know it was true; I was there." (Transcript, Doc. 52 at PageID 378.) But never did defense counsel ask about the difference in the descriptions.

To find Detective Engle's initial testimony was untruthful would also require finding that the two other officers who testified consistent with her testimony were lying. Sergeant Antinore was never explicitly asked about the differing language, although counsel had the opportunity to inquire. The Court found Sergeant Antinore to be a credible and reliable witness. He was confident when he confirmed the contents of his report were accurate, although he also testified that the report was prepared at 3:16 in the morning after a particularly long shift. (Transcript,

Doc. 52 at PageID 378.)  The Court also found Sergeant Seaman to be a credible and reliable witness.  Although Detective Engle was not forthcoming about her admission of reading Exhibit 4, she ultimately *did* testify that she read the note.  The Court would not easily conclude that her testimony is false because of her reticence to admit she read the note.  In short, the Court is unwilling to discredit the sworn testimony of all three officers based on minor discrepancies in reports, which were unsworn statements made in the early morning after a long shift.  The Court will not infer based on the absence of direct questioning about these discrepancies that all three officers were untruthful.

Because there is consistent testimony that Genco's mother conveyed the general content of Exhibit 4 prior to the search of Genco's bedroom, the written reference to Exhibit 4 was properly not excluded by the Court in consideration of the Search Warrant and whether it was supported by probable cause.  The Court finds that the good faith exception would still apply in the alternative.  For these reasons, Genco's Motion for Reconsideration is **DENIED**.

### IV. CONCLUSION

For the reasons stated herein, Genco's Motion for Reconsideration (Doc. 48) is **DENIED**.

**IT IS SO ORDERED.**

S/Susan J. Dlott_____
Judge Susan J. Dlott
United States District Court