# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

UNITED STATES OF AMERICA,          :

          Plaintiff,          :

          vs.          :          Case No. 1:21CR085

TRES GENCO,          :          Judge Dlott

          Defendant.          :

## SENTENCING MEMORANDUM OF DEFENDANT TRES GENCO

Now comes the Defendant, TRES GENCO, by and through counsel, and hereby submits this sentencing memorandum for the Court's consideration in sentencing.

Mr. Genco was already prosecuted in state court for the same conduct that is the subject of this duplicitous, instant federal prosecution. In that timely state prosecution, Mr. Genco received a sentence of 17 months, which he has already served. Given the 2 years that Mr. Genco has now spent in federal custody for the same conduct, he submits that a sentence of "time served" is appropriate in this case. Such a sentence is consistent with the factors under 18 U.S.C. § 3553 and the sentencing guidelines. The grounds for this request are provided below.

In determining an appropriate sentence, the Court is required to impose a sentence that is "sufficient, but not greater than necessary" to comply with the statutory purposes of sentencing. 18 U.S.C. § 3553(a). The factors the Court must consider are as follows:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed--
    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) the kinds of sentences available;
(4) the kinds of sentence and the sentencing range established for--
(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines
. . . .
(5) any pertinent policy statement
. . . .
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense.

A careful review of each of these factors in this case demonstrates that a sentence of time served is more than sufficient under the circumstances. Each factor is addressed in turn below.

**1. Nature and circumstances of offense, and history and characteristics**

The first statutory factor requires consideration of both the seriousness of the present offense and the history of the defendant. Each issue is explored in depth separately.

**A. Seriousness of the present offense**

The instant prosecution is unique. Mr. Genco is charged with attempting to kill women because of their gender. He committed no actual violent acts toward women, nor did his conduct in this offense ever put women in fear of harm. In fact, in the entire course of the attempted hate crime, Mr. Genco never actually encountered a woman. Rather, in investigating Mr. Genco, the government found that Mr. Genco had created several disturbing personal writings that sounded like he was planning a crime. As a result, the instant prosecution for the inchoate offense of an "attempted" hate crime ensued.

Admittedly, Mr. Genco has pled guilty to an "attempt" to commit this hate crime and has fully accepted responsibility for such conduct. As with all criminal cases, however, there are degrees of seriousness. The same is certainly true of inchoate "attempt" offenses. As will be seen

in the discussion below, Mr. Genco's conduct, while an "attempt," was not significantly close, as compared with the typical "attempt offender," to the commission of the substantive offense.

Considering the spectrum of conduct that may constitute an "attempt," obviously most defendants who are convicted of "attempt" get very close to the actual commission of the completed crime. For example, the bank robber who is caught by police on the way to the bank with a firearm and a note. Or the pickpocket who is thwarted by the victim attempting to steal a wallet. In these instances, the classic "attempt" formulation is apparent. This is the common understanding of an "attempt" under the law.

Mr. Genco's conduct is a far cry from this classic attempt scenario. In fact, his conduct is more akin to conduct that was not found to be an attempt at all in United States v. Ferguson, 65 F. 4th 806 (6th Cir. 2023), a reversal of an attempt conviction by the Sixth Circuit just this past April. Similar to Mr. Genco, the defendant in Ferguson, had done a good deal of opining regarding his potential conduct. Specifically, in Ferguson, the defendant had conducted some extensive planning to kidnap a federal agent. The defendant created an online chatroom to form a militia group, called the Spartans, to revolt against the government. Id. at 808. He espoused plans to "orchestrate raids" to obtain supplies and weapons for the Spartans. Id. More specifically, the defendant wrote posts to other members about a plan to lure a law enforcement officer to a remote location, "ambush him and subdue him, raid his cruiser, and strip him of all his weapons and send him walking home brushed and with our calling card." Id. at 809. The defendant brought his AR-15 rifle to one of the planning meetings for this purpose. Id. The defendant drew out a diagram, detailed his plans, and set a tentative date of the end of the month, or in June (the next month). Id. at 810. The defendant and others then engaged in a recon mission to an abandoned house in the Cuyahoga Valley National Park, and even placed a fake call to see how quickly park rangers would

respond. Id. The FBI had undercover officers working within the defendant's group at the time, however, and he was arrested. Id.

In reviewing the conviction, the Sixth Circuit held that the defendant's conduct did not rise to the level of an "attempt" to commit a kidnapping under the law because he committed no "substantial step" toward its commission. Specifically, the court focused on the fact that the defendant's plan was "underdeveloped and exploratory in nature." Id. at 814. In this regard, the court found that the defendant was uncertain about the details of his plot, and did not express a plan to execute it imminently (plan was for more than a month in the future). Id. Further, the court emphasized that the defendant had purchased his AR-15 rifle **before** he had first espoused his idea for the kidnapping. Id. at 815.

In summarizing, the Sixth Circuit held that words that simply express a "criminal idea" categorically do not constitute an "substantial step" under the law. Id. The court found that "mere discussion of a criminal idea is not a substantial step because a 'fragment of the crime' is rarely committed by speech alone." Id. at 816. Finally, the court emphasized that the defendant's surveillance of the potential crime scene was not a substantial step because it occurred more than a month prior to the intended crime. Id. at 816-17.

In the present case, Mr. Genco's conduct was less serious than the defendant's actions in Ferguson in many respects. In fact, in pretrial filings Mr. Genco's counsel questioned whether the facts alleged in the indictment in this case could in fact constitute a "substantial step" toward the commission of a hate crime, and thus an "attempt" under the law. The Court issued a pretrial ruling finding that Mr. Genco had "acted in this district in ways that constitute a 'substantial step.'" (R. 47, Order, p. 26). In addition to the alleged "surveillance" of a university in Ohio (which the

government claimed occurred at Mt. Union University in Alliance, Ohio), the Court held as follows:

> The Indictment describes several acts taken by Genco in the Southern District of Ohio that taken together could constitute a "substantial step," including: acquiring and modifying a rifle and pistol; researching gun modifications and downloading illustrated guides to constructing M-16s; writing his manifesto which outlined his philosophy of hate; and drafting his document "isolated" which he intended to be found after he committed his planned murders; conducting online research of potential targets for his attack, including sororities and a university in Ohio; researching and saving police scanner codes for Columbus, Ohio police and university police; and purchasing body armor and ammunition and hiding them with a modified rifle in the trunk of his car.

Id.

In considering Mr. Genco's actions through the lens of Ferguson — which was decided after the plea in Mr. Genco's case — it appears that the conduct in Ferguson (which was not an attempt) was strikingly similar to the conduct of Mr. Genco present case. These similarities are discussed in turn below.

### i. Firearms and related paraphernalia

Both Mr. Genco and the defendant in Ferguson had purchased firearms. But as in Ferguson, Mr. Genco owned the firearms and other paraphernalia months before he first espoused Incel beliefs in July 2019, which the Sixth Circuit found significant in rejecting that an attempt had occurred. According to the indictment, all of the firearms and related items were purchased in January, February, and May of 2019. (R. 7, Indictment, ¶ 7).

### ii. Writings and online searches

Both Mr. Genco and the Ferguson defendant espoused a number of views online and conducted searches that suggested "criminal ideas." For Mr. Genco, the indictment referenced the following documents:

(1) On August 3, 2019, a document entitled "A Hideous Symphony" while in Greece (R. 7, ¶ 6);

(2) In early August 2019, a one page document referencing May 23, 2020 and O.S.U. while in Greece (R. 7, ¶ 8);

(3) On January 11, 2020, a document entitled "Isolated." (R. 7, ¶ 12).

As with the writings of the defendant in <u>Ferguson</u>, each of these writings espoused violent views. Importantly, however, unlike the defendant in <u>Ferguson</u> who was actively trying to form a militia to carry out his plan, there was no indication that any of the above referenced writings were sent to anyone after being written. They were simply thoughts and plans that Mr. Genco wrote down.

Similarly, the indictment indicated that Mr. Genco conducted a number of internet searches. (R. 7, ¶¶ 9, 10, 13, and 14). Most of these searches were months before Mr. Genco's arrest in March 2020, at which point in time there was no indication that 19-year-old Mr. Genco had a cohesive plan for an imminent crime.

The Sixth Circuit firmly reminded in <u>Ferguson</u>, that "mere discussion of a criminal idea is not a substantial step." <u>Ferguson</u>, 65 F. 4th at 816. Thus, Mr. Genco's writings and internet searches, as in <u>Ferguson</u>, would not alone constitute an attempt to commit a crime.

### iii. Timing and uncertainty

The government has never directly expressed when it believed the actual crime would have occurred in this case. There is reference in the indictment to a May 23, 2020 date, which was based on the one page note that Mr. Genco wrote in August 2019. (R. 7, ℙ 8). This date was **nine months** prior to May 2020. Moreover, this May date was over two months from when Mr. Genco was arrested in March 2020. Thus, similar to the defendant in <u>Ferguson</u>, the time gap is illustrative

of a lack of a criminal attempt under the law.  <u>Ferguson</u>, 65 F. 4th at 816-17 (no substantial step where crime was planned more than a month in the future).

Moreover, Mr. Genco repeatedly expressed some reservation about the Incel beliefs.  On August 18, 2019, Mr. Genco wrote in a message chain with a friend complaining about how Incels were prone to violence and how he was no longer involved with Incels.  (Defendant's Exhibit 1 attached).  On January 21, 2020, he wrote in a conversation with a professor in Georgia that he had developed as an individual and was no longer an Incel.  (Defendant's Exhibit 2 attached).  That same day, he messaged with a friend that he was trying to delete the Discord messaging app because Incels kept sending messages on it and he didn't want the negative stuff back in his life.  (Defendant's Exhibit 3 attached).  All of these items were located on the download from Mr. Genco's phone and discovery obtained by the government.

Additionally, by 2020, there was uncertainty about what "plan" young Mr. Genco actually had.  At the time of his arrest, the police believed that Mr. Genco was targeting sex offenders.  (Defendant's Exhibit 4 attached).  Thus, in many ways, Mr. Genco's ill-gotten beliefs were significantly less developed than the defendant in <u>Ferguson</u>.

### iv. Surveillance

As noted above, the Sixth Circuit in <u>Ferguson</u> found that surveillance of an alleged crime scene over a month beforehand was not indicative of a substantial step toward criminal conduct.  The same is true in Mr. Genco's case.  The indictment provided that on January 15, 2020, Mr. Genco conducted surveillance "in the location of a university in Ohio."  (R.7, ¶ 13).  This date was two months before Mr. Genco's arrest in March 2020, and four months before the vague May 23, 2020 date referenced above (which was mentioned in the August 2019 one page note).  This time frame is significantly more remote than the time frame of surveillance in <u>Ferguson</u>.

Moreover, the alleged surveillance in Mr. Genco's case above did not actually happen. Although the indictment does not specify, the government averred repeatedly in pretrial filings that this January 15, 2020 surveillance occurred in Alliance, Ohio. The government indicated that Mt. Union University is in Alliance and that Mr. Genco conducted this alleged surveillance at that location. There is not a preponderance of the evidence to support this allegation and it should not be considered.

In sum, Mr. Genco submits that as the Court considers the seriousness of the present offense, Ferguson illustrates that this case falls on the extreme low end of what may properly be considered an "attempt" under the law. Mr. Genco has pled guilty and accepted responsibility for his conduct, as he did in the earlier state prosecution for the same conduct. However, the degree to which this crime certainly does not fit into the ordinary formulation of an "attempt" is an important consideration in balancing the statutory factors and the relative "seriousness" of the offense.

**B. History and characteristics of Mr. Genco**

Mr. Genco's history and characteristics likewise indisputably militate in favor of a sentence of time served. The details of Mr. Genco's life leading up the offense are detailed below.

**i. Mr. Genco's childhood with his mentally ill, single mother**

Mr. Genco is now 23 years old. At the time of this offense, he was only 19. He was raised the son of a single mother. Mr. Genco's father left the family upon finding out about the pregnancy and he never met his father. He was born and raised in Los Gatos, California. His mother is autistic, agoraphobic, and also suffers from severe PTSD due to horrific abuse and homelessness she suffered as a child. She has long collected SSI due to her disabilities. Mr. Genco's mother submitted a letter to the Court under separate cover detailing these circumstances.

Mr. Genco was severely bullied as a young person in school, and as a result his mother took him out of school and homeschooled him. Mr. Genco was severely stunted in social skills, and his mother largely isolated him from others during his formative years. His mother did, however, have a goat rescue farm at which Mr. Genco enjoyed helping. His mother reported that he was a great ranch hand and that he was always kind to animals. He enjoyed caring for them.

### ii. Early dreams of joining the military

One outlet Mr. Genco had for human contact was with military personnel. As noted in his mother's letter, she was unable to hold a regular job due to her mental challenges, but she did work for years in her own business cleaning military offices. Often, she would bring Mr. Genco with her to the instillations. He had a strong admiration for the military personnel and developed an early dream of joining the military when he grew older.

### iii. Graduation from his mother's "home school" and move to Ohio

After Mr. Genco graduated "home school," he went to Shasta College online in California. He attended there for one year. When Mr. Genco was 18 years old, his maternal grandmother passed away and he and his mother received an inheritance. His mother decided to use this money to move to Hillsboro, Ohio in late 2018. They had no family there and knew nothing of the community, but made the choice to find somewhere safer to live with a lower cost of living.

Mr. Genco admittedly had a difficult time adjusting to the move. He had no friends or family in Ohio other than his mother, which further fostered his isolation and social awkwardness. In early 2019, Mr. Genco turned 19 and he was still considering a plan of joining the military. He purchased the rifle and handgun with thoughts of learning to shoot guns. He also purchased some tactical gear, including the bullet proof vest, that he would wear as a weighted vest when doing training on long runs.

As with many young people in this generation, Mr. Genco lived much of his social life online. He was extremely socially awkward due to his upbringing and found online relationships to be significantly easier. It was, however, also a place that he encountered many extreme views, including the Incel movement. Mr. Genco was admittedly already having some dark thoughts, and the internet was a place that he found he could express some of those feelings. He actually used these opportunities to write some of his deep, dark thoughts as a kind of therapeutic outlet.

### iv. Decision to join military and the drunken trip to Greece

By July of 2019, Mr. Genco had made the decision to give the military a try. Before going, however, he decided to travel abroad for the first time in his life with some of the money he had received from the inheritance. This culminated in a 10-day trip to Greece. He went by himself and it was really the first time he was away from his mother for any period in his life.

The drinking age in Greece is 18, and Mr. Genco had not had much experience with alcohol. He ended up spending the great majority of this trip intoxicated. During this same time period, he wrote two of the items which were later discovered by the authorities in this case. Specifically, while drunk in Greece, he wrote the August 3, 2019 document entitled "A Hideous Symphony" (referenced in ¶ 6 of the indictment). Additionally, in early August 2019 he wrote the one page document which was later discovered stored in a tub in his bedroom by police in March 2020 (referenced in ¶ 8 of the indictment). Admittedly, these documents expressed some of the very dark thoughts Mr. Genco had during this time frame, but were exacerbated by his highly intoxicated state.

Additionally, in this time period Mr. Genco was experimenting taking St. John's Wort to deal with his symptoms of depression and mood swings. Unfortunately, the medication seemed to increase his manic state, which contributed to his racing thoughts.

During this time period, however, Mr. Genco was also showing reservations about the Incel philosophies. For example, on August 18, 2019, Mr. Genco wrote in a message chain with a friend complaining about how Incels were prone to violence and how he no longer wanted to be involved with Incels.

### v. The military experience and return home

After returning from Greece, Mr. Genco began with the military in August 2019. He sincerely hoped that the military would help him to fix the problems he perceived in himself, including depression and low feelings of self-worth. Unfortunately, the experience seemed to have the opposite effect. He reported to basic training at Fort Benning, Georgia and struggled physically while he was there. He was bullied severely and struggled socially. During the training, he came down with pneumonia and was obviously physically unable to perform the requirements. He felt that he dragged the company down due to his illness.

Additionally, the training made him quickly realize that he was not interested in the job functions of an infantryman, specifically he did not want to kill people, an obvious potential requirement of the job. As a result of all of these problems, Mr. Genco's military service terminated in December 2019 and he returned to his mother's house.

Mr. Genco was extremely discouraged by his military experience and disappointed in himself personally. On January 11, 2020, he wrote a document entitled "Isolated" (referenced at paragraph 12 of the indictment), which was a way of him expressing some of his dark thoughts.

### vi. Mr. Genco's attempts to turn toward the positive

On the positive side, however, Mr. Genco was taking steps to try to better himself and find a path forward without the military. He enrolled at Southern State Community College and was supposed to start in the Spring. Further, Mr. Genco got involved in a training program to work

toward being a pharmacy technician at CVS. Finally, Mr. Genco engaged in treatment with his doctor at Adena Regional Medical Center in Hillsboro to try to deal with the mental health problems he was experiencing. The doctor put him on a series of medications to help manage his mood swings.

Moreover, in late January 2019, Mr. Genco again was expressing reservations about the Incel belief system. On January 21, 2020, he wrote in a conversation with a professor in Georgia that he had developed as an individual and was no longer an Incel. That same day, he messaged with a friend that he was trying to delete the Discord messaging app because Incels kept sending messages on it and he didn't want the negative stuff back in his life.

### vii. Mr. Genco's arrest in 2020 and his first prosecution by the state

Unfortunately, he was not able to put these positive changes into play in his life due to his arrest in March 2020. As the Court is aware, Mr. Genco and his mother were in a fight and she called the police. He had holed himself in his room, but promptly came out upon police arrival. This is the day that the police found the two firearms and paraphernalia that Mr. Genco had purchased a year prior in 2019, and the one page note that he had written while intoxicated on his trip to Greece in early August 2019. Regarding the latter, his mother had found the note while Mr. Genco was in the military and stored it in a tub among his other possessions in his room.

Upon his arrest, the local police believed that Mr. Genco was intending to target sex offenders. The FBI and ATF declined any involvement or efforts at prosecution of Mr. Genco, and indicated that the local police could handle any charges. As a result, Mr. Genco was prosecuted by Highland County and pled guilty to one count of Making Terrorist Threats, a felony of the fourth degree. Although the offense carried a maximum possible penalty of 18 months, the state court imposed a 17-month sentence.

### viii.  The state prison term and Mr. Genco's community rehabilitation

Mr. Genco served the prison portion of his sentence during the Covid era.  He spent much of the sentence in the extreme Covid-23-hour-lock-down the prisons were experiencing at the time.  Additionally, Mr. Genco himself caught Covid while incarcerated in state prison, and was quarantined, in isolation, for almost two months with no interaction with others.  He was finally released to a halfway house on February 23, 2021.  At that point, he started work at Tumbleweed Restaurant in Chillicothe, and worked there until he got employment at Candle-Lite in Leesburg making candles for $18 per hour.  During this time frame, he also enrolled in Columbus State Community college and got his financial aid set up.

It was not until July 2021 - a full 16 months after his arrest and 5 months after his release from state prison — that the government charged Mr. Genco with the instant federal hate crime.  This completely disrupted Mr. Genco's rehabilitative process through the state court and returned him back to jail in federal custody.

### ix.  Mr. Genco continues rehab in spite of successive prosecution

Mr. Genco has now remained incarcerated for an additional two years with the present federal charges pending.  Although county jails generally afford little opportunity for rehabilitation, Mr. Genco has nonetheless forged his path forward in continuing his efforts to better himself.  He has been involved in a program for Veterans at the Butler County Jail and a program called Mentoring Against Negative Actions (MANA), which is facilitated by a former Cincinnati Bengals player.  Mr. Genco has been involved in this programming since January 2022, and it teaches individuals how to manage adverse environments and cope with behaviors.  The programs have zero tolerance for negative behaviors.  A letter from the program director is attached under separate cover.

In sum, Mr. Genco is in a very different place in his life than he was at age 19 over three years ago. He completed a state prison sentence, starting at the young age of 20, under Covid restrictions which potentially were the worst prison circumstances in the recent history of the prison system. After finishing his sentence, he was reintegrated to the community, worked jobs, enrolled in college, and was on the right track with no indicia that he still fostered the beliefs that led to his prosecution. Even after his rearrest and re-prosecution by the government, he has continued his rehabilitative efforts.

## 2. Balancing of § 3553 factors

The sentencing statute requires the Court to balance the factors of promoting respect for the law, providing just punishment for the offense, the need to deter criminal conduct adequately, the need to protect the public from further crimes, and the need to provide the defendant with treatment or training in the most effective manner. In the end, the Court must impose a sentence that is sufficient, but not greater than necessary to meet these goals.

In the present case, these factors weigh in favor of a sentence of time served. Specifically, the needs of promoting respect for law, punishment, and deterring criminal conduct are all met with this sentence. First and foremost, this crime was already fully prosecuted by the state. Mr. Genco was duly prosecuted for Making Terroristic Threats and sentenced to 17 months for his conduct. This prosecution was conducted by the proper state authorities as the court of first instance. Such a prosecution is in accordance with the standard societal expectations, and certainly promotes respect for the law and the justice system in general. It appropriately deters criminal conduct and provided just punishment, in the eyes of the proper authorities for this crime. In fact, the government originally passed on prosecuting Mr. Genco federally for this crime, and instead specifically deferred to the state.

It was not until the state had fully, completely, and fairly prosecuted Mr. Genco for his conduct, and he had entirely served the incarceration portion of his sentence and most of his rehabilitation, that the federal government chose to indict him. It is hard to argue that this parsed out prosecution was necessary to further the concept of "promoting respect for the law." This is absolutely the antithesis of how a justice system should work. This process turns concepts of fair justice and respect for the legal system on its head.

At present, Mr. Genco has remained incarcerated for an additional two-year time period since the government's belated indictment in this case in July 2021. This two-year time period is over 25% longer that the **total sentence** (17 months) imposed by the learned state court judge who presided over this offense in state court. Surely, imposing a sentence that already is significantly longer than the sentence imposed in state court for the same conduct is sufficient to protect the public and deter others from committing similar crimes.

In terms of providing treatment and training in the most effective manner, it is clear that what Mr. Genco needs is reintegration into the community. Mr. Genco has in fact already been through the cycle of imprisonment and reintegration into the community once for this conduct. He was successfully participating in halfway house programming, had obtained two good jobs, and was enrolled to start college. Importantly, there has not been a shred of information to suggest or even hint that Mr. Genco was acting inappropriately or exhibiting any of the former dark thoughts during the five months he was engaged in rehabilitation with the state. To be sure, he was a 19-year-old boy at the time of this crime, who had experienced a strange childhood and was faced with difficult problems going into adulthood. He had to grow up very quickly and face a significant sentence in adult prison and he has matured very rapidly. He is not a person who will ever find

his way back into a prison again. He has served his time and is ready to reintegrate into the community and function as a law-abiding adult.

These concepts are certainly reinforced by simply reading the letter submitted by Mr. Genco to the Court under separate cover, and the letters from other incarcerated individuals whose lives he has touched. Mr. Genco has obviously learned from his mistakes, has matured tremendously from when he committed this offense at the young age of 19, and is not only demonstrating his rehabilitation, but is extending his positive thinking to those around him.

As such, the factors support a sentence of time served in this case.

**3. Kinds of sentence available and sentencing guidelines**

There are two drastically different guideline computations proposed in this case. First, is the straightforward reading of the applicable guideline, which is U.S.S.G. § 2H1.1. By way of brief background, Appendix A of the sentencing guidelines refers violations of 18 U.S.C. § 249 (attempting to kill women based on their gender) to § 2H1.1. No other guideline section is referenced in Appendix A. Thus, in the ordinary course of events, a defendant who attempts to kill women based on their gender, in violation of § 249, would be sentenced based on the parameters of § 2H1.1.

This guideline, however, contains a cross reference which requires a court to apply a different guideline than § 2H1.1 where the defendant has committed "any underlying offense." U.S.S.G. § 2H1.1(a)(1). The guideline defines the phrase "any underlying offense" as conduct "other than an offense that is itself covered" by the guideline. U.S.S.G. § 2H1.1, Application Note 1.

In the present case, Mr. Genco was convicted of attempting to kill women based on their gender, in violation of 18 U.S.C. § 249. As noted above, this is the offense that is referenced to §

2H1.1.  So, if the cross reference section were applicable, there would have to be a crime other than this offense (attempting to kill women based on their gender) that was committed to justify application of another guideline.

What the government has attempted to do in this case is use the crime of conviction (attempting to kill women based on their gender) and argue that it is somehow a separate crime that triggers application of the cross reference to another guideline.  The government's position could only be true, however, if in attempting to kill women based on their gender, Mr. Genco had committed a rape or some other underlying crime that was not part of the crime of conviction in 18 U.S.C. § 249.  But this is not the case. Instead, the government is simply arguing that the crime of conviction (attempting to kill women based on their gender under § 249) may serve as both the offense that references to § 2H1.1 under Appendix A **and** as a separate "underlying offense" that triggers application of a different guideline which contains a much higher offense level.  This interpretation entirely ignores the plain wording of the guideline itself.

Strangely, the purported cross reference by the government is to § 2A2 of the guidelines, which are the Assault guidelines.  There was no suggestion in the facts of the present case that Mr. Genco actually assaulted any alleged women victims.  As noted previously, Mr. Genco committed no actual violent acts toward women, nor did he ever put women in fear of harm or even encounter a woman in the course of conduct for the alleged offense.

In sum, a cross reference is entirely inappropriate in this case.  Thus, this Court should reject the proposed base offense level of 33 contained in the PSR, and instead apply the appropriate base offense level of 10 from § 2H1.1 of the guidelines.  With a three-level increase based on U.S.S.G. § 3A1.1(a), the adjusted offense level would be 13.  Mr. Genco then receives a two-level reduction for acceptance of responsibility, yielding a final offense level of 11.  Combined with a

criminal history category of I, the sentencing guideline range should be 8-14 months. Given that Mr. Genco received 17 months from the State of Ohio for the same conduct, and has served two years in detention on the federal case, he has more than served the guidelines recommended sentence.

### 4. The need to avoid unwarranted disparities

Admittedly this a unique and uncommon type of prosecution in this district. However, the few similar cases that have been prosecuted all received significantly lower sentences than the government is seeking against Mr. Genco. For example, in United States v. Michael Chan, 1:17CR108-SJD, the defendant was convicted of cyberstalking for repeatedly harassing a female victim for upwards of 6 years with threatening texts, messages, and packages. The harassment was so extended and severe that multiple police departments were involved in trying to determine the defendant's identity. The defendant also harassed the police departments, threatening them directly that he was going to harm the victim and there was nothing the police could do about it. The threat levels escalated to the defendant threatening to do mass shootings at University of Cincinnati, bombing the university, raping the victim, and injuring her family members. Upon his conviction, the Court imposed a sentence of 37 months imprisonment.

Similarly, in United States v. Izmir Koch, 1:18CR034-SJD, the defendant was convicted of committing a hate crime under 18 U.S.C. § 249 for randomly attacking a perceived Jewish person, fracturing his face and ribs, and threatening to "slaughter, slice, and kill" Jewish people. Additionally, the defendant requested an "innocence proffer" through his counsel, which led to the defendant separately lying to federal officials about the offense. As a result, he was also prosecuted for false statement to federal law enforcement. Rather than ever admitting guilt, the defendant

proceeded to jury trial on the charges, was convicted, and received a sentence from the Court of 30 months imprisonment.

Finally, in <u>United States v. Samuel Whitt</u>, 1:17CR060-MRB, the defendant was convicted of civil rights violations under the Right to Fair Housing Act, 42 U.S.C. § 3631 for destroying the property of the African American victim, painting swastikas and other racially motivated symbology on the walls of his residence, stabbing a butcher knife in the floor of the victim's residence, and attempting arson at the home by turning on the gas and leaving a lit candle nearby. The defendant had numerous convictions on his record, including a prior hate crime where he spray-painted churches and residences with swastikas, white power symbols, and various racially charged graffiti. Upon his conviction by plea, he was sentenced to 54 months imprisonment.

In comparing these similar recent cases before this Court, it appears that much of the conduct was the same or even more serious than the conduct involved in Mr. Genco's case. In <u>Chan</u>, the defendant terrorized a female victim for upwards of 6 years, taunted police departments, and threatened a mass shooting, a bombing, rape, and injury to families. In comparison, Mr. Genco actually threatened no one, and his writings referenced above were shared with no one but himself. In <u>Koch</u>, the defendant actually beat and kicked a perceived Jewish person fracturing his face and ribs, and threatened to slaughter Jewish people generally. In comparison, Mr. Genco actually injured no one. In <u>Whitt</u>, the defendant committed serious racial intimidation of multiple victims, attempted arson, destroyed property, and left a knife sticking in a victim's floor. In comparison, no potential victim of Mr. Genco was ever aware of any threat.

Yet each of these defendants received significantly lower sentences than requested by the government in the present case. The longest sentence imposed for this litany of serious violent

crime was 4.5 years.  It is beyond the pale to think that Mr. Genco could possibly deserve a longer sentence than these defendants, all of whom were sentenced in this district in recent years.

As such, Mr. Genco submits that the requested sentence of time served is sufficient.  As noted previously, Mr. Genco was previously sentenced to 17 months in state court for the same conduct.  The probation department noted in the PSR that this term ought to be credited against Mr. Genco's sentence in the federal case pursuant to U.S.S.G. § 5K2.23 because it was the same conduct as the instant federal offense.  (R. 65, PSR, ¶ 117-118).  Moreover, Mr. Genco has been in federal custody since July 2021.  Combining the state and federal time Mr. Genco has served, and considering the above-referenced sentences of similar defendants, Mr. Genco submits that a time served sentence in the present case is in accord with the statutory purposes of sentencing.

## 5. Conclusion

Based on the foregoing, Mr. Genco respectfully requests that the Court impose a sentence of time served in this matter.

Respectfully submitted,

DEBORAH WILLIAMS
FEDERAL PUBLIC DEFENDER

*s/ Richard Monahan*
Richard Monahan (0065648)
First Assistant Federal Public Defender
250 E. 5th Street, Suite 350
Cincinnati, Ohio 45202
(513) 268-2453

Attorney for Defendant
Tres Genco

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was served upon Megan Gaffney-Painter, Assistant United States Attorney, via Electronic Case Filing, on this 26th day of May, 2023.

*s/ Richard Monahan*
Richard Monahan