**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | |
| vs. | : | Case No. 1:21CR85 |
| TRES GENCO, | : | Judge Dlott |
| Defendant. | : | |

**RESPONSE IN OPPOSITION TO GOVERNMENT'S MOTION SEEKING POST HOC**
**SUPERVISED RELEASE RESTRICTIONS**

On May 20, 2026, the government filed a motion to modify the conditions of Defendant

Tres Genco's supervised release by adding four restrictions:

1. Computer monitoring for his electronic devices.
2. No contact with Thomas Develin.
3. Prohibition on residing within two miles of any Ohio university or college.
4. Prohibition on entering upon the grounds of any Ohio university or college without prior approval from the Probation Office.

On May 25, 2026, Mr. Genco, through counsel, consented to adding computer monitoring

software to all of his electronic devices, giving the government broad access to his personal

information in the hopes of alleviating the government's (unfounded) public safety concerns. He

also consented to having no contact with his friend Thomas Develin to alleviate the government's

(unfounded) concern that they might negatively influence each other.[1]

---

[1] In its motion, the government suggests that the relationship between Genco and Develin is problematic because Develin's "firearm offense…also involved threatening statements by Develin towards the Jewish community while Develin was serving as a security guard at a Jewish organization," and thus their offenses both share an animus-based component. Mr. Genco urges the Court to reject the government's unfounded, inflammatory intimations. Mr. Genco is Jewish and the descendant of a Holocaust survivor. His maternal side of the family were Franks, and his mother's grandmother (nee Zurinsky) survived a concentration camp. If the Court will recall, Mr. Genco submitted a psychological evaluation report authored by Dr. Bob Stinson as part of his sentencing materials in 2023. That report contained a "Family Tree Mental Health" chart depicting that his great-grandmother Betty Franks suffered from PTSD from the Holocaust. Genco

With respect to the remaining two restrictions, Mr. Genco strenuously objects. The burden is on the government to establish the necessity of the restrictions it seeks, *yet the government has provided the Court with no case law or legal analysis in its motion*, despite the sweeping and ostracizing effects that the restrictions would have on Mr. Genco's life.

For the reasons set forth below, the Court should deny the government's motion to impose a *post hoc* residential restriction, requiring Mr. Genco to live at least two miles away from any Ohio university or college. In addition, the Cout should deny the government's request that Mr. Genco be prohibited from entering the grounds of any Ohio university or college without prior approval from the Probation Office.

These two restrictions would serve to unjustifiably destabilize Mr. Genco physically, financially, and psychologically. Specifically, the restrictions sought by the government would have the effect of ousting Mr. Genco from his Probation-approved residence, causing him and his lease-guarantor to incur financial harm, and would significantly impair his freedom of movement.

**Litigation History**

This case was originally brought by the federal government after Mr. Genco had already been prosecuted and sentenced by the State of Ohio for the same criminal conduct charged in the federal indictment. At the time of his arrest on the federal case, Mr. Genco had already completed his state prison sentence of 17 months and was residing in a halfway house, working full-time,

---

has always maintained and been connected to his Jewish identity. Indeed, following Mr. Genco's release from prison, he reached out to the Rabbi of ██████████████████ to attend classes and services. (Corroborating emails will be provided upon request.) Far from being a bad influence on Mr. Develin, Mr. Genco was instrumental in helping Mr. Develin confront and eschew his antisemitic views when they were cellmates at the Butler County Jail by sharing his great-grandmother's Holocaust story and his own experiences of being discriminated against in the Army based on his Jewish identity. While Mr. Genco is not contesting the no-contact condition, the government's request in that regard speaks to the sometimes deeply uninformed position it is in when it petitions the court for onerous conditions of supervised release such as, for example, the residency and university/college restrictions at issue in this response.

engaging in rehabilitative services, including mental health treatment. (See Doc. # 68, Defendant's Sentencing Memorandum). By then, Mr. Genco had already disavowed any association with the incel philosophies. He had matured a great deal since the age of 19 when he committed the offense and was moving forward with his adulthood, eschewing his previous connections to anything misogynistic. Nonetheless, the government chose to proceed with its federal criminal prosecution. The government arrested Mr. Genco from the halfway house, sought his pretrial detention in federal court, and was successful in ripping him from his community-based rehabilitation process to imprison him pre-trial. As a result, Mr. Genco remained detained at the Butler County Jail from 2021-2024 while the parties litigated his federal case and ultimately proceeded to sentencing.

On October 11, 2022, Mr. Genco pleaded guilty pursuant to a plea agreement governed by Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, capping the sentence at 150 months of incarceration. (Doc. # 60). While the government could have drafted a plea agreement containing special conditions of supervised release, it chose not to, consistent with other cases involving hate crimes in this district.

Following the change of plea hearing on October 11, 2022, the Probation Office, pursuant to the dictates of Rule 32 of the Federal Rules of Criminal Procedure, conducted its presentence investigation, and the initial presentence report was completed on January 31, 2023. (Doc. # 63). Based on the Probation Office's investigation into Mr. Genco's criminal conduct, his history and characteristics, and the need to promote rehabilitation in the most effect manner, among other factors, the initial presentence report contained a recommendation that the Court impose the standard conditions of supervision along with two special conditions of supervised release: (1) Mr. Genco engage in mental health counseling if instructed to do so by his probation officer; and (2) Mr. Genco participate in vocation training as direct by his probation officer. Counsel for the

government lodged no objections to the Probation Office's reasoned and appropriate proposed conditions of supervision; nor did the government request additional conditions of supervision. The presentence report was finalized and filed with the Court on April 28, 2023, and Mr. Genco was sentenced ten months later, on February 29, 2024.

During the 10-month period leading up to sentencing, the parties filed numerous memoranda in support of their sentencing positions. While the government's sentencing memoranda included outlandish rhetoric—such as "The women of our state need to be protected from the defendant for as long as possible"—the government did not request or argue for a residency restriction or any other condition of release based on public safety concerns in any of its numerous filings. (Doc. # 67, Government's Sentencing Memorandum, p. 18).

At sentencing, the defendant, through his attorney Richard Monahan, Esq., challenged the government's rhetoric and fearmongering, pointing out that Mr. Genco had committed no actual violent acts toward women, and his conduct never put women in fear of him. As noted in Mr. Genco's sentencing memorandum, "In the entire course of the attempted hate crime, Mr. Genco never actually encountered a woman. Rather, in investigating Mr. Genco, the government found that Mr. Genco had created several disturbing personal writings that sounded like he was planning a crime." (Doc. # 68, p. 2). Even in 2019, during the time of his offense conduct and despite these personal limitations, the evidence revealed that Mr. Genco was showing reservations about the incel philosophies and a desire to withdraw his association with that group. For example, on August 18, 2019, "Mr. Genco wrote in a message chain with a friend complaining about how Incels were prone to violence and how he no longer wanted to be involved with Incels." (Doc. # 68, p. 11). Nonetheless, Mr. Genco took responsibility for "attempting" to commit a hate crime, but his attorney noted that he was an impressionable 19-year-old teen at the time of his offense, immature

4

and isolated and suffering from a traumatic upbringing and untreated mental health issues, and that the crime itself was on the least serious end of the spectrum for "attempt" crimes.

After hearing arguments from both parties, the Court rejected the government's position that Mr. Genco needed to be imprisoned for 150 months and imposed a sentence of 80 months, followed by five years of supervised release, along with the conditions recommended by the Probation Office.

**Mr. Genco's pre-release conduct and supervised release**

Before the expiration of Mr. Genco's 80-month sentence, the Bureau of Prisons designated him to the ███████████████, Ohio. This halfway house is located at ███████████ ████████████████, and Mr. Genco lived there for eight months, from August 2025 to April 30, 2026. During his placement at the halfway house in ████████, Mr. Genco was employed, interacting in the community with the permission of the halfway house, and engaging collaboratively with the United States Probation Office in anticipation of his term of supervised release.

Notably, at the ████████ halfway house, Mr. Genco incurred no violations whatsoever— not a single complaint was issued by anyone about him during that entire eight-month period. Based on his good conduct and compliance, he was even placed in the "Honor Dorm" of the halfway house.

As part of the "pre-release" process, Mr. Genco was assigned a probation officer from the United States Probation Office in ████████ to assist him with his reentry and was given assistance securing a residence before his term at the halfway house was set to expire. Wanting a successful, long-term reintegration, Mr. Genco submitted applications for apartments that he would be able to afford. One such apartment was the ██████████████████████ in Dublin, Ohio, but Mr.

Genco received a rejection email following a background check. (Exhibit A, Denial Email, Under Seal). Another application submitted by Mr. Genco was for the ████████████ where he currently resides, located at █████████████, near the ███████ University campus. Unlike his application for the apartment in Dublin, Mr. Genco's application for that apartment was approved.

On April 22, 2026, Mr. Genco informed his federal probation officer of the location of the apartment and the amount of rent he would be responsible for, and they discussed whether ████████ would permit him to reside there given his felony conviction. These communications between Mr. Genco and his federal probation officer were in writing and are preserved for this Court's consideration. (Exhibit B, Text Messages with probation officer regarding apartment ██ █████████, Under Seal). As the Court can see, Mr. Genco and his probation officer determined that ████████ would permit him to reside at that location as long as he had a Guarantor, and Toni Develin agreed to be his Guarantor. (Exhibit C, Letter from Toni Develin to the Court, Under Seal). Pursuant to his probation officer's request, Mr. Genco provided the Probation Office with confirmation that the apartment had been secured, along with a copy of the lease, to which the probation officer replied, "Congratulations!" and approved his move-in date of May 14, 2026, which was set to be Mr. Genco's last day at the halfway house. (Exhibit B, Text Messages; Exhibit D, Lease, Under Seal). On April 28, 2026, Mr. Genco was unexpectedly informed by the halfway house that his release date would be advanced to April 30, 2026, based on a First Step Program reduction in time. To address the unexpected early release from the halfway house, Mr. Genco received permission from his probation officer to live with Toni Develin and her husband in Waverly, Ohio, from April 30 until his move-in date on May 14. (Exhibit B, Text Messages, Under Seal).

On May 14, 2026, Mr. Genco moved into his new apartment with the assistance of the Develins. He was greeted by a new probation officer, who inspected and cleared the residence. At that time, Mr. Genco was handed a letter from the ████████ University, barring him from being on campus or university property without permission. (Exhibit E, Letter from ████). Mr. Genco understands this prohibition and has not violated it and would not.

Importantly, Mr. Genco has committed no wrongdoing and is residing at this apartment in compliance with the terms of his supervised release. Equally important to note is that the Probation Office is not the party moving the Court to impose the conditions at issue in this motion; Probation has conscientiously supervised Mr. Genco according to the conditions set forth by the Court.

On May 20, 2026, the United States Attorney's Office, not the Probation Office, petitioned this Court to modify the conditions of Mr. Genco's conditions of supervised release. It requested a hearing on an urgent basis, noting that the anniversary date of "an infamous mass shooting by a noted incel" had taken place on May 23, three days ahead of when it filed its motion. That anniversary date has since come and gone, Mr. Genco took no mental note of it, and his compliant behavior on supervision has continued.

**Statutory Framework**

Pursuant to 18 U.S.C. 3583(e), the Court may, after considering the factors set forth in 18 U.S.C. 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7), modify the conditions of supervised release pursuant to the provisions applicable to the initial setting of the terms and conditions of post-release supervision. The Court may not consider 3553(a)(2)(A), or other retributive sentencing factors pertaining to a defendant's underlying crime, in modifying the terms of supervision. Esteras v. United States, 606 U.S. 185 (2025).

7

Critically, a condition of supervised release must "reasonably relate" to the factors listed in 3553(a)(1), (a)(2)(B), (C), and (D). Even if a proposed condition otherwise meets the statutory requirements of 3553(a), it still must "involve no greater deprivation of liberty than is reasonably necessary" for the purposes of supervised release.  United States v. Carter, 463 F.3d 526, 528 (6th Cir. 2006).

**Relevant Case law**

Residency restrictions are permissible as a general matter. 18 U.S.C. 3563(b)(13). But they should not be imposed lightly, as "such restrictions can impose a severe burden on a defendant's liberty interests." United States v. Lacoste, 821 F.3d. 1187, 1193 (9th Cir. 2016). Such restrictions are most commonly imposed in the context of a sex crime, where a defendant is prohibited from residing within a specific distance from schools, consistent with applicable state laws governing registered sex offenders. United States v. Greenberg, 894 F.Supp.2d 1039 (S.D. Ohio Aug. 29, 2012)(modification of conditions of defendant's supervised release prohibiting the defendant from residing within 1,000 feet of a school appropriate in Ohio). Other jurisdictions across the country, such as Indiana and Kentucky, have adopted sex offender residency restrictions as a matter of law, also restricting sex offenders from residing within 1,000 feet of a school.

But even in the context of sex crimes, courts must ensure a reasonable relation to the 3553(a) factors and must ensure no greater deprivation of liberty than is reasonably necessary. For example, the Ninth Circuit rejected a residential restriction in a sex crime where the district court imposed a condition prohibiting the defendant from residing within 2,000 feet[2] from school yards, parks, public swimming pools, playgrounds, youth centers, video arcades, and other places frequented by minors. See United States v. Rudd, 662 F.3d 1257 (9th Cir. 2011). The defendant in

---

[2] The government here seeks to impose a residency restriction on Mr. Genco that is a shocking 428% greater than the restriction rejected by the Ninth Circuit.

Rudd had been convicted of an offense involving sexual contact with young boys in Bangladesh. Pursuant to a written plea agreement, the parties agreed to a restriction prohibiting the defendant from living "within direct view" of such places that minors frequent, not the 2,000-foot restriction imposed by the court. In reversing the district court, the Ninth circuit stated

> What is not evident from the record is why forbidding residence within direct view of such places primarily used by minors is insufficient to deter Rudd from further contact with minors, or how the 2,000 foot requirement suggested by the Probation Office and adopted by the court would further reduce the risk of such conduct upon Rudd's release from prison at or near the age of 73.

[citation]. See also United States v. Collins, 684 F.3d 873 (9th Cir. 2012)(residency requirement imposing a 2,000 foot ban plain error where the ban "effectively prevents Collins from living in an urban area" without a sufficient explanation).

In non-sex offense contexts, where there is no state law imposing a residency or school-related restriction on the defendant based on the nature of the offense of conviction, courts impose such *post hoc* bans and restrictions only where violative conduct has occurred and more narrowly tailored conditions have failed. LaCoste, 821 F.3d. at 1193 (residency restriction banning defendant from living in four counties reversed where bases for restriction were merely precautionary: "Simply declaring that a defendant will likely resume a life of crime if he returns to a given area is not enough…"); see United States v. Inman, 666 F.3d 1001 (6th Cir, 2012)(case remanded where less restrictive conditions were available to the district court: "We believe there may be another option available to the district court to address any concern that Inman might use electronic equipment, a post office box, or a storage unit for improper or unlawful purposes.")

United States v. Alexander, 509 F.3d 253 (6th Cir. 2007), is instructive on this point. In Alexander, the defendant challenged a residency restriction where his underlying crime involved an alcohol-induced strangulation of his sister, causing serious bodily injury. Id. at 254. At

sentencing, the court set conditions aimed at curtailing the defendant's drinking, including prohibiting the defendant from "entering the Hannahville Indian Community without prior approval of the probation officer," *a residency restriction to which the defendant did not object.* After the defendant completed his prison sentence and began his term of supervision, he began drinking again, going to his mother's home in Hannahville without permission, continuing to drink there, leading to criminal complaints about his conduct, including knocking on someone's door in a drunken state at 6 a.m. Based on these violations, the Probation Office (not, as here, the government) petitioned the court for a modification of the defendant's term of supervision to require him to attend residential treatment, and the modification was approved.

While waiting for a bed to become available, the defendant once again returned to Hannahville without permission, resumed drinking, and was arrested for public intoxication. When the defendant appeared before the Court for his revocation hearing, the Court imposed a residency restriction requiring the defendant to reside in Grand Rapids for the first 12 months of his new term of supervision, and the defendant appealed. The Sixth Circuit upheld the residency restriction because the record showed that the district court "did not impose it until earlier conditions of supervised release, which did not contain such a restriction, had conspicuously failed." Id. at 256. In reviewing the record, the Sixth Circuit noted that the district court judge had pointed out that "the supervised release conditions have not been sufficient to intervene and straighten this situation out." The Sixth Circuit further emphasized that "had this condition been imposed [at the time of sentencing for] his first federal offense, it might have raised a more difficult question about whether it 'involved no greater deprivation of liberty than is reasonably necessary' to serve the goals of deterrence, rehabilitation, and public protection." Id. Instead, the Sixth Circuit determined it was "reasonably necessary to impose a greater restriction after the more limiting one had not

worked." Id. See United States v. Brandenburg, 157 Fed.Appx. 875, 879-80 (6th Cir. 2005)(upholding a special condition prohibiting the defendant from cohabitating with any female when a narrower restriction requiring the defendant to notify his probation officer of his social contact with females did not prevent him from committing domestic violence).

**Burden of Proof**

When the government seeks to restrict a defendant's liberty through a term of supervised release, it shoulders the burden of proving that a particular condition of supervised release involves no greater deprivation of liberty than is reasonably necessary to serve the goals of supervised release. United States v. Bates, 804 Fed.Appx. 345 (6th Cir. 2020); United States v. Kreuger, 18 Fed.Appx. 847 (6th Cir. 2020); United States v. Williams, 356 F.3d 1045, 1049 (9th Cir. 2004).

**Argument**

The government has not met its burden of proving that the two objectionable conditions involve no greater deprivation of liberty than is reasonably necessary to serve the goals of rehabilitation, deterrence, and protection of the public. Citing to no law whatsoever, and engaging in no legal analysis at all, the government simply argues that the nature of Mr. Genco's offense conduct requires precautionary conditions related to female students at or living near college campuses in Ohio. But the nature of Mr. Genco's offense was well-known to the government and the Court at the time of his sentencing, and the government did not choose to argue for such restrictions then. The idea that the nature of his offense conduct can alter the terms of supervision *after* the nature of his offense conduct was already well-considered by the Court in its sentencing decision, *after* Mr. Genco has already been sentenced, *after* the conditions of supervised release have already been imposed, *after* Genco has completed his term of imprisonment, and *after* Mr.

11

Genco has established himself in an apartment consistent with the Court's sentencing parameters and with the approval of the Probation Office, has no support in the law and must be rejected.

Unlike the defendant in Alexander, 509 F.3d 253, Mr. Genco is not before the Court based on an alleged violation of the conditions of his supervision or any other allegation of wrongdoing. To the contrary, he has shown this Court that he can be trusted to remain in his apartment and abide by the conditions of release set by the Court. The evidence in the record shows that Mr. Genco is not a threat to women or to college students. Not a single female— no student in the ▇▇▇▇▇ metro area or any other Ohio town or city—has lodged a complaint about Mr. Genco. During the past 9 months at the halfway house, in his neighborhood and the larger community in the ▇▇▇▇▇ area, Genco's conduct has been exemplary. Further underscoring Mr. Genco's successful rehabilitation, he served his prison sentence of 80 months without a single reprimand or sanction.

Furthermore, Mr. Genco's underlying crime is not a sex offense where residency restrictions are built into state laws. It defies logic that the government would seek to impose a more onerous residency restriction than the restrictions codified into law for registered sex offenders. The government's two-mile ban would place Mr. Genco in a state of constant eviction. Schools and campuses expand with the acquisition of new property on a regular basis, and there's no reason to believe that if the Court capitulates to the government's fearmongering and evicts him from his apartment now, that business owners, local agencies, and even random neighbors won't make the same request for a residential ban. In short, the government's request would brand Mr. Genco with a stigma more sweeping and devastating than that imposed on sex offenders, serving only to ostracize him at a time when he has shown that he has made great strides in positive socialization and rehabilitation.

As a showing of good faith compliance, Mr. Genco consented to two new conditions of supervision, one of which allows the government to monitor every strike of his keyboard and every search term entered, every text, every call, for improper behavior or thinking, ensuring that the Court and law enforcement can be made aware if Mr. Genco were to ever research or even discuss a topic that contributed to his past criminality.  Computer monitoring is a sufficient and appropriate addition to the standard and special conditions already imposed by the Court to address the government's safety concerns. And, in addition to computer monitoring, the University's no-trespass notice makes it a crime if Mr. Genco goes on campus grounds or property without pre-approval. Thus, the Court's standard condition prohibiting Mr. Genco from committing any local, state, or federal offense while on supervision, combined with the University's notice, serves to prohibit Mr. Genco from stepping foot on the very college campus that the government is concerned about.

In sum, there is simply no factual basis or cause of action justifying Mr. Genco's eviction from his Probation-approved apartment and requiring him to relocate a wholly arbitrary mile or two from where he currently lives. Similarly, there is no factual basis to impose a sweeping, overbroad condition that precludes Mr. Genco from stepping foot on *any* school campus in the state of Ohio without permission, when there is already a more narrowly tailored condition in effect preventing Mr. Genco from entering the University campus.[3]

The conditions imposed at the time of the original sentencing hearing—such as, for example, mental health counseling and a weapons prohibition—along with the two new conditions to which Mr. Genco has recently consented, already strike the right balance of protecting the public

---

[3] There are something like 140 colleges and universities in Ohio, each of which own extensive property and most of which have multiple campuses. Often, the extent of their real estate holdings is not evidently known. And it is no answer that Mr. Genco can seek permission—he did so here with respect to his apartment that the government—not his probation officer—now seeks to evict him from.

and effecting deterrence, while promoting Genco's rehabilitation and involving "no greater deprivation of liberty than is reasonably necessary" for the purposes of supervised release. <u>Carter</u>, 463 F.3d at 528. The Court must reject the government's two remaining proposed conditions.

<div style="margin-left: 40%">

Respectfully submitted

JOSEPH MEDICI
FEDERAL PUBLIC DEFENDER

<u>s/ Karen Savir</u>
Karen Savir (KY 92002)
Assistant Federal Public Defender
250 E. 5th Street, Suite 350
Cincinnati, Ohio 45202
(513) 929-4834

Attorney for Defendant
Tres Genco

</div>

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was served upon Tim Mangan, Assistant United States Attorney, via Electronic Case Filing, on this 30th day of May 2026.

<div style="margin-left: 40%">

<u>s/ Karen Savir</u>
Karen Savir

</div>

14